

JUNHO HYON
643 MEADOWBROOK LN.
RIO VISTA, CA 94571
408 824-0987

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JUNHO HYON | No. |
| | 2:19-cv-259 KJM EFB |
| Plaintiff, | COMPLAINT FOR |
| vs. | **(1) FRAUD** |
| GOVERNOR JERRY BROWN; STATE OF CALIFORNIA; JEFFREY SHOPOFF; SHOPOFF GROUP; SHOPOFF CAVALLO & KIRSCH LLP; DI AGGREGATE MANAGEMENT LLC; JAY CRAM; BACHEKI CROM & CO. LLP; KELLY JACKSON; CHICAGO TITLE COMPANY; HAROLD LIGHT; LAW OFFICES OF HAROLD LIGHT; ROBERT STUMPF; SHEPPARD MULLIN RICHTER & HAMPTON LLP; RONALD MALLEN; DAVID WINNETT; HINSHAW & CULBERTSON LLP; DONALD SAVAGE; THEODORE GRIFFINGER; LUBIN OLSON & NIEWIADOMSKIE LLP; PHILIP PUTNAM; MONTELEONE & MCCROY LLP; JEFFREY KIRK; JOHN MARCIN; DON CLOES; ERVIN COHEN & JESSUP; NORMAN PINE; PINE TILLET PINE LLP; ELLIOT BIEN; BIEN & SUMMERS; GVA KIDDER MATHEWS; LAURENCE COLANGELO; ALFRED STEDMAN; ERIC SELTEN; TOM NUNZIATO; RANDELL JENSON; LAWRENCE HERSHFIELD; RANCH CAPITAL LLC; PETER JOHNSON; RON JOHNSON; LAW OFFICES OF JOHNSON; STEVE SHOWER; RESIDENT OF 5540 ESTATE DR. OAKLAND CA; POSTMASTER PETER HURTADO; UNITED STATES POSTAL SERVICE; | **(2) CONSPIRACY** |
| Defendants, | |

1

**JURIDICTION**

1. Plaintiff files this complaint with this Court because Superior Court of Solano County, Court of Appeal and Supreme Court of California have abused power over him and indiscriminately dismissed all the defendants.

2. The reason why the courts had abused power over him and dismissed all the defendants is because plaintiff sued Governor Jerry Brown and State of California.

3. Plaintiff pleads this Court to take his case for **Justice and Honesty.**

**INTRODUCTION**

4. Plaintiff asks this Court to see junho4justice on YouTube at first.

5. On December 3, 1935 plaintiff was born to Korean parents in Japan where lawyers, judges and justices are respected and trusted. They do not harm people. He came to Los Angeles in 1962 with that mentality. When he needed to retain lawyers from 2000 to 2006, he trusted them and had paid them about $1.8 million. However, they had preyed on him and destroyed his life of running a sand mining business on Decker Island ("DI") which locates in Sacramento River.

6. Several lawyers had preyed on plaintiff. **3 lawyers among them must be prosecuted and put behind bars. They are Jeffrey W. Shopoff, Harold J. Light and Robert J. Stumpf.**

7. Plaintiff sued these lawyers, but judges in Superior Court of Solano County had sided with them and ruled against him. He appealed to Court of Appeal Division 3 and 4. But both courts adopted the judges' rulings and ruled against him. He petitioned to Supreme Court of California. But the court denied his petition.

8. Plaintiff was shocked to learn from the court clerk on December 12, 2018 that Judge Scott Daniels closed plaintiff's case and dismissed all of 20 defendants without his knowledge. He was very upset with Judge Daniels' abuse of power. Thus, he hand-delivered a letter to him on December 14, requesting his answers. **See Exhibit 1.** However, Judge Daniels has failed to answer. Instead, plaintiff received on December 18 the judge's letter dated December 12, saying nothing about the closure of the case and the dismissal of the defendants – Jeffrey Shopoff and his coconspirators. **See Exhibit 2.**

Thus, there is discrepancy and confusion between the court clerk and Judge Daniels. Plaintiff believes that the judge has changed his mind to save Governor Jerry Brown.

9.  Plaintiff, last November, requested Judge Daniels to grant him a starting date for a jury trial of Shopoff and coconspirators because all of them had failed to produce any documents which plaintiff had subpoenaed. If Shopoff were tried and convicted, I could have an opportunity to try Governor Brown. Thus, Judge Daniels decided to dismiss Shopoff and coconspirators.

10. Judge Daniels could not dismiss them abruptly and blatantly since the court had accepted 22 subpoenas against them and the proof of the services during the past several months.

11. **In December 2015,** plaintiff discovered from title insurance company a document Shopoff had used to convey DI to him and a document on his obtaining a $2.42 million loan against DI. A lawyer advised plaintiff to subpoena documents from Shopoff and coconspirators within 3 years.

12. **Judge Daniels' dismissal of Shopoff and coconspirators devastates plaintiff because Governor Brown, Attorney General Xavier, District Attorney of Solano County and State Bar have conspired not to prosecute Shopoff and put him behind bars. His many years' struggles have ended with nothing.**

13. Plaintiff filed APPELLANT'S PLEA FOR COPURT TO REMAND THE CASE FOR A JURY TRIAL with Court of Appeal Division 3 on October 25, 2018. **See Exhibit 3.** However, he has not received any response from the court.

14. **Judge Scott Kays ("Judge Kays") is the culprit of this lawsuit. He had fabricated his statements in his rulings and dismissed all of defendants blatantly and indiscriminately.**

15. Judge Kays said, in his final ruling, *"In the current action, plaintiff claims that his signature on the December 19, 2003 deed of trust and assignment of rents was forged. However, this deed of trust and assignment of rents merely confirm the $2.6 Million obligation contained in the October 15, 2003 Global Settlement Agreement (which by its terms required plaintiff to sign a deed of trust for this debt.) The San Francisco interpleader action necessarily resolved that obligation,*

1
2
3
4
5
6
7
8
9

*by confirming the sale of Decker Island and a distribution of net assets made after payoff of that existing debt, which it identified as secured by a deed of trust. Plaintiff, represented by counsel in that San Francisco interpleader action, and subsequent appeals, raised or could have raised in those proceedings any concerns about the underlying debt as secured by the subject deed of trust and assignment of rents. Therefore, all claims against these defendants are barred under the principles of res judicata and collateral estoppels. "* Judge Kays fabricated his false statements. Plaintiff notified Governor Brown of Judge Kays' fabrications.

10
11
12
13
14
15
16
17
18
19
20
21
22

Shopoff paid off the $2.6 million in October 2005 and sold DI for $6.6 million in July 2007. How could Judge Kays' statement *"a distribution of net assets made after payoff of that existing debt"* be just since Shopoff paid off the 2.6 million debt in October 2005, which is 19 months before his sale of DI? Plaintiff notified Governor Brown of this fact. Judge Kays lied by saying, *"Plaintiff, represented by counsel in that San Francisco interpleader action, and the subsequent appeals, raised or could have raised in those proceeding any concerns about the underlying debt as secured by the subject deed of trust and assignment of rents. Therefore, all claims against these defendants are barred under the principals of res judicata and collateral estoppels. "* Plaintiff had argued repeatedly with Judge Kays that he discovered the deed around July 2010 and it had not existed during Judge Karnow's bench trial (from September 2004 to February 2009). However, Judge Kays had ignored his arguments and lied. **Judge Kays had rejected true evidence and fabricated false evidence. Then, he dismissed defendants.** Plaintiff notified Governor Brown of this fact.

23
24
25
26
27

16.    Plaintiff submitted the deed along with 16 sets of the fraudulent documents to Judge Kays for his review. Plaintiff has no idea on whether Judge Kays had reviewed them or not, but he should have reviewed and investigated the 17 sets of the fraudulent documents. **Then, if Judge Kays had found out that the 17 sets of the documents were entirely fraudulent, plaintiff might have won over all the defendants he had sued.**

28

4

17. Judge Kays' rulings against plaintiff had been adopted by Superior Courts of Solano County, Courts of Appeal and Supreme Court of California.

18. Thus, plaintiff has to file this complaint with this Court.

19. Plaintiff will submit the 17 sets of the fraudulent documents to this Court for review.

20. Plaintiff filed a complaint against Judge Kays with Commission on Judicial Performance. However, the commission had done nothing against Judge Kays whatsoever. Plaintiff notified Governor Brown of this fact.

21. In order to survive, plaintiff had to sue Governor Brown and State of California. Plaintiff sent him a letter. **See Exhibit 4.** However, Governor Brown had failed to respond to him. Thus, plaintiff filed a lawsuit against him and State of California in December 2016. The case was assigned to Judge Paul Beeman. **See Exhibit 5.**

22. Plaintiff submitted the 17 sets of the documents to Judge Paul Beeman for his review. Plaintiff has no idea whether Judge Beeman had reviewed them or not. If he reviewed them, he must have found that those documents are entirely fraudulent. Then, plaintiff might have won over his lawsuit against Governor Brown.

23. Governor Brown had fabricated his demurs to plaintiff's complaint, accusing him of a vexatious litigant. Governor Brown's tricky accusations constitute **FRAUD.** Plaintiff never is a vexatious litigant, but he does not have legal ability to oppose his demur. At that time, he was drafting opposition to Governor Brown's demur and at the same time searching a contingency lawyer who would redraft the opposition in legal way. Thus, he called Judge Beeman's office and asked the court to grant him a 30-day extension of the demur hearing date March 29, 2017. Then, the clerk told him that he asked Governor Brown for the extension. Thus, he sent a letter to the lawyer who represented Governor Brown, asking for the extension. He expected she would give it to him. But she had never replied to him.

24. Plaintiff filed Case Management Statement on March10, 2017, requesting the court to grant him the date. **See Exhibit 6.** However, the court denied his request. Thus, he decided to attend the demur hearing date March 29, 2017 and request with Judge Beeman on his need to have a lawyer who would represent him.

5

25. On the hearing day, he argued with Judge Beeman on his reason to need a lawyer, but he said, *"I'm about to adopt the tentative ruling as the permanent ruling of the Court On this motion to have you declared a vexatious litigant."* **See Exhibit 7.** Plaintiff felt Judge Beeman abused brutal power.

26. Plaintiff appealed to Court of Appeal Division 3, and filed his opening brief and his response to respondents brief. **See Exhibit 8.** In his opening brief, he stated that *"It is imperative for this Court to investigate Judge Scott Kays' rejection of true evidence and fabrication of false evidence."* However, the court had intentionally failed to investigate it.

In the brief, he also argued that he is not a vexatious litigant, and he has proved that he is not a vexatious litigant by attacking Governor Brown's 10 accusations on plaintiff's 10 lawsuits in detail. He participated in arguments in the court through phone due to my illness. He asked if the court investigated Judge Kays' rejection of true evidence and fabrication of false evidence. Then, there was several seconds' silence. It was obvious that the court had never investigated it. The court had not done it because if the court had done it, Governor Brown would have lost over plaintiff's lawsuit against him. The court adopted Judge Beeman's ruling and ruled against him.

27. Judge Kays, Judge Beeman, Judge Daniels and justices in Court of Appeal and Supreme Court of California have violated Federal Rule that says, *"A judge shall uphold the integrity and independence of the judiciary. A judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary."*

28. Plaintiff sought help from Mark Stone Chairman of Assembly Judiciary Committee. **See Exhibit 9.**

29. Plaintiff wanted FBI to prosecute Shopoff so that he visited FBI in Roseville and spent a few hours in explaining on his case and evidence of Shopoff's crimes. After 2 weeks later, he received a reply from FBI. The agent said that his case and Shopoff's crimes have been reviewed by lawful courts so that FBI would not take any action against Shopoff. Plaintiff responded to FBI, saying that FBI refused to prosecute Jeffrey Shopoff

and put him behind bars because if FBI prosecuted Shopoff and put him behind bars, Governor Brown might lose over this lawsuit plaintiff filed against him. **See Exhibit 10.**

## PARTIES

30. Defendant, Governor Jerry Brown, is, and at all times mentioned, was, a resident of the County of Sacramento, State of California.

31. Defendant, Governor Jerry Brown, is, and at all times mentioned, was, doing business as with principal place of business in Capital, County of Sacramento, State of California.

32. Defendant, State of California, is, and at all times mentioned, was, doing business as with principal place in Capital, County of Sacramento, State of California.

33. Defendant, Jeffrey Shopoff, is, and at all times mentioned, was, a resident of the County of San Francisco, State of California.

34. Defendant, Jeffrey Shopoff, is, and at all times mentioned, was, doing business as with principal place of business in the City of San Francisco, County of San Francisco. State of California

35. Defendant, Shopoff Cavallo & Kirsch LLP, is, and at all times mentioned, was, doing business as with principal place of business in the City of San Francisco, County of San Francisco, State of California.

36. Defendant, Shopoff Group, is, and at all times herein mentioned, was, doing business as with principal place of business in the City of Irvine, County of Orange, State of California.

37. Defendant, Harold Light, is, and at all times mentioned, was, a resident of the County of Los Angeles, State of California.

38. Defendant, Light, is, and at all times herein mentioned, was, doing business as with principal place of business in the City of Los Angeles, County of Los Angeles, State of California.

39. Defendant, Law Office of Harold Light, is, and at all times mentioned, was, doing business as with principal place of business in the City of Los Angeles, County of Los Angeles, State of California.

40.   Defendant, Robert Stumpf, is, and at all times herein mentioned, was, a resident of the County of San Francisco, State of California.

41.   Defendants, Robert Stumpf and Sheppard Mullin Richter & Hampton LLP, is, and at all times herein mentioned, was, doing business as with principal place of business in the City of San Francisco, County of San Francisco, State of California.

42.   Defendant, Chicago Title Company, is, and at all times mentioned, was, doing business as with principal place of business in the City of San Francisco, County of San Francisco, State of California.

43.   Defendant, Donald Savage, is, and at all times mentioned, was, a resident of the County of Alameda, State of California.

44.   Defendant, Theodore Griffinger, is, and at all times mentioned, was a resident of the County of San Francisco, State of California.

45.   Defendant, Theodore Griffinger, is, and at all times mentioned, was, doing business as with principal place of business in the City of San Francisco, County of San Francisco, State of California.

46.   Defendant, Lubin Olson & Niewadomski LLP, is, and at all times mentioned, was, doing business as with principal of business in the City of San Francisco, County of San Francisco, State of California.

47.   Defendant, Ronald Mallen, is, and at all times herein mentioned, was, a resident of the County of San Francisco, State of California.

48.   Defendant, Ronald Mallen, is, and at all times mentioned, was, doing business as with principal place of business in the City of San Francisco, County of San Francisco, State of California.

49.   Defendant, David Winnett, is, and at all times herein mentioned, was, a resident of the County of San Francisco, State of California.

50.   Defendant, David Winnett, is, and at all times mentioned, was, doing business as with principal place of business in the City of San Francisco, County of San Francisco, State of California.

51. Defendant, Hinshaw & Culbertson LLP, is, and at all times mentioned, was, doing business as with principal place of business in the City of San Francisco, County of San Francisco, State of California.

52. Defendant, Randell Jenson, is, and at all times mentioned, was, a resident of the County of San Diego, State of California.

53. Defendant, Randell Jenson, is, and at all times herein mentioned, was, doing business as with principal place of business in the City of San Diego, County of San Diego, State of California.

54. Defendant, Lawrence Hershfield, is, and at all times mentioned, was, a resident of the County of San Diego, State of California.

55. Defendant, Lawrence Hershfield, is, and at all times herein mentioned, was, doing business as with principal place of business in the City of San Diego, County of San Diego, State of California.

56. Defendant, Ranch Capital LLC, is, and at all times herein mentioned, was, doing business as with principal place of business in the City of San Diego, County of San Diego, State of California.

57. DI Aggregate Management LLC, is, and at all times mentioned, was, doing business as with principal place of business in the City of San Diego, County of San Diego, State of California.

58. Defendant, Jay Crom, is, and at all times herein mentioned, was, a resident of the County of San Francisco, State of California.

59. Defendant, Jay Crom, is, and at all times mentioned, was, doing business as with principal place of business in the City of San Francisco, County of San Francisco, State of California.

60. Defendant, Jay Crom and Bachecki, Crom & Co. LLP, is, and at all times mentioned, was, doing business as with principal place of business in the City of San Francisco, County of San Francisco, State of California.

61. Defendant, Philip Putnam, is, and at all times mentioned, was, a resident of the County of Los Angeles, State of California.

62. Defendant, Philip Putnam, is, and at all times mentioned, was, doing business as with principal place of business in the City of Los Angeles, County of San Francisco, State of California.

63. Defendants, Philip Putnam and Monteleone & McCroy LLP, are, and at all times mentioned, was, doing business as with principal place of business in the City of Los Angeles, County of San Francisco, State of California.

64. Defendant, Ervine Cohen & Jessup LLP, is, and at all times mentioned, was, doing business as with principal place of business in the City of Beverly Hills, County of Los Angeles, State of California.

65. Defendant, Norman Pine, is, and at all times mentioned, was, a resident of the County of Los Angeles, State of California.

66. Defendant, Norman Pine, is, and at all times mentioned, was, doing business as with principal place of business in the City of Sherman Oaks, County of Los Angeles, State of California.

67. Defendant, Pine and Pine Tillet Pine LLP, is, and at all times mentioned, was, doing business as with principal place of business in the City of Sherman Oaks, County of Los Angeles, State of California.

68. Defendant, Eric Selten, is, and at all times mentioned, was, a resident of the County of Los Angeles, State of California.

69. Defendant, Eric Selten, is, and at all times mentioned, was, doing business as with principal place of business in the City Mission Hills, County of Los Angeles, State of California.

70. Defendant, Ton Nunziato, is, and at all times mentioned, was, a resident of the County of Los Angeles, State of California.

71. Defendant, Tom Nunziato, is, and at all times mentioned, was, doing business as with principal place in the City of Santa Monica, County of Los Angeles, State of California.

72. Defendant, Laurence Colangelo, is, and at all times mentioned, was, a resident of the City of Elmhurst, State of Illinois.

73. Defendant, Alfred Stedman, is, and at all times mentioned, was, a resident of the County of Los Angeles, State of California.

74. Defendant, Jeffrey Kirk, is, and at all times mentioned, was, a resident of the County of Contra Costa, State of California.

75. Defendant, Jeffrey Kirk, is, and at all times mentioned, was, doing business as with principal place of business in the City of San Francisco, County of San Francisco, State of California.

76. Defendant, Elliot Bien, is, and at all times mentioned, was, a resident of the County of Marin County, State of California.

77. Defendant, Elliot Bien, is, and at all times mentioned, was, doing business as with principal place of business in the City of San Rafael, County of Marin, State of California.

78. Defendant, Bien and Bien & Summers, is, and at all times mentioned, was, doing business as with principal place of business in the City of San Rafael, State of California.

79. Defendant, GVA Kidder Mathews, is, and at all times mentioned, was doing business as with principal place in the City of San Francisco, County of San Francisco, State of California.

80. Defendant, Peter Johnson, is, and at all times mentioned, was, a resident of the County of Contra Costa, State of California.

81. Defendant, Peter Johnson, is, and at all times mentioned, was, doing business as with principal place in the City of Walnut Creek, County of Contra Costa, State of California.

82. Defendant, Ron Johnson, is, and at all times mentioned, was, a resident of the County of Contra Costa, State of California.

83. Defendants, Law Offices of Johnson and Johnson, are, and at all times mentioned, was, doing business as with principal place in the City of Walnut Creek, County of Contra Costa, State of California.

84. Defendant, Don Cloes, is, and at all times mentioned, was, a resident of the County of Contra Costa, State of California.

85. Defendant, Don Cloes, is, and at all times mentioned, was, doing business as with principal place in the City of Concord, County of Contra Costa, State of California.

86. Defendant, John Marcin, is, and at all times mentioned, was, a resident of the County of Los Angeles, State of California.

87. Defendant, John Marcin, is, and at all times mentioned, was doing business as with principal place in the City of Tarzana, County of Los Angeles, State of California.

88. Defendant, Steve Shower, is, and at all times mentioned, was, a resident of the County of Sacramento, State of California.

89. Defendant, Steve Shower, is, and at all times mentioned, was, doing business as with principal place in the City of Fair Oaks, County of Sacramento, State of California.

90. Defendant, Resident of 5540 Estate Dr. Oakland CA, is, and at all times mentioned, was, a resident of the County of Alameda, State of California.

91. Defendant, Postmaster Peter Hurtado, is, and at all times mentioned, was, a resident of the County of Solano, State of California.

92. Defendant, Postmaster Peter Hurtado, is, and at all times mentioned, was, doing business as with principal place in the City of Rio Vista, County of Solano, State of California.

93. Defendant, United States Postal Service, is, and at all times mentioned, was, doing business as with principal place in the City of Rio Vista, County of Solano, State of California.

### GENERAL ALLEGATIONS

94. Plaintiff had been a long time constituent for defendant Governor Brown since 1974. He had informed the Governor of Shopoff's frauds and crimes since 2008. He has written many letters to the Governor and sought help from him. However, the Governor has ignored all of my letters.

95. Plaintiff had been also a long time constituent for US Senator Dianne Feinstein. H has also informed the Senator of Shopoff's frauds and crimes, and sought help from her. He is grateful that she has been helpful particularly on Federal issues. He, in January 2014, received a letter from **the Senator who said, *"I have been assured that his (Governor***

*Brown) staff will work hard to help you in your endeavors"*. Governor Brown has lied to me. In his opinion, plaintiff believes that Governor's actions constitute frauds.

96. Governor Brown demurred to plaintiff's complaint, accusing him of a vexatious litigant who files frivolous and meritless lawsuits which have no chance to win and just harass defendants. The Governor listed 10 travesties of plaintiff's past lawsuits.

97. Plaintiff has been an indigent litigant so that he has obtained court fee waivers since May 2010. No vexatious litigant can obtain a court fee waiver unless he or she proves that the person is an indigent litigant.

98. Plaintiff has been/is never a vexatious litigant. He has been broke since 2009. Since then, he has sought a contingency lawyer who would take his case and contacted nearly 100 lawyers. However, none of them has come forward. Thus, he has had to file lawsuits against Shopoff, his coconspirators, Harold Light and Robert Stumpf by himself. The lawsuits have had merit and had chances to win.

Plaintiff had attacked Governor Brown's the 10 travesties and proved that they are false. In his opinion, plaintiff believes that the Governor's actions constitute fraud.

99. Defendant Governor Brown had rejected plaintiff's May 2018's offer that said, *"Dear Governor Brown,*

*Attorney General Xavier Becerra and State Bar have lied to me by refusing to prosecute Shopoff and putting him behind vars. Thus, I have to write to you directly. I do not care who prosecute Shopoff as long as the prosecutor put him behind bar. I believe you can do the task. As I have said, if Shopoff is behind bars, I will stop fighting you and donate Decker Island ("DI") to Department of Water Resources ("DWR") and Department of Fish and Wildlife ("DFW").*

*DWR needs sand on DI for levees' repair and construction. There are 15 to 20 million tons of sand. The value of sand is more than $200 million. A recent newspaper article states, "Brown has proposed saving $5.8 billion of the surplus, roughly two-thirds, and spending $2 billion to tackle a $20 billion backlog of maintenance projects, **including levees in need of repair."***

*DFW has beautiful 34-acres natural habitat at a northern tip of DI and wants to expand*

13

*the development.*

*Around May 2005, DWR wanted to buy DI from me, but Shopoff interfered, killed the deal, conveyed DI to himself and makes money from running a sand mining business on DI.*

*If you refuse the task of putting Shopoff behind bars, I will continue to fight you for $200 million, as I said in the attached letter.*

*Please reply to me before June 9, 2018.*

*Truly,*

*Junho Hyon*

*CC.   United States Senator Dianne Feinstein*

*Attorney General Xavier Becerra*

*State Bar*

*Assemblyman Mark Stone, Chairman of Assembly Committee on Judiciary*

*Court of Appeal Division Three*

*Court of Appeal Division Four*

*Judge Paul L. Beeman*

*Judge Scott L. Kays*

*Supreme Court of California*

*Supreme Court of United States*

*Jeffrey W Shopoff*

**Governor Brown, General Attorney Becerra and State Bar had conspired not to prosecute Shopoff.**

100.    Plaintiff and his wife moved to Rio Vista from Malibu in February 2004 to run a sand mining business on DI.

101.    In September 2004, defendant Shopoff whom plaintiff had paid $200,000 filed an interpleader lawsuit against me and his coconspirators – defendants, claiming that he was

14

named as trustee by plaintiff, although he had never named Shopoff as his trustee. Upon the lawsuit and thereafter, his coconspirators joined Shopoff and formed "Joint Litigation Agreement". **Shopoff had become the godfather of all defendants. They together had conspired to defraud plaintiff.** Plaintiff had told Light that he had never named Shopoff as trustee. **Plaintiff's lawyer Harold Light ("Light") could have attacked this issue at Judge Karnow's bench trial.**

102.  Shopoff violated an agreement made on December 13, 2003 that plaintiff would run a sand mining business on DI. Thus, his filing the interpleader lawsuit was illegal. Plaintiff did not know it was illegal back then, but Light knew it was illegal. **If Light had argued with Judge Karnow that it was illegal, his life could have been saved.**

103.  The first thing Shopoff and coconspirators had tried to do was for plaintiff to accept a bogus $9 million offer to purchase DI. Plaintiff reviewed the offer, and it was their trick.

104.  The second thing they had tried to do was for Judge Curtis E.A. Karnow to appoint a receiver. They filed motions to appoint a receiver with court, claiming that it is necessary for Judge Karnow to appoint a receiver who can stop plaintiff from stealing equipment on DI. In their motions, they accused plaintiff of refusing to accept the bogus $9 million offer to purchase DI. **See Exhibit 11.** (Only the 2 caption pages used, due to the voluminous documents which is included in the Exhibit 5 in this complaint). Plaintiff has never stolen any equipment. Light had failed to attack their bogus motions.

105.  Judge Karnow appointed Donald Savage as receiver. By law, Receiver Savage was the agent of Judge Karnow, but he was the agent of Shopoff. By law, Receiver Savage had to be neutral, but he had acted for the benefits of Shopoff only. Light could have attacked this issue with courts. Also, plaintiff's lawyer Robert Stumpf ("Stumpf") could have attacked this issue in his appeal.

106.  Around the same time they filed the above mentioned motions, they had secretly started filing and recording 17 sets of fraudulent documents related to DI with the office of assessor/recorder of Solano County. **See Exhibit 12.** (The very first fraudulent document) With this document, Shopoff had started convey DI to himself. Plaintiff does not believe

15

that Judge Karnow had been aware of Shopoff's and coconspirators crimes. Light could have attacked this issue. Also, Stumpf could have attacked this issue in his appeal.

107.  After Receiver Savage was appointed, Shopoff had tried to sell DI in vein. Plaintiff informed to Receiver Savage that Department of Water Resources ("DWR") of California wanted to buy DI from him. There was a court hearing on who would go to DWR to negotiate with them. Receiver Savage's lawyer from Lubin Olson & Niewiadomski LLP said that he would call make an appointment with DWR and let Stumpf know it. Plaintiff had waited for a call from Stumpf. However, Stumpf had never called him. Later, he found out that Shopoff, Receiver Savage and Eric Selten who was plaintiff's former best friend/consultant/confident visited DWR and Shopoff killed DWR's offer to buy DI. Stumpf could have attacked this issue in his appeal.

108.  Around June 2007, plaintiff was informed that there would be a court hearing on Shopoff's sale of Decker Island. The hearing was attended by Shopoff, his lawyer Ronald Mallen ("Mallen"), Receiver Savage, and his lawyer, plaintiff and his lawyer Robert Stumpf. Shopoff said he found a buyer who would buy DI for $7 million. Plaintiff demanded Shopoff to disclose the buyer. However he refused to do so. Then, plaintiff requested Judge Karnow to order Shopoff to disclose the buyer. But the judge rejected his request, saying that Shopoff has a right not to disclose. Later, plaintiff learned that by law only Receiver Savage could sell DI. **Thus, Judge Karnow, Shopoff, Mallen, Receiver Savage, his lawyer and plaintiff's lawyer Stumpf conspired to break the law.**

109.  Shopoff sold DI for $6.6 million instead of $7 million in July 2007, saying that there was oil spill on DI so that he discounted $400,000 from $7 million. In fact, there was no such oil spill. His action must go through a court hearing and have Judge Karnow's approval.

110.  Later, Judge Karnow learned Shopoff's $400,000 discount, but he had ignored it and done nothing against Shopoff. **See Exhibit 13.**

111.  Exhibit 13 is statement on distribution of proceeds of sale of DI. At the top, Sale of Decker Island $6.600.000.00 is shown. Shopoff and coconspirators received money from the sale, **but plaintiff received no money.** The statement is bogus.

112.   There was a court hearing on the distribution in September 2007. Plaintiff could not attend the hearing because he was not notified of the hearing. I called Stumpf if he attended it. He said no. Mallen, Receiver Savage's lawyer and defendant Tom Nunziato had said to courts that Stumpf attended it. Stumpf could have attacked this issue in his appeal.

113.   Plaintiff called a title insurance company to find out the buyer of DI in September 2007. He obtained the buyer's name and address: Milpitas Main Street Investment LLC, 12275 El Camino Real #110 San Diego, CA 92130. Before visiting MMST, he wanted to inform MMST of his visit and had tried to find out the phone number. But he found out the phone number was not listed. He checked with Secretary of State if MMSI was registered, and found it was registered. Its owners were Randall Jenson and Lawrence Hershifield.

In September 2007, plaintiff visited MMST and met with defendant Randall Jenson. He was nervous, and he had interrupted several times the meeting to call someone (plaintiff believed he called Shopoff). What Jenson had said to him did not make any sense. Plaintiff sent Stumpf an email if he could obtain the escrow document of Shopoff's sale of DI. **See Exhibit 14.** He answered by saying it was too late. Because plaintiff trusted him back then, he did not suspect Stumpf would harm him. **If Stumpf had obtained the escrow document, plaintiff's life could have been saved.**

114.   Shopoff sent plaintiff a bogus tax return in November 2007. **See Exhibit 15.** In it, Shopoff said that plaintiff and defendant Laurence Colangelo made a capital gain of $1,804,568 from the sale of DI. Plaintiff replied to him by saying that he sold DI for $6.6 million and there was no capital gain because he and Colangelo acquired DI in exchange for a $7.6 million judgment against Yasunori Umeno who owned DI. Plaintiff demanded Shopoff to explain on the capital gain. Shopoff had ignored his demand. Stumpf could have attacked this fact in his appeal.

115.   Shopoff sent plaintiff just 2 pages of a revised bogus tax return filed with IRS in March 2008. **See Exhibit16.** In it, he reported that plaintiff and defendant Colangelo made a capital gain of $961,393. Stumpf could have attacked this fact in his appeal.

17

116. Shopoff paid IRS $144,659 from his sale of DI for plaintiff's capital gain. Stumpf could have attacked this fact in his appeal.

117. **Plaintiff had requested repeatedly IRS, San Francisco Police Department, Attorney General Jerry Brown, District Attorney of Solano County and State Bar to prosecute Shopoff for the bogus tax return. However, all of them had rejected his requests.**

118. Plaintiff requested Light to try Shopoff at Judge Karnow's court for the tax return. However, Light rejected his request by saying plaintiff owed him over $900,000, despite he had paid Light about $1.2 million during July 2004 to March 2006.

119. Plaintiff requested his lawyer Stumpf to try Shopoff at Judge Karnow's court for the tax return. However, Stumpf rejected his request by saying that he was retained for appeal, despite plaintiff had paid him about $250,000.

120. Around June 2010, plaintiff discovered a bogus deed of trust which was manufactured by Shopoff and defendant Philip Putnam. They forged his signatures and contrived a bogus notary which contained his thumbprints. **See Exhibit 23.**

121. Plaintiff visited District Attorney of Solano County and met with Investigator Sonny Ash regarding the bogus deed of trust. The meeting lasted 2 hours. Plaintiff requested him to investigate the deed of trust. The investigator accepted his request and told him to wait because he had a few cases before him.

122. A few days later, Investigator Ash called plaintiff and told that he went to the office of assessor/recorder of Solano County and found 17 sets of fraudulent documents in which the bogus deed of trust was included.

123. Shopoff and coconspirators had filed and recorded the 17 sets of fraudulent documents with the County office during Judge Karnow's bench trial. Plaintiff believes Judge Karnow had been unaware of their crimes. Stumpf could have attacked this fact in his appeal.

124. Thus, on July 1, 2010 plaintiff visited the County office and obtained the copies of the 17 sets of fraudulent documents related to DI. Plaintiff thought this was a breakthrough to victory over Shopoff, coconspirators and Light.

125. Plaintiff consulted with 2 lawyers about the statute of limitations to sue Shopoff, coconspirators and Light. The lawyers advised him to sue them within 2 years. Plaintiff started searching a contingency lawyer and had contacted nearly 40 lawyers. However, none of them had come forward.

126. **Investigator Ash had not called plaintiff nearly a year. Thus, plaintiff wrote to him about the investigation of the bogus deed of trust. Then, he received a letter from District Attorney du Bain saying that the statute of limitations expired during his wait and his case was closed. He was devastated.** Stumpf could have attacked this fact in his appeal.

127. Plaintiff had been unable to find a contingency lawyer within 2-year of statute of limitations. In May 2012, he filed Complaint against Shopoff, coconspirators and Light following his discovery of the 17 sets of fraudulent documents. His case was eventually assigned to Judge Kays. Plaintiff had continued to search a contingency lawyer in vain.

128. All the defendants had demurred to complaint, accusing plaintiff of res judicata – retrial of Judge Karnow's bench trial. Plaintiff had pleaded Judge Kays to continue the demur hearing for him to find a contingency lawyer and draft his oppositions to **their 14 demurs.** However, Judge Kays rejected his plea, adopted their demurs and dismissed all the defendants indiscriminately. Stumpf could have attacked this fact in his appeal.

129. Shopoff has represented Shopoff Group ("SG"). Plaintiff believes SG had involved Shopoff's sale of DI, and Shopoff and SG is running DI Aggregate Management LLC.

130. Defendant Randell Jenson whom plaintiff met in September 2007 was the buyer of DI. The buyer name was Milpitas Main Street Investments, LLC and the address was 12275 El Camino Real, #110, San Diego, CA 92130. **See Exhibit 14.** He said he bought DI from Shopoff for $7 million. (Shopoff said that he sold DI for $6.6 million. He embezzled $400,000.) Through their conversation, plaintiff felt that Jenson was a front man for Shopoff. Plaintiff sent Stumpf an email, asking him to obtain an escrow document of Shopoff's sale of DI. However, Stumpf refused to do so, saying it was too late.

131.   Defendant Lawrence Hershfield was the boss of Jenson. He was also a front man for Shopoff. Both Jenson and Hershfield run DI Aggregate Management LLC which Shopoff involves.

132.   Ranch Capital LLC was responsible and accountable for Jenson's and Hershfield's wrongful conducts.

133.   DI Aggregate Management ("DIAM") LLC's address is the same address of Jenson. **See Exhibit 26.** Shopoff is behind DIAM.

134.   Defendant Jay Crom of Bacheki, Crom & Co. LLP had drafted the Shopoff's bogus tax return – Exhibits 15 and 16.  Plaintiff asked Crom to meet with him for the bogus tax return, but he refused to meet with him. Bacheki, Crom & Co. LLP is responsible and accountable for Crom's fraud.

135.   Defendant Chicago Title Company ("CTC") had been working for Shopoff during over the past dozen years. CTC had been Trustee in the 12 sets of 17 sets of fraudulent documents Shopoff and coconspirators filed and recorded with Solano County. In addition, CTC was Trustee for the $2.42 million loan Shopoff obtained against DI.

136.   In December 2005, plaintiff found out that CTC had done escrow for Shopoff's sale of DI. Thus, he called CTC office in San Francisco, and asked an agent if they had done the escrow. Strangely, the agent told him to wait a few minutes. Thus, I had waited for several minutes until he talked to me. He told plaintiff to call CTC in Sacramento, and plaintiff called the CTC and asked if they had done the escrow. Then, the agent said no and told plaintiff to call CTC in Rancho Cordova. Thus, plaintiff called the CTC and asked the same question. The agent said no and told him CTC in Alameda. Thus, plaintiff called the CTC and asked the same question. The agent said no. Then, plaintiff realized that CTC was hiding their wrong doings.

137.   Plaintiff called CTC in San Francisco back and talked with Kelly Jackson who admitted CTC had done the escrow. Plaintiff explained to her that he owned DI, but Shopoff had stolen from him and sold it by himself. After the explanation, plaintiff requested her to provide him with the escrow file, but she refused to do so by saying that the seller of DI

was Receiver Savage, not plaintiff. **If she had provided him with the escrow file, his life might have been saved.**

138.   Chicago Title Company is responsible and accountable for Kelly Jackson's frauds.

139.   In November 20012, a paralegal told plaintiff that Light whom he had paid $1.2 million and Stumpf whom he had paid $250,000 had deceived him. The paralegal said to him that Light knew an interpleader lawsuit does not require a jury trial and that Shopoff could not file the interpleader lawsuit because he was not named as trustee by plaintiff. When Shopoff filed it, plaintiff told Light that he had never named him as trustee. However, Light had never fought with Judge Karnow. Light had knowingly demanded a jury trial for plaintiff.

The paralegal also told plaintiff that Stumpf knew an interpleader lawsuit does not require a jury trial. However, Stumpf knowingly pleaded Court of Appeal Division One to grant plaintiff a jury trial.

140.   Thus, plaintiff filed complaint against Light and Stumpf with Judge Kays in April 2013. **See Exhibit 17.** Light and Stumpf demurred to his complaint by arguing "that Hyon's claims were barred by the statute of limitations. Both fabricated their arguments. Plaintiff learned their wrongful conducts from the paralegal in November 2012, and he filed complaint in April 2013.

141.   Judge Kays adopted their demurs and dismissed both, saying plaintiff had known an interpleader lawsuit does not require a jury trial while Light and Stumpf had represented him.

142.   Plaintiff appealed to Court of Appeal Division 4. However, the Court adopted Judge Kays' ruling and denied plaintiff's appeal. He believed the Court denied it because the Court wanted to protect Governor Brown whom he sued.

143.   Plaintiff petitioned to Supreme Court of California, but the Court denied his petition. He informed US Supreme Court of his plan to appeal.

144.   Light had committed serious crimes. When Shopoff filed the interpleader lawsuit, plaintiff did not have money to fight back Shopoff. Thus, he asked his rich friend in Japan to lend him money. Then, the friend dispatched his agent to meet with Light.

When the agent and plaintiff met with Light, he presented a winning strategy to them. After the meeting, the agent reported to his friend. Then, the friend started sending him money. He had paid Light about $1.2 million during July 2004 to March 2006. In addition, he had owed Light over $900,000. Thus, **Light had billed plaintiff about $2.1 million totally.**

145.   Light is a brilliant lawyer. They had milked plaintiff for the money he had borrowed from his friend. We had a good chance to win over the interpleader lawsuit at the early stage of the lawsuit, but Light wanted to prolong the lawsuit and make it complicated. Thus, he could make so much money for the short period July 2004 to March 2006. **Light defrauded his friend.**

Light had had so many attacking issues with Judge Karnow. But he had failed to attack Judge Karnow and Judge Kays. Plaintiff lists just 13 travesties of attacking points amid so many:

(1)   Light could have attacked defendant Eric Selten and Seltent's lawyer defendant Tom Nunziato who created a bogus "quantum meruit" theory for Selten who had claimed that he had worked hard for plaintiff without evidence. As a result, Selten had obtained over $1.6 million from plaintiff, his business referrals, DI sale, Superior Court's and Appeal Court's rulings.

(2)   Light could have attacked Selten and defendant Laurence Colangelo who had formed a company called a bogus Capital City Aggregates to defraud a loan from Wells Fargo Bank against DI. CTC submitted a business plan to the bank, which said, *"Expert Schmittel estimates the total value of the reserve at something over one billion dollars.* Schmittel's estimation was bogus. Plaintiff's expert's estimation is between $200 and $250 million.

(3)   Light could have attacked Shopoff who illegally filed the interpleader lawsuit because his representation of plaintiff had ended on December 19, 2003.

(4)   Light could have attacked Shopoff who claimed that he was named as trustee by plaintiff. Light had known that plaintiff had never named Shopoff as trustee.

(5) **Light had made plaintiff a criminal. See paragraphs 177, 178, 179, 180, 181, 182, 183, 184 and Exhibits 20, 21, 22.** Light called him around March 2005 and told me that it was a crime for him to steal Ota' money so that he should come to see his friend criminal lawyer in Los Angles. Back then, he trusted Light completely so that he drove down to his office in Santa Monica. Next day, he took plaintiff to the criminal lawyer. Plaintiff did not recall what they had discussed. What he can recall is that he paid the lawyer $500.

(6) **Light brought late attorney Eliot Disner as a witness at Judge Karnow's bench trial. He examined Disner who said that plaintiff stole Ota's money and he was a criminal. Back then, plaintiff believed in Light completely. In truth, Disner and Selten conveyed Ota's money in an escrow account to Disner's account in Mannatt. Light and Disner conspired to make plaintiff be a criminal.**

(7) Light could have attacked the fraudulent motions (Exhibit 11) filed by Shopoff and coconspirators. In their motions, they accused plaintiff of stealing equipment worth over a half million from DI and refusing to accept the offer of a bogus $9 million to purchase DI.

(8) Light could have attacked Judge Karnow who had revived Selten and gave him contingency 14.1% and approved his illegal business, whereas Selten had lost his contingency fees 11% because of his illegal lawyer referral business at the trial in Los Angeles in October 2005.

(9) Light had lied on the occasion when plaintiff told him to stop Judge Karnow's abuse of power. Then, he said that he would appeal and would file a complaint against Judge Karnow with Commission on Judicial Performance. Believing in him, plaintiff thought that he would win in the appeal and he would file the complaint with CJP. He had failed to file the appeal and the complaint.

(10) Light could have attacked Selten and Nunziato at the trial in Los Angeles in June 2009. **Light, Selten and Nunziato had conspired for Selten to win.** The court in San Francisco had held plaintiff's money about $730,000. Selten wanted the money, using "quantum meruit". Light also wanted the money because plaintiff had owed

about $900,000. Light called him and told that he wanted to represent him without pay for the jury trial in Los Angeles. Light put a lien on DI for the money plaintiff owed so that he asked plaintiff to sign his declaration drafted by Light, declaring to support Light's obtaining the money the court held. Light submitted his pleading paper and plaintiff's declaration. However, the court denied his plea. Then, Light changed. He asked plaintiff if he had money for a jury trial, he said no. Then, Light advised him to accept a bench trial. Since plaintiff had confidence to win, he accepted the bench trial.

(11) Judge John S. Wiley had presided over the bench trial. Selten had claimed "quantum meruit" that he had worked for plaintiff over 8,000 hours so that he deserved to obtain the money held in the court. He and Nunziato submitted more than a dozen pages of documents to Judge Wiley to support Selten's 8,000 hours work. Plaintiff was certain that those documents were bogus. He wondered why he was not given those documents. He believed Light was given the documents, but he intentionally did not show them to plaintiff because he wanted Selten to obtain the money since he was denied the money.

However, it was too late for plaintiff to view the documents because Judge Wiley pointed out the documents in his final ruling. He criticized Light for his malicious performance. **See Exhibit 18.** Light, Selten and Nunziato had conspired for plaintiff to lose.

(12) **Light advised plaintiff to file bankruptcy.**

(13) Light filed a motion with Judge Kays to impose sanctions against plaintiff.

Law Offices of Harold Light was responsible and accountable for Light who had committed fraud and conspiracy.

146. Stumpf had committed serious crime. When plaintiff wanted to appeal, he had no money. Thus, he asked the friend for the money. Then, the friend dispatched an agent to meet with Stumpf. When the agent and plaintiff met with Stumpf, he presented a winning strategy to them. After the meeting, the agent reported to the friend. Then, he started sending him money. Plaintiff had paid him about $250,000 for the appeal. **Stumpf had**

24

**defrauded his friend.**

In the appeal, Stumpf had failed to attack the followings:

(14) Stumpf had failed to attack Shopoff who illegally filed the interpleader lawsuit because his representation of plaintiff had ended on December 19, 2003.

(15) Stumpf had failed to attack Shopoff who had claim that he was named as trustee by plaintiff. Stumpf had known that plaintiff had never named Shopoff as trustee.

(16) Stumpf had failed to attack the fraudulent motions (Exhibit 11) filed by Shopoff and coconspirators. In their motions, they accused plaintiff of stealing equipment worth over a half million from DI and refusing to accept the offer of a bogus $9 million to purchase DI.

(17) Stumpf had failed to attack Judge Karnow who had revived Selten and gave him contingency 14.1%, approving his illegal business, whereas Selten had lost his contingency fees 11% because of his illegal lawyer referral business at the trial in Los Angeles in October 2005.

**Stumpf pleaded Court of Appeal to grant plaintiff a jury trial, despite knowing that an interpleader lawsuit does not require a jury trial.**

147.  Defendant Sheppard Mullen Richter & Hampton LLP was responsible and    accountable for Stumpf who had committed fraud and conspiracy.

148.  Defendant Ronald Mallen who had represented Shopoff had advised Shopoff to commit frauds and conspiracy. He had also participated in Shopoff's frauds and conspiracy.

149.  Defendant David Winnett who had represented Shopoff had advised Shopoff to commit frauds and conspiracy. He had also participated in Shopoff's frauds and conspiracy.

150.  Defendant Hinshaw & Culbertson was responsible and accountable for Mallen's and Winnett's frauds.

151.  Defendant Receiver Donald Savage had broken the law that says, *"The receiver is the agent of the court and not any party, and is neutral, and acts for the benefit of all who may have an interest in the receivership property, and hold assets for the court and not for the plaintiff or the defendant."* Light could have attacked this issue.

152. Receiver Savage was the agent of Shopoff and had destroyed plaintiff's life. He had let Shopoff have stolen DI from plaintiff and let Shopoff sell it. Receiver Savage was one of the key parties who had manufactured 5 bogus notarizations of Consulate General of The United States of America in Japan. Shopoff had used these notarizations for conveyance of DI to him.

153. Receiver Savage had heavily involved a $2.42 million loan Shopoff obtained against DI. In the loan, Receiver Savage, defendant Laurence Colangelo and plaintiff were trustors.

154. Receiver Savage has been gone in hiding in Oakland to avoid a subpoena since last year. Plaintiff has no money to hire a professional investigator.

155. Defendant Theodore Griffinger has advised Savage and participated in manufactured 5 bogus notarizations of Consulate General of The United States of America in Japan. See paragraph 151.

156. Griffinger had involved the 2.42 loan Shopoff obtained against DI in August 2006 under Judge Karnow's supervision.

157. Lubin Olson & Niewiadomski LLP is responsible and accountable for Griffinger's wrongful conduct.

158. Defendant Laurence Colangelo had unreasonably demanded 50% of DI. Plaintiff had expended over a dozen years' effort, times and nearly $500,000 since 1991 before plaintiff and Colangelo acquired DI. On the contrary, Colangelo had expended very little effort, very little times and just $5,000. Plaintiff had felt Colangelo's demand of the 50% was utterly unfair. Thus, since 1998, plaintiff had emailed repeatedly Colangelo to meet with him on the percentage, but he had dodged the meeting.

159. In December 2003, defendant Eric Selten told plaintiff that he should demand 95% of DI and that Colangelo deserved 5%. Then, Selten told him that he arranged defendant Philip Putnam to mediate on the percentage issue between Colangelo and him on December 19, 2003. Selten also told him if Colangelo refused to accept 5%, he just walked away from the mediation.

160. In the evening of December 19, 2003, plaintiff, Colangelo and Selten met with Putnam. Plaintiff explained to Putnam why he demanded the 95%, but Putnam rejected his

demand. Discussion and arguments had lasted nearly the midnight. Everyone got tired, and finally Putnam came up with a proposal. **See Exhibit 19.** Plaintiff did not like it because plaintiff's percentage was 65.82. However, he wanted to run a sand mining business on DI as soon as possible, he accepted it.

161. Putnam sent the copy to Shopoff, informing him of that his representation of plaintiff ended on December 19, 2003. Light did not attack this fact at Judge Karnow's bench trial on Shopoff's interpleader lawsuit filed in September 2004. The interpleader lawsuit was illegal.

162. Colangelo filed bogus motions with Judge Karnow, accusing plaintiff of stealing equipment worth more than $500,000 from DI. Light did not attack this fact with Judge Karnow.

163. Colangelo received $565,058 from Shopoff's sale of DI. Colangelo's receipt of $565,058 was illegal because Shopoff had stolen DI from plaintiff.

164. Defendant Alfred Stedman, in the motion to appoint a receiver, lied by saying, *"the removal of GSA Recovery assets is no longer a mere "danger," it is a REALITY, Junho Hyon is at this moment in the process of removing all of the sand mining equipment from Decker. Specifically, as set forth in more detail in the attached Declaration of Laurence Colangelo it is case that Mr. Hyon has sold the all of the equipment at Decker Island to Rock Systems, Inc., a Sacramento sand and gravel equipment dealer, which is now in the process of removing it from the island."* **Stedman fabricated his statement.** Light could have attacked the fact with courts.

165. Stedman, in the motion, lied by saying, *"A receiver is necessary to review the pending $9 million contract."* **Stedman fabricated his statement.** Light could have attacked this issue.

166. Stedman is responsible and accountable for Colangelo's frauds.

167. Defendant Selten had become plaintiff's best friend, consultant and confidant. Plaintiff had provided him with businesses from which he had made nearly $200,000. Back then, he was in bankruptcy. He thanked plaintiff because he and his wife were able to buy the house with the $200,000 as a down-payment. They live in the house today.

168. Selten had worked hard for plaintiff in order to sneak into the ownership of DI. He volunteered to work for him. However, plaintiff had paid him for his work. Light could have attacked this fact with courts.

169. Selten had spied on plaintiff for Colangelo and informed him of what plaintiff had been doing. Thus, Colangelo had been out of sight and out of reach from plaintiff. Light could have attacked this fact with courts.

170. Selten and Colangelo called plaintiff in Rio Vista in July 2004 and told that he could not run the sand mining business because they together were a majority owner of DI so that they would run the business. Around the same time, plaintiff received an express mail from defendant Philip Putnam. The mail was Operational Agreement for Decker Sand Co., LLC which plaintiff owned. It showed that Junho Hyon 48.6%, Laurence Colangelo 25.25% and Eric Selten 26.15. Putnam, Colangelo and Selten conspired to lower plaintiff's 65.82% to 48.6%. Light could have attacked this fact with courts.

171. Selten had acted as an owner of DI. He accepted a bogus $9 million offer to purchase DI and signed it. Colangelo also signed it. Then, Selten, Shopoff and defendant Jeffrey Kirk called Light for plaintiff to accept the bogus $9 million offer. Light could have attacked this fact with courts.

172. Selten had interfered in plaintiff's filing a river dredge permit with Army Corp Engineers. As a result, plaintiff had failed to obtain the permit. The permit was very valuable because river dredge provides DI with river sand perpetually. Extremely valuable resource lost. Light could have attacked this fact with courts.

173. Selten received $163,060 from Shopoff's sale of DI. Selten's receipt of $163,060 was illegal because he had stolen DI from plaintiff.

174. Selten, with his bogus claim of "quantum meruit", had fraudulently obtained over $730,000 held for plaintiff in the court in San Francisco. There was a bench trial for his claim of "quantum meruit" in June 2009 in Los Angeles. **He, his lawyer defendant Tom Nunziato and Light had conspired for him to win.** Selten submitted more than a dozen pages of documents to Judge John Wiley. **But plaintiff was never given the documents.**

175.  Around September 2002, plaintiff's friend's father Minoru Ota who was very wealthy in Yokohama Japan called him and asked him to come to see him regarding a business deal. Mr. Ota offered to pay for his travel expenses. Thus, plaintiff flew to Yokohama and met with his friend Ms. Nakayama and Mr. Ota. He said his cousin Boo Choi sold a small shopping center in Redondo Beach in Los Angeles County for over $5 million without his permission. Choi paid IRS over $900,000 for a capital gain. Some sale's proceeds were held in escrow co. North American Title Company. He asked plaintiff to protect the money in the escrow for him. Plaintiff accepted the task. Then, Mr. Ota and he visited US Embassy in Tokyo and made an official agreement. Plaintiff told Mr. Ota that he would hire Eric Selten and late attorney Eliot Disner whom Selten recommended him to retain. Mr. Ota agreed.

176.  Plaintiff and Selten had attempted to get the $900,000 Choi paid to IRS back for Mr. Ota. Eventually he and Selten had succeeded in getting the $900,000 back from IRS and deposited the money into Mr. Ota's bank account in Los Angeles.

177.  Plaintiff had sent Mr. Ota his invoices, Selten's invoices and Disner's invoices once a month by fax. Mr. Ota's remittances by wire were always late from the start. Plaintiff had called repeatedly him and pleaded with him to remit money to pay Selten and Disner. A month or 2 months late remittance was common.

178.  Disner had complained to plaintiff that he had not been paid over 6 months so that he wanted to quit. Plaintiff had called Mr. Ota repeatedly and begged him to remit, **suggesting that he could remit from his bank account in Los Angeles. However, he had always said, *"Do as you like!"*** Plaintiff finally realized that he would never remit. Thus, he told Disner and Selten that Mr. Ota would never remit.

179.  Selten sent plaintiff a letter which he drafted and told him to send it Disner. **See Exhibit 20.** It was obvious that Selten and Disner had conspired to obtain the money in the escrow account for them to be paid. Light could have attacked this issue with courts.

180.  Plaintiff called Mr. Ota's daughter and told her about the Selten's and Disner's conspiracy. She accepted it and told him to do as Selten directed. She also promised that if a lawsuit would ensue, she would appear at court to defend him. Later, she sent him her

declaration in support of him in Japanese and English. Light could have attacked this issue with courts.

181. Selten asked plaintiff to remit $45,809 for his unpaid amount. **See Exhibit 21.** Ota's daughter asked me to remit $204,000. **See Exhibit 22.** Light could have attacked this issue with courts.

182. Disner's firm Manatt remitted $657.590 to plaintiff's bank account. After paying Selten and Ota's daughter, plaintiff had used remaining money for a $25,000 loan to Colangelo and legal fights. **See Exhibit 22.**

183. **Selten had said to courts that plaintiff stole Ota's money.** Light could have attacked this issue with courts.

184. **Selten had informed courts that plaintiff had damaged him at the amount of $1,366,795 without evidence.** Light could have attacked this fact with courts.

185. Defendant Tom Nunziato who had represented Selten had created a bogus "quantum meruit" theory for Selten. As a result, **Selten could illegally obtain over $1.66 million according to plaintiff's records.** Light could have attacked this issue with courts.

186. Nunziato had approved Selten's frauds, participated in them and attacked plaintiff relentlessly at courts. Light could have attacked this issue with courts. Light could have attacked this issue with courts.

187. In motion to appoint a receiver (Exhibit 11), Nunziato lied by saying that the court appoints a receiver because of an immediate danger of DI being lost or squandered, plaintiff's rejection of a $9 million offer to purchase DI and his fight against Shopoff. Light could have attacked this issue with courts. Light could have attacked this issue with courts.

188. Nunziato had lied publicly by saying that Stumpf attended the court hearing on the distribution of the proceedings of the DI sale. **See Exhibit 13.** Stumpf did not attend.

189. Nunziato was responsible and accountable for Selten's frauds.

190. Mr. Ota sued plaintiff, Selten and Disner. Light recommended plaintiff to retain defendant John Marcin. Disner won over arbitration with Ota.

191. Plaintiff had paid Marcin about $125,000 during August 2005 to August 2006. Plaintiff won over Ota's summary judgment over him. He thought that he would win over Ota's lawsuit. However, Marcin wanted to quit just 15 days before the trial because plaintiff owed him about $40,000. Plaintiff had pleaded with Marcin to finish the trial, but he demanded the $40,000 payment. Plaintiff suspected that Shopoff, Selten, Nunziato, Ota's lawyer James Dumas and Marcin had conspired for plaintiff to lose because if he would win over Ota, he would give a damaging brow to Shopoff, Selten, Nunziato and others in his appeal. Light could have attacked this issue with courts.

192. Plaintiff had sought a lawyer in Los Angeles area and found attorney Steve Roth in Burbank who would try Ota for $15,000. Plaintiff had quickly raised $15,000 by borrowing the money from his relatives in Tokyo.

193. Plaintiff left Rio Vista to meet attorney Roth. While he was driving on I-5, Marcin called him and asked if he found a lawyer. He answered yes. Then, Marcin asked how much he would pay him. He answered $15,000. Then, Marcin told him that he found a lawyer who would try Ota for $15,000 and plaintiff would come to his office in Century City to meet the lawyer. Plaintiff called attorney Roth and apologized for his change of mind.

194. Plaintiff went to Marcin's office and met his colleague late attorney Barry Silver. Marcin told plaintiff to pay $10,000 attorney Silver and pay $5.000 to him because plaintiff owed him money. Plaintiff did as Marcin told me to do. Light could have attacked this fact with courts.

195. Plaintiff told them that he should stay in Los Angeles to help attorney Silver to prepare for the trial which would start in 10 days. Then, attorney Silver told him not to worry and go home because Marcin would help him prepare for the trial. Thus, plaintiff came home, believing he would win since he won over Ota's summary judgment against him. Light could have attacked this issue with courts.

196. Plaintiff recalls that when he was to leave his office, Marcin told him not to badmouth Selten in order to win the trial. Back then, he trusted Marcin. But, now, he believes that Marcin had conspired with Dumas, Selten, Nunziato and Shopoff for plaintiff to lose over the trial. Light could have attacked this issue with courts.

31

197. Plaintiff met with Silver in the morning of the trial day. He was shocked to hear from Silver that he was not prepared for the trial because Marcin were out of town and out of reach. Both lawyers had fooled him. Light could have attacked this issue with courts.

198. Plaintiff had been embarrassed and attacked by Dumas and Nunziato. Disner who had won over the arbitration with Ota, appeared at the trial and attacked plaintiff. Nunziato had also attacked plaintiff. Ota won, though he was absent at the trial. His daughter was also absent, despite the fact that she had declared that she would appear as a witness to support plaintiff. **Selten won. Plaintiff lost.** Ota obtained unspecified amounts of money held for plaintiff in the court in San Francisco. Light could have attacked this fact with courts.

199. The Ota's case was caused by Selten and Disner who conveyed Ota's money into Mannet's account. **See Exhibits 20, 21 and 22.** Plaintiff was used as "A fall guy". Light could have attacked this issue with courts.

200. Plaintiff has had subpoenas served several times to Marcin since March 2017. However, Marcin has succeeded in avoiding subpoenas by changing his address. His licenses in California and Las Vegas suspended in July 2018. He did this way in order to avoid a subpoena. Plaintiff found his current address through online. However, it is PO Box address. The address is PO Box 572644, Tarzana, CA 91357-2644. Can US Marshal serve a subpoena to the address? Plaintiff has no money to hire a professional investigator to find Marcin's home address.

201. Defendant Philip Putnam whom plaintiff had paid over $30,000 had drafted Short Form Deed of Trust and Assignment of Rents ("The deed"). **See Exhibit 23.** The deed is one of 17 sets of fraudulent documents plaintiff discovered at the office of Solano County. Putnam and Shopoff had manufactured the deed, and forged plaintiff's signatures and thumbprints. Plaintiff had repeatedly notified to Judge Kays that the deed was bogus, stating the date on the deed was made was December 19, 2003 and it was the day when Putnam mediated over Colangelo's and plaintiff's ownership interests of DI. Putnam had made an Agreement on that day. **See Exhibit 19.** Plaintiff submitted the Agreement to Judge Kays. Plaintiff has no idea whether the judge had reviewed it or not. There was a

court hearing on the deed. Plaintiff obtained reporter's transcript of proceedings. **See Exhibit 24.** Before the court hearing, Putnam, through his lawyer, demurred to plaintiff's Complaint, accusing of res judicata. He lied. Plaintiff discovered the deed on July 1, 2010 at the office of Solano County. It did not exist during Judge Karnow's bench trial from November 2004 to March 2006.

At the court hearing, Putnam lied by saying, *"I will just be brief. The plaintiff admitted in his original complaint that he already sued my clients, that my clients already paid him $158,000 to settle a case in which the deed of trust was an integral part of the underlying dispute."* Light could have attacked this fact with courts.

202.   Plaintiff, through Light, sued Putnam, Colangelo and Selten around September 2004 for their conspiracy for Colangelo and Selten to run a sand mining business on DI. **See paragraph 169.** Just before the trial, Putnam's insurance co. paid Light $158,000. Light kept the money.

203.   Monteleone & McCroy LLP were responsible and accountable for Putnam's frauds.

204.   Defendant Jeffrey Kirk, whom plaintiff had paid several thousand dollars, threatened him to accept a bogus $9 million offer to purchase DI. Kirk declared to Judge Karnow that it was necessary to appoint a receiver because plaintiff refused to accept the bogus $9 million offer and thus, the receiver could accept the bogus offer. Light could have attacked this fact with the court. Kirk received $163,059 from Shopoff's sale of DI. Kirk's receipt of $163,059 was illegal because Shopoff had stolen DI from plaintiff.

205.   Defendant Don Cloes, whom plaintiff had paid $57,746.30 for clean-up of DI, had lied by saying that he was paid $36,746.30 out of $57,746.30 by defendant Receiver Savage. Light could have attacked this fact with courts.

206.   Cloes and Receiver Savage had conspired to defraud plaintiff.

207.   Defendant Ervin Cohen & Jessup LLP ("ECJ") abandoned plaintiff's case when Judge Harry Kinnicutt of Superior Court of Solano County reversed a $42 million jury verdict against former owner of DI. However, when Shopoff brought ECJ in his interpleader lawsuit, ECJ joined Shopoff. Light could have attacked this facts with courts. ECJ

1  received $283,798 from Shopoff's sale of DI. ECJ's receipt of $283,798 was illegal
2  because Shopoff had stolen DI from plaintiff.

3  208.  Plaintiff had paid defendant Norman Pine $5,000. When Shopoff brought Pine in his
4  interpleader lawsuit, he joined Shopoff. Light could have attacked this fact with courts.
5  Pine received $315,081 from Shopoff's sale of DI. Pine's receipt of $315,081 was illegal
6  because Shopoff had stolen DI from plaintiff.

7  209.  Defendant Pine Tillet Pine LLP was responsible and accountable for Pine's fraud.

8  210.  Defendant Elliot Bien sold plaintiff his contingency fees 5% for $60,000 in December
9  2004, despite Shopoff's and Kirk's fierce opposition to his sale to plaintiff. Despite no
10  equity in DI whatsoever, Bien joined Shopoff who brought him in his interpleader
11  lawsuit. Thus, Bien's act to join him was illegal. Light could have attacked this fact with
12  courts.

13  211.  Bien received $34,143 from Shopoff's sale of DI. Bien's receipt of $34,143 was illegal
14  because Shopoff had stolen DI from plaintiff.

15  212.  Defendant Bien & Summers was responsible and accountable for Bien's fraud.

16  213.  Defendant GVA Kidder Mathews received $264,000 from Shopoff's sale of DI. GVA's
17  receipt of $264,000 was illegal because Shopoff had stolen DI from plaintiff.

18  214.  Defendant Randell Jenson whom plaintiff met in September 2007 was the buyer of DI.
19  The buyer name was Milpitas Main Street Investments, LLC and the address was 12275
20  El Camino Real, #110, San Diego, CA 92130. **See Exhibit 14.** He said he bought DI
21  from Shopoff for $7 million. (Shopoff said that he sold DI for $6.6 million. He
22  embezzled $400,000.) Through their conversation, plaintiff felt that Jenson was a front
23  man for Shopoff.

24  215.  Defendant Lawrence Hershfield was the boss of Jenson. He was also a front man for
25  Shopoff. Both Jenson and Hershfield run DI Aggregate Management LLC which Shopoff
26  involves.

27  216.  Ranch Capital LLC was responsible and accountable for Jenson's and Hershfield's
28  wrongful conducts.

217. DI Aggregate Management ("DIAM") LLC's address is the same address of Jenson. **See Exhibit 25.** Shopoff is behind DIAM.

218. Defendants Peter Johnson and Ron Johnson fabricated Deed of Trust. **See Exhibit 26.** Plaintiff discovered the deed of trust from a title insurance company on December 24, 2015.The deed of trust was bogus. Chicago Title Company was Trustee. Shopoff used it when he had conveyed DI to him.

219. Law Offices of Johnson & Johnson is responsible and accountable for Peter Johnson's and Ron Johnson's wrongful conducts.

220. Defendant Steve Shower has betrayed plaintiff.  Shower had been his friend and consultant until Selten and Colangelo declared that they were a majority owner of DI and were going to run the sand mining business on DI.

221. Shower refused to talk with plaintiff when he called Shower on August 14, 2018. Thus, he sent a letter to him. **See Exhibit 27.**

222. Shower and Shopoff had conspired to defraud plaintiff.

223. Defendant Resident of 5540 Estate Dr. Oakland CA said he bought Receiver Savage's house from his family because he passed away. Plaintiff demanded repeatedly him to produce the escrow file, but he refused to do so.

224. Plaintiff visited the office of Alameda County to see Receiver Savage's death certificate. He found no his death certificate. He has investigated through online, but the online information just says "Donald G. Savage lives in Oakland.

225. Resident and Receiver Savage have conspired to defraud plaintiff.

226. Defendant postmaster Peter Hurtado had ignored plaintiff's repeated requests to investigate why 2 priority mails sent on September 21, 2018 to an attorney in Los Angeles have gotten lost. The lost documents were several hundred pages of Clerk's Transcript on Appeal. **See Exhibit 31.**

227. Postmaster Hurtado has ignored his demand of compensation. **See Exhibit 32.**

228. Defendant United States Postal Service is responsible and accountable for postmaster Hurtado's frauds.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## FIRST CAUSE OF ACTION

### (FRAUD)

229.  Plaintiff incorporates herein by reference the allegations made in paragraph 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 12, 13, 14, 15, 16, 17, 20, 21, 22, 23, 24, 25, 26, 27, 29, 94, 95, 96, 97, 98 and 99 inclusive, as though fully set forth herein.

230.  At all times relevant herein, defendant Governor Jerry Brown had committed frauds.

231.  Plaintiff incorporates herein by reference the allegation made in paragraph 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 20, 21, 22, 29, 101, 102, 103, 104, 105, 106, 107, 108, 109, 110, 111, 112, 113, 114, 115, 116, 117, 118, 119, 120, 121, 122, 123, 124, 125, 126, 127, 128, 129, 130, 131, 133, 134, 135, 136, 137, 160 and 221 inclusive, as though fully set forth herein.

232.  At all times relevant herein, defendant Jeffrey Shopoff had committed frauds.

233.  Plaintiff incorporates herein by reference the allegations made in paragraph 1, 2, 3, 4, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 113, 129, 130, 131 and 133 inclusive, as though fully set forth herein.

234.  At all times relevant herein, defendants Randell Jenson and Lawrence Hershfield have committed frauds.

235.  Plaintiff incorporates herein by reference the allegations made in paragraph 1, 2, 3, 4, 8, 9, 10, 11, 12, 13, 14, 15, 114, 115, 116, 117 and 134 inclusive, as though fully set forth herein.

236.  At all times relevant herein, defendant Jay Crom had committed frauds.

237.  Plaintiff incorporates herein by reference the allegations made in paragraph 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 135, 136 and 137 inclusive, as though fully set forth herein.

238.  At all times relevant herein, defendant Kelly Jackson of Chicago Title Company had committed frauds.

239.  Plaintiff incorporates herein by reference the allegations made in paragraph 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 14, 101, 102, 104, 106, 118, 124, 127, 138, 139, 140, 141, 142, 143, 144, 163, 164, 167, 168, 169, 170, 171, 178, 179, 180, 182, 183, 184, 185, 186, 190, 193, 194, 195, 196, 197, 198, 199, 200, and 209 inclusive, as though fully set forth herein.

240. At all times relevant herein, defendant Harold Light had committed frauds.

241. Plaintiff incorporates herein by reference the allegations made in paragraph 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 12, 14, 15, 105, 106, 107, 108, 112, 113, 114, 115, 116, 119, 123, 126, 128, 130, 138, 139 and 145 inclusive, as though fully set forth herein.

242. At all times relevant herein, defendant Robert Stumpf had committed frauds.

243. Plaintiff incorporates herein by reference the allegations made in paragraph 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 108, 112, 127 and 128 inclusive, as though fully set forth herein.

244. At all times relevant herein, defendant Ronald Mallen had committed frauds.

245. Plaintiff incorporates herein by reference the allegations made in paragraph 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 108, 112, 127 and 128 inclusive, as though fully set forth herein.

246. At all times relevant herein, defendant David Winnett had committed frauds.

247. Plaintiff incorporates herein by reference the allegations made in paragraph 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 105, 107, 108, 111, 112, 136,137, 150, 151, 152, 153, 204, 205, 222, 223 and 224 inclusive, as though fully set forth herein.

248. At all times relevant herein, defendant Donald Savage had committed frauds.

249. Plaintiff incorporates herein by reference the allegations made in paragraph 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 104, 107, 108, 109, 110, 112, 127, 128, 137, 150, 151, 152, 153, 154, 155 and 156 inclusive, as though fully set forth herein.

250. At all times relevant herein, defendant Theodore Griffinger had committed frauds.

251. Plaintiff incorporates herein by reference the allegations made in paragraph 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 103, 104, 111, 114, 115, 157, 158, 159, 161, 162, 163, 168 and 169 inclusive, as though fully set forth herein.

252. At all times relevant herein, defendant Laurence Colangelo had committed frauds.

253. Plaintiff incorporates herein by reference the allegations made in paragraph 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 103, 104, 106,163, 164 and 165 inclusive, as though fully set forth herein.

254. At all times relevant herein, defendant Alfred Steadman had committed frauds.

255.  Plaintiff incorporates herein by reference the allegations made in paragraph 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 166, 167, 168, 169, 170, 171, 172, 173, 174, 175, 176, 177, 178 , 179, 180, 181, 182 and 183 inclusive, as though fully set forth herein.

256.  At all times relevant herein, defendant Eric Selten had committed frauds.

257.  Plaintiff incorporates herein by reference the allegations made in paragraph 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 184, 185, 186, 187, 188, 188, 189, 195 and 197 inclusive, as though fully set forth herein.

258.  At all times relevant herein, defendant Tom Nunziato had committed frauds.

259.  Plaintiff incorporates herein by reference the allegations made in paragraph 1, 2, 3, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 189, 190, 191, 192, 193, 194, 195, 196, 197, 198 and 199 inclusive, as though fully set forth herein.

260.  At all times relevant herein, defendant John Marcin had committed frauds.

261.  Plaintiff incorporates herein by reference the allegations made in paragraph 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13,14, 15, 120, 200, 201 and 202 inclusive, as though fully set forth herein.

262.  At all times relevant herein, defendant Philip Putnam had committed frauds.

263.  Plaintiff incorporates herein by reference the allegations made in paragraph 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12 and 203 inclusive, as though fully set forth herein.

264.  At all times relevant herein, defendant Jeffrey Kirk had committed frauds.

265.  Plaintiff incorporates herein by reference the allegations made in paragraph 8, 9, 10, 204 and 205 inclusive, as though fully set forth herein.

266.  At all times relevant herein, defendant Don Cloes had committed frauds.

267.  Plaintiff incorporates herein by reference the allegations made in paragraph 8, 9, 14, 15 and 206 inclusive, as though fully set forth herein.

268.  At all times relevant herein, defendant Ervin Cohen & Jessup LLP had committed frauds.

269.  Plaintiff incorporates herein by reference the allegations made in paragraph 8, 9, 10, 14, 15, 207 and 208 inclusive, as though fully set forth herein.

270.  At all times relevant herein, defendant Norman Pine had committed frauds.

271. Plaintiff incorporated herein by reference the allegations made in paragraph 8, 9, 10, 14, 15, 209, 210 and 211 inclusive, as though fully set forth herein.

272. At all times relevant herein, defendant Elliot Bien had committed frauds.

273. Plaintiff incorporates herein by reference the allegations made in paragraph 8, 9, 10, 14, 15 and 212 inclusive, as though fully set forth herein.

274. At all times relevant herein, defendant GVA Kidder Mathews had committed frauds.

275. Plaintiff incorporates herein by reference the allegations made in paragraph 8, 9, 10, 14, 217 and 218 inclusive, as though fully set forth herein.

276. At all times relevant herein, defendants Peter Johnson and Ron Johnson had committed fraud.

277. Plaintiff incorporates herein by reference the allegations made in paragraph 8, 9, 10, 219, 220 and 221 inclusive, as though fully set forth herein.

278. At all times relevant herein, defendant Steve Shower had committed frauds.

279. Plaintiff incorporates herein by reference the allegations made in paragraph 8, 9, 10, 222, 223 and 224 inclusive, as though fully set forth herein.

280. At all times relevant herein, defendant Resident had committed frauds.

281. Plaintiff incorporates herein by reference the allegations made in paragraph 12,

282. Plaintiff incorporates herein by reference the allegations made in paragraph 29 and 226 as though fully set forth herein.

283. Plaintiff incorporates herein by reference the allegations made in paragraph 225, 226 and 227 inclusive, as though fully set forth herein.

284. At all times relevant herein, defendant postmaster Peter Hurtado had committed frauds.

## SECOND CAUSE OF ACTION

## (CONSPIRACY)

285. Plaintiff incorporates herein by reference the allegations made in paragraph 12 as though fully set forth herein.

286. At all times relevant herein, defendant Governor Jerry Brown had committed conspiracy.

287. Plaintiff incorporates herein by reference the allegations made in paragraph 101 as though fully set forth herein.

288. At all times relevant herein, defendant Jeffrey Shopoff had committed conspiracy.

289. Plaintiff incorporates herein by reference the allegations made in paragraph 101 as though fully set forth herein.

290. At all times relevant herein, defendants Randell Jenson and Lawrence Hershfield had committed conspiracy.

291. Plaintiff incorporates herein by reference the allegations made in paragraph 101 as though fully set forth herein.

292. At all times relevant herein, defendant Jay Crom had committed conspiracy.

293. Plaintiff incorporates herein by reference the allegations made in paragraph 101 as though fully set forth herein.

294. At all times relevant herein, defendant Kelly Jackson of Chicago Title Company had committed conspiracy.

295. Plaintiff incorporates herein by reference the allegations made in paragraph 144 (10), 173 as though fully set forth herein.

296. At all times relevant herein, defendant Harold Light had committed conspiracy.

297. Plaintiff incorporates herein by reference the allegations made in paragraph 108 as though fully set forth herein.

298. At all times relevant herein, defendant Robert Stumpf had committed conspiracy.

299. Plaintiff incorporates herein by reference the allegations made in paragraph 101 as though fully set forth herein.

300. At all times relevant herein, defendant Ronald Mallen had committed conspiracy.

301. Plaintiff incorporates herein by reference the allegations made in paragraph 101 as though fully set forth herein.

302. At all times relevant herein, defendant David Winnett had committed conspiracy.

303. Plaintiff incorporates herein by reference the allegations made in paragraph 101 as though fully set forth herein.

304. At all times relevant herein, defendant Donald Savage had committed conspiracy.

305. Plaintiff incorporates herein by reference the allegations made in paragraph 101 as though fully set forth herein.

306. At all times relevant herein, defendant Theodore Griffinger had committed conspiracy.

307. Plaintiff incorporates herein by reference the allegations made in paragraph 101 as though fully set forth herein.

308. At all times relevant herein, defendant Laurence Colangelo had committed conspiracy.

309. Plaintiff incorporates herein by reference the allegations made in paragraph 101 as though fully set forth herein.

310. At all times relevant herein, defendant Alfred Steadman had committed conspiracy.

311. Plaintiff incorporates herein by reference the allegations made in paragraph 101 as though fully set forth herein.

312. At all times relevant herein, defendant Eric Selten had committed conspiracy.

313. Plaintiff incorporates herein by reference the allegations made in paragraph 101 as though fully set forth herein. At all times relevant herein, defendant Tom Nunziato had committed conspiracy.

314. Plaintiff incorporates herein by reference the allegations made in paragraph 101 as though fully set forth herein.

315. At all times relevant herein, defendant John Marcin had committed conspiracy.

316. Plaintiff incorporates herein by reference the allegations made in paragraph 101 as though fully set forth herein.

317. At all times relevant herein, defendant Philip Putnam had committed conspiracy.

318. Plaintiff incorporates herein by reference the allegations made in paragraph 101 as though fully set forth herein.

319. At all times relevant herein, defendant Jeffrey Kirk had committed conspiracy.

320. Plaintiff incorporates herein by reference the allegations made in paragraph 101 as though fully set forth herein.

321. At all times relevant herein, defendant Don Cloes had committed conspiracy.

322. Plaintiff incorporates herein by reference the allegations made in paragraph 101 as though fully set forth herein.

323. At all times relevant herein, defendant Ervin Cohen & Jessup LLP had committed conspiracy.

324. Plaintiff incorporates herein by reference the allegations made in paragraph 101 as though fully set forth herein.

325. At all times relevant herein, defendant Norman Pine had committed conspiracy.

326. Plaintiff incorporates herein by reference the allegations made in paragraph 101 as though fully set forth herein.

327. At all times relevant herein, defendant Elliot Bien had committed conspiracy.

328. Plaintiff incorporates herein by reference the allegations made in paragraph 101 as though fully set forth herein.

329. At all times relevant herein, defendant GVA Kidder Mathews had committed conspiracy.

330. Plaintiff incorporates herein by reference the allegations made in paragraph 101 as though fully set forth herein.

331. At all times relevant herein, defendants Peter Johnson and Ron Johnson had committed conspiracy.

332. Plaintiff incorporates herein by reference the allegations made in paragraph 101 as though fully set forth herein.

333. At all times relevant herein, defendant Steve Shower had committed conspiracy.

334. Plaintiff incorporates herein by reference the allegations made in paragraph 101 as though fully set forth herein.

335. At all times relevant herein, defendant Resident had committed conspiracy.

336. Plaintiff incorporates herein by reference the allegations made in paragraph 226, 227 and 228 inclusive, as though fully set forth herein.

337. At all times relevant herein, defendant postmaster Peter Hurtado committed conspiracy.

WHEREFORE, plaintiff prays for relief as follows:

### JURY TRIAL

338. Plaintiff hereby demands a trial by jury in this matter.

### PRAYER

1. For compensatory damages;

2. For exemplary and punitive damages;

3. For declaratory relief as may be ordered by the Court.

42

1

2

3

4

5

6    Dated:    January 31, 2019

Junho Hyon, Pro Se

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

43

# Exhibit 1

December 14, 2018

**VIA HAND DELIVERY**

DEC 14 2018

Received _____

Clerk of the Superior Court

To:     Judge Scott D. Daniels
        Old Solano Courthouse
        580 Texas Street
        Fairfield, CA 94571

From:  Junho Hyon
        643 Meadowbrook Ln.
        Rio Vista, CA 94571

Re:     Hyon vs. Governor Jerry Brown #FCS048068

Dear Judge Daniels:

2 days ago, I went to the office of Court Clerk to file a subpoena. I was shocked that the clerk told me the case was closed so that I could not file the subpoena. I demand you to tell me why you closed it.

The Court accepted my filing 22 deposition subpoenas for production of business records from 20 defendants – Jeffrey Shopoff and his coconspirators last August. All of them had failed to produce any document. Thus, I called to your office to grant me a date for jury trial. The clerk told me that I have to submit paper requesting you to grant me the date. Since I had been searching a contingency lawyer and contacted several lawyers, I thought the lawyer to draft the paper. However, none of them had come forward, even though I had offered them 30% of winnings. I think once the lawyers found out that I am fighting against Governor Brown, they were out.

Thus, I had to file the paper with the Court last October, and requested the Court to reply to me. But the Court had ignored my request.

I wish you had informed me of dismissing the 20 defendants in whom Governor Brown is excluded. Instead, you dismissed them who had destroyed my life.

Your dismissal of them might save Governor Brown. You have hard documentary evidence that Shopoff had stolen Decker Island from me and Shopoff obtained a $2.42 million loan against DI. If you had not dismissed Shopoff, I am sure that he might had been convicted and put him behind bar. If that might happen, I could bring Governor Brown into a jury trial.

I believe that you changed your mind because if Shopoff were tried and convicted, Governor Brown might be brought into a jury trial. Because of your actin to dismiss Shopoff and coconspirators, Shopoff is free instead of behind bars.

I will continue to fight until JUSTICE IS SERVED.

I demand you to tell me why you dismissed them before December 25. I will not accept your silence.

Truly,


Junho Hyon




Cc:     US Senator Dianne Feinstein                    Supreme Court of California

        Governor Jerry Brown                           Supreme Court of the United States

        Mark Stone                                     Jeffrey Shopoff
        Chairman of Assembly Judiciary Committee
        State Capital, P.O. Box 942849
        Sacramento, CA 94249-0108

        Court of Appeal Division 3 and 4

December 19, 2018

**VIA HAND DELIVERY**

To:     Judge Scott D. Daniels
        Old Solano Courthouse
        580 Texas Street
        Fairfield, CA 94571

From:   Junho Hyon
        643 Meadowbrook Ln.
        Rio Vista, CA 94571

Re:     Hyon vs. Governor Jerry Brown #FCS048068

Dear Judge Daniels:

I demand you to investigate Judge Scott Kays' fabrications in his rulings in which Judge Kays had indiscriminately all of defendants. I demand you answer me whether you investigate or not before December 29. If you do not answer, that will be proof that you have approved the rulings of Judge Kays, Judge Paul Beeman and Court of Appeal Division 3 and 4.

Judge Kay's fabrications are as follows:

On SHORT DEED OF TRUST AND ASSIGNMENT OF RENTS which defendants Jeffrey Shopoff and Philip Putnam fabricated, Judge Kays, in his final, said, *"In the current action, plaintiff claims that his signature on the December 19, 2003 deed of trust and assignment of rents was forged. However, this deed of trust and assignment of rents merely confirm the $2.6 Million obligation contained in October 15, 2003 Global Settlement Agreement (which by its terms required plaintiff to sign a deed for this debt.) The San Francisco interpleader action necessarily resolved that obligation, by confirming the sale of Decker Island and a distribution of net assets made after payoff of that existing debt, which it identified as secured by a deed of trust. Plaintiff, represented by counsel in that San Francisco interpleader action, and subsequent appeals, raised or could have raised in those proceeding any concerns about the underlying debt as secured by the subject deed of trust and assignment of rents. Therefore, all claims against these defendants are barred under principles of res judicata and collateral estoppels."* Judge Kays fabricated his statements.

In truth, Shopoff paid off the $2.6 million debt with $1.85 loan money in October 2005 and sold Decker Island for $6.6 million in July 2007. How could Judge Kays' fabricated statement *"a distribution of net assets made after payoff of that existing debt"* be possible since Shopoff paid off the 2.6 million in October 2005, which is 19 months before his sale of DI? Judge Kays fabricated his statements.

In truth, the deed of trust and assignment rents had never existed during Judge Curtis Karnow's bench trial for Shopoff interpleader action from September 2004 to February 2006. I discovered the deed around July 2010.

DEC 19 2018

Clerk of the Superior Court

Truly,

Junho Hyon

Cc:    US Senator Dianne Feinstein                Supreme Court of California

       Governor Jerry Brown                       Supreme Court of the United States

       Mark Stone                                 Jeffrey Shopoff
       Chairman of Assembly Judiciary Committee
       State Capital, P.O. Box 942849              Philip Putnam
       Sacramento, CA 94249-0108
                                                   Harold Light
       Court of Appeal Division 3 and 4            Robert Stumpf

# Exhibit 2

# 𝔖uperior 𝔔ourt of 𝔔alifornia
## 𝔔ounty of 𝔖olano

Chambers of
D. SCOTT DANIELS
Judge
Department Six

December 12, 2018

Old Solano Courthouse
580 Texas Street
Fairfield, CA 94533
(707) 207-7306
FAX (707) 207-7706

Junho Hyon
643 Meadowbrook Lane
Rio Vista, CA 94571

Dear Mr. Hyon:

This acknowledges receipt of your letter to the court dated December 7, 2018. No other response to your letter will be given.

State law prohibits unilateral contact (sometimes called "ex parte contact") with a judge in nearly all cases, and requires that all parties be notified as to all contacts with a judge involving issues in a case, and served with a copy of any materials filed in the court file or mailed to the judge. There are very few exceptions to this rule. Your letter is a prohibited ex parte communication and is being returned for that reason.

Please refrain from initiating any communications with the court that are not authorized by law. You may wish to seek legal advice regarding this matter. Thank you for your cooperation.

Very truly yours,

D. SCOTT DANIELS
Judge of the Superior Court

DSD:tm

Exhibit 3

**A151032**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA
## FIRST APPELLATE DISTRICT, DIVISION 3

JUNHO HYON

*Plaintiff and Appellant*

vs.

Governor Jerry Brown et al,
*Defendants and Respondents*

---

## APPELLANT'S PLEA FOR COURT TO REMAND THE CASE FOR A JURY TRIAL

---

JUNHO HYON
643 Meadowbrook Ln., Rio Vista, California 94571
Telephone: (408) 824-0987

Appellant
Self-Represented

1

Appellant respectfully requests leave of the Court to amend this pleading paper, if the Court finds any defect in them.

## **INTRODUCTION**

The Court knowingly dismissed Governor Jerry Brown who has conspired with Attorney General Xavier Becerra, District Attorney of Solano County, State Bar and FBI not to prosecute Jeffrey Shopoff ("Shopoff") who had fraudulently conveyed appellant's property Decker Island ("DI") to himself and not to prosecute Shopoff who obtained a $2.42 million loan against DI a Ponzi company.

Shopoff sold DI to his brother company Shopoff Group for $6.6 million and that Shopoff and his coconspirators received money for the sale, but **appellant received no money.** Shopoff is making money from a sand mining business on DI.

The Court dismissed only Governor Brown and State of California, but did not dismiss Shopoff and his coconspirators. They were sent back to Superior Court of Solano County for a jury trial.

Thus, appellant had Deposition Subpoena for Production of Business Records to Shopoff and coconspirators. However, all of them had failed to produce any documents.

Thus, appellant called Judge Scott Daniels' court and requested a date for a jury trial. The court clerk advised him to submit a pleading paper to Judge Daniels, requesting the date.

Since appellant was searching a contingency lawyer for the trial, he thought it was a better idea to let the lawyer submit the paper to Judge Daniels.

On September 21, 2018, appellant sent 2 packages containing legal documents by priority mail to a lawyer who might take my case on contingency base in Los Angeles. He requested the lawyer to reply by email before October 4, 2018. However, he had not received his rely. He worried that the packages might never been delivered to the lawyer. Thus, he checked usps tracking that said, *"Your package will arrive later than expected,*

2

*but is still on its way. It is currently in transit to the next facility."* A few days later, an agent from usps called him and told that she could not locate the packages so that he had to file a request for missing mail through online. He filed it. Next day, he received an email reply from usps. It said, *"Court Documents. The information you provided is not sufficient to identify this item. Please use the descriptor and textbox to further describe your items."* Since he did not know anything about descriptor and textbox, he went to see the postmaster of Rio Vista. The postmaster told him he would check with usps and he would inform appellant of his finding. He promised to call him by end of the day. But he failed to call him. Thus, he went to see the postmaster. The postmaster told him he did not receive any call from usps tracking. He told appellant just to wait until he calls. As of today (10-25-18), the postmaster has failed to call him. It is mystery.

Thus, appellant filed APPELLANT'S REQUEST FOR COURT TO GRANT HIM A 40-DAY EXTENSION TO OCTOBER 18, 2018 WHICH IS A DEADLINE FOR APPELLANT TO APPEAL TO SUPREME COURT OF THE UNITED STATES with Court on October 4, 2018. However, he has not received any reply from the Court.

Thus, appellant pleads with the Court to remand his case for a jury trial.

## **DECLARATION OF APPELLANT**

I, Junho Hyon, declare:

1.  I make this declaration based upon my personal first-hand knowledge and if called as a witness herein, I could and would competently testify thereto under oath.

2.  My life had been destroyed by Shopoff, Receiver Donald G. Savage ("Receiver Savage"), lawyer Philip C. Putnam ("Putnam"), lawyer Harold J. Light ("Light"), lawyer Robert J. Stumpf ("Stumpf"), **Governor Jerry Brown,** Attorney General Xavier Becerra, District Attorney of Solano County ("DASC"), State Bar, Judge Curtis A. E. Karnow ("Judge Karnow"), Judge Scott L. Kays ("Judge Kays"), Judge Paul L. Beeman ("Judge Beeman"), Courts of Appeal Division 3 and Division 4,

Supreme Court of California, San Francisco Police Department ("SFPD"), IRS and FBI.

3.    I had paid Shopoff $200,000, yet he had preyed on me.

I had paid Putnam $30,000, yet he had preyed on me.

I had paid Light **$1.2 million** and owed him **$900,000**, yet he had preyed on me.

I had paid Stumpf $250,000, yet he had preyed on me.

4.    Shopoff sent me a fabricated draft of my income tax return in November 2007. In it, he reported I made a capital gain of **$1,804,586** from the DI sale. Whereas I received no money from the sale. I, through my accountant, sent him a letter, demanding the evidence that I made the capital gain. However, Shopoff had ignored my demand. **I have informed Attorney General Jerry Brown and Governor Jerry Brown of this fact.**

5.    Shopoff sent me just 3 pages of the tax return he filed with IRS in March 2008. In it, he reported I made a capital gain of **$961,393** from the sale. **I have informed Attorney General Brown and Governor Brown of this fact.**

6.    I acquired DI in exchange for a $7.6 million judgment against Yasunori Umeno ("Umeno") who owned DI. Thurs, there was no capital gain in the sale. I have informed Governor Brown.

7.    At later time, I obtained the complete return from IRS. In it, Shopoff reported I received $103,529.26 from the sale. Whereas I received no money. He also reported I paid $144,659.20 to Franchise Tax Board for the capital gain of $961,393. I have informed Governor Brown of this fact.

8.    Since November 2008, I had contacted IRS, SFPD, Attorney General Brown, DASC, State Bar, and requested them to investigate Shopoff for the bogus tax return. However, they had done nothing. I have informed Governor Brown of this fact.

9.    I requested Light to try Shopoff for the bogus return with Judge Karnow. However, he rejected my request, saying I owed him $900,000.

10.   I requested Stumpf to try Shopoff with Judge Karnow. However, he too rejected my request, saying he was retained for appeal.

11.   Shopoff filed an interpleader lawsuit against me and his coconspirators in September 2004, claiming he was named as trustee by me. I told Light that I had never named Shopoff trustee. But he did not object Shopoff's claim. I demanded, through Light, a jury trial. However, Judge Karnow rejected my demand, citing an interpleader lawsuit does not require a jury trial. Thus, the judge had presided over his bench trial. I have informed Governor Brown of this fact.

12.   From the beginning, Judge Karnow had sided with Shopoff and his coconspirators. At one point, when I could not stand Judge Karnow's abuse of power anymore, I said to Light that I cannot stand Judge Karnow anymore. Do something to stop him. Then, he said that he is trying to appeal and file a complaint against Judge Karnow with Commission on Judicial Performance ("CJP"). I still trusted him.

13.   Judge Karnow issued Statement of Decision following Trial to The Court in May 2006. It was totally in favor of Shopoff and his coconspirators. Judge Karnow awarded over $1 million to Shopoff and his coconspirators for their attorney fees. I have informed Governor Brown of this fact.

14.   Judge Karnow's bench trial had consisted mostly of his wrongful conducts. I do not have desire to describe them because they are just too many. Thus, I describe just 4 of them as follows.

15.   Judge Karnow revived Eric Selten who had lost his contingency fee 12% due to his illegal lawyer referral business in the trial in Los Angeles, and gave him 14.1%. I have informed Governor Brown of this fact.

16.   Judge Karnow approved Shopoff's illegal sale of DI. There was a court hearing on the sale of DI in June 2007. The attendees were Shopoff, his lawyer Ronald Mallen, Receiver Savage, his lawyer Michael Donner, me and Stumpf. Shopoff said that he found a buyer who would pay $7 million for DI. I demanded Shopoff to disclose the buyer, but he rejected my demand. Then, I pleaded with Judge Karnow to order him to disclose the buyer. However, he rejected my plea, saying Shopoff has a right not to disclose the buyer. I have informed Governor Brown of this fact.

17.   Judge Karnow and the attendees violated a law that says, *"The receiver is the agent of the court and not any party, and is neutral, and acts for the benefit of all who may have an interest in the receivership property, and **hold assets for the court** and not for the plaintiff or the defendant."* I have informed Governor Brown of this fact.

18.   In early 2016, I needed transcripts of the court hearing. Thus, I called Judge Karnow's court to get the transcripts. The court clerk told me the court hearing was sealed so that I could not get them, and told only my lawyer might request the court to unseal it. I did not have money to hire a lawyer.

19.   Judge Karnow presided over hearing on the distribution of the proceeds of the DI sale in September 2007 without presence of Stumpf and me. Shopoff and coconspirators have lied to courts by saying that Stumpf attended the hearing.

20.   Light changed his mind to appeal, instead recommended me to retain Stumpf for appeal. Also he did not file the complaint with CJP.

21.   Before I retained Light in 2004, I asked my very wealthy friend to lend me money to fight Shopoff and his coconspirators. Then, he dispatched his agent to meet with Light. I and she met with him. He presented us a strategy to win. We liked it. My friend called me and told he would lend me money.

22.   Light defrauded me, her and him. Light had committed serious crimes. I did not know his serious crimes until a paralegal told me in November 2012 that Light knew that an interpleader lawsuit does not require a jury trial.

23.   Before retaining Stumpf, I asked the friend to lend me money to appeal. Then, he dispatched an agent to meet with Stumpf. I and he met with Stumpf. He presented us a strategy to win. We liked it. The friend called me and Okayed the financing.

24.   Stumpf too defrauded me, him and the friend. Stumpf had committed serious crimes. I did not know his serious crimes until the paralegal told me in November 2012 that Stumpf knew that an interpleader lawsuit does not require a jury trial.

25.   Stumpf rejected my request for him to obtain an escrow file of Shopoff's sale of DI, saying, *"It is too late."*

26.   Around July 2010, I discovered 16 sets of fraudulent documents Shopoff and coconspirators had filed and recorded at the office of Assessor/Recorder in Solano County. Most of the documents are related to Shopoff's conveyance of DI to himself. I have informed Governor Brown of this fact.

27.   Shortly after my discovery of the documents, I had consulted with 2 lawyers about suing Shopoff and coconspirators. They said I had 2 years to sue them. I had started to find a contingency and contacted more than 40 lawyers. However, none of them had come forward. I have informed Governor Brown of this fact.

28.   Thus, I had to file Complaint against Shopoff and coconspirators with Superior Court of Solano County following my discovery of the documents. The case was assigned to Judge Kays.

29.   Shopoff and coconspirators demurred to my lawsuit, saying my lawsuit was res judicata – retrial of Judge Karnow's bench trial.

30.   There was a court hearing on the most important documents among the 16 sets of documents. The name of the documents is SHORT FORM DEED OF TRUST AND ASSIGNMENT OF RENTS ("Deed"). Putnam and Shopoff fabricated the documents and forged my signatures. In the deed, I was a trustor who borrowed $2.6 million from Umeno against DI. I had informed Governor Brown of this fact.

**31.**   I had argued with Judge Kays that the deed was bogus and the deed did not exist at Judge Karnow's bench trial. However, Judge Kays ruled that it existed at the Judge Karnow's trial. I have informed Governor Brown of this fact.

**32.**   I filed a complaint against Judge Kays with CJP, the commission rejected it. I have informed Governor Brown of this fact.

**33.**   Judge Kays adopted their demurs and had indiscriminately dismissed all of them. In his final ruling against me, Judge Kays said the fraudulent documents had been tried in Judge Karnow's bench trial. Judge Kays rejected true evidence and fabricated false evidence. I have informed Governor Brown of this fact.

34.   His serious wrongful conducts have affected rulings of Courts of Appeal Division 3 and 4.

35. Court of Appeal Division 3 adopted Judge Kays' ruling and Judge Beeman's ruling against me who sued Governor Brown and State of California.

36. Court of Appeal Division 4 adopted Judge Kays' ruling and dismissed Light and Stumpf whom I sued in March 2013. I petitioned to Supreme Court of California, but the court denied my petition.

37. I requested State Bar to prosecute Light and Stumpf and put them behind bars, but the Bar had ignored my request.

38. Judge Kays retired last June. Judge Beeman retired last January.

39. Court of Appeal Division 3 dismissed Governor Brown and State of California, but did not dismiss Shopoff and coconspirators. They were back to Judge Scott D. Daniels.

40. I had 22 DEPOSITION SUBPOENA FOR PRODUCTION OF BUSINESS RECORDS served to Shopoff and coconspirators. However, none of them had failed to produce any document. I was surprised with Chicago Title Company's failure to produce the escrow file of the DI sale.

41. A process server attempted to serve it to Shopoff's office in San Francisco, but the server found out that Shopoff moved out there a few months ago. I searched his home address and found it. The server had attempted to serve it to him totally 6 times, but no one had come to the door at each attempt. When the server attempted to serve it at the evening of September 9, he noticed some one was home, but the person did not come to the door. It is obvious that Shopoff has been avoiding the subpoena.

42. Receiver Savage has been hiding. Oakland Police Department is investigating this matter.

43. I wrote the following letter to Governor Brown:

May 28, 2018

To:    Governor Jerry Brown
       Office of Governor
       State Capital, First Floor
       Sacramento, CA 95814

8

From: Junho Hyon
     643 Meadowbrook Ln.
     Rio Vista, CA 94571
     jhyon@frontier.com

Re:    Prosecution of Jeffrey W Shopoff ("Shopoff")

Dear Governor Brown:

     Attorney General Xavier Becerra ("AG Becerra") and State Bar have lied to me by refusing to prosecute Shopoff and putting him behind bars.

     Thus, I have to write to you directly. I do not care who prosecutes Shopoff as long as the prosecutor put him behind bar. I believe you can do the task.

     As I have said, if Shopoff is behind bars, I will stop fighting you and donate Decker Island ("DI") to Department of Water Resources ("DWR") and Department of Fish and Wildlife ("DFW").

     DWR needs sand on DI for levees' repair and construction. There are 15 to 20 million ton of sand. The value of sand is more than $200 million. A recent newspaper article states, *"Brown has proposed saving $5.8 million of the surplus, roughly two-thirds, and spending $2 billion to tackle a $20 billion backlog of maintenance projects, including levees in need of repair."*

     DFW has beautiful 34-acres natural habitat at a northern tip of DI and wants to expand the development.

     Around May 2005, DWR wanted to buy ID from me, but Shopoff interfered, killed the deal, conveyed DI to himself and makes money from running a sand mining business on DI.

     If you refuse the task of putting Shopoff behind bars, I will continue to fight you for $200 million, as I said in the attached letter. Then, I will disclose your fraud and AG Becerra's fraud to news-media and public.

     Please reply to me before June 9, 2018.

     Truly,

     Junho Hyon

Cc:  United States Senator Dianne Feinstein

     Attorney General Xavier Becerra
     State Bar

9

> Assemblyman Mark Stone, Chairman of Assembly Committee on Judiciary
> Court of Appeal Division Three
> Court of Appeal Division Four
> Judge Paul L. Beeman
> Judge Scott L. Kays
> Supreme Court of California
> Supreme Court of United States
> Jeffrey W Shopoff

44.   However, Governor Brown has failed to rely to me.

45.   I twittered "Gov. Brown, AG Becerra, Bar & FBI conspired not to prosecute lawyer Jeffrey Shopoff who had stolen my property, Decker Island, worth over $200 million. They conspired not to prosecute Jeffrey Shopoff who obtained a $2.42 million loan on DI. I demand their response." They blocked my twitters. They violated First Amendment – Freedom of Speech and Fair Trial.

46.   I twittered "Gov. Brown, AG Becerra, Bar & FBI conspired not to prosecute lawyer Jeffrey Shopoff who had stolen my property, Decker Island, worth over $200 million. They conspired not to prosecute Jeffrey Shopoff who obtained a $2.42 million loan on DI. I demand their response." to Sacramento Bee, East Bay Times. San Francisco Chronicles, Los Angeles Times and Washington Post. However, they too blocked my twitters. They violated First Amendment – Freedom of Speech.

47.   I emailed to Associated Press for help to publish my twitters. However, AP too has ignored my email and violated Freedom of Speech.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

## CONCLUSION

Appellant pleads with the Court to remand his case for a jury trial.

He also pleads with the Court to respect a Federal Rule that says, *"A judge shall uphold the integrity and independence of the judiciary. A judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary."*

Date:   October 25, 2018

By: _____

Junho Hyon, Appellant

Cc:  US Senator Dianne Feinstein

     Governor Jerry Brown

     Attorney General Xavier Becerra

     Court of Appeal, Division Three

     Court of Appeal, Division Four

     Judge Curtis A. E. Karnow

     Judge Scott D. Daniels

     Mark Stone, Chairman of Assembly Judiciary Committee

     State Bar

     FBI

     Supreme Court of California

     Supreme Court of the United States

     Jeffry W. Shopoff

     Philip C. Putnam

     Harold J. Light

     Robert J. Stumpf

11

Exhibit 4

September 30, 2016

To:    Governor Jerry Brown
       Office of Governor
       State Capital, First Floor
       Sacramento, CA 95814

From:  Junho Hyon
       816 Brookside Lane
       Rio Vista, CA 94571
       jhyon@frontier.com

Re:    Your help

Dear Governor Brown:

I have voted for you since 1975 so that I feel that I am entitled to write this letter.

As I have informed you of State legislators' rejection of my request to make a law for me to obtain a jury trial and Solano County District Attorney's rejection of my request to investigate Jeffrey Shopoff and prosecute him, I have to ask you to help save my life. Please review the letter I sent you in March 2015. You are the only one who can save me. If you refuse to do so, I have to sue you and State for me to survive. Also, please review the letter I sent to Assemblyman Mark Stone a month ago.

As I have informed you, my former lawyer Jeffrey Shopoff had stolen my property Decker Island and my business to run sand mining operation on Decker Island. Shopoff sold Decker Island and the business for $6.6 million to his brother's company in which Shopoff is a director. Shopoff received $1.5 million from the sale. I received no money from it. They are making money by running the sand mining business. Judge Scott Kays approved this and dismissed Shopoff.

As I have informed you, I had filed complaints against Judge Kays for his frauds with Commission on Judicial Performance, but the commission had rejected them. Thus, I plead with you to order the commission to investigate Judge Kays and remove him from bench. If they remove him, I will get a jury trial.

I have been devastated by Shopoff, Judge Kays and the commission. As a result, I could not afford my wife to live with me so that she moved to the place where my daughter lives in Redlands. I have been living in a rented room and I have been receiving food from a food bank. In addition, I am ill with lung fibrosis which is incurable.

I am 80 year-old. It would be no surprise if I drop dead tomorrow. But I cannot die because I had borrowed $2.5 million from friends, relatives and family members for the lawsuits against Shopoff. I cannot die in peace until I pay them back.

1

As I have informed you, I had requested repeatedly District Attorney of Solano County to investigate Shopoff and convict him. But the DA had ignored my repeated requests. Thus, I plead with you to order the DA to investigate Shopoff and prosecute him for his fraudulent conveyance of Decker Island to himself or elderly abuse. If they convict him, I will get a jury.

As I have informed you, Judge Kays dismissed my former lawyers Harold Light and Robert Stumpf who had preyed on me, who had helped Shopoff win and who had helped me lose.

I want you to know that I will be very happy as long as I get a jury trial, whether through the commission's action against the Judge Kays and the DA's action against Shopoff or your own action for me to get a jury trial. I feel you have responsibility to serve and protect constituents.

Please reply to me by email before 14the of next month. If I do not receive your reply by then, as I have informed you, I have to sue you and State for $200 million.

Sincerely,


Junho Hyon




Cc:    Senator Diane Feinstein                    Jeffrey Shopoff

       Court of Appeal Division 3                 Alex Graft for Harold Light

       Court of Appeal Division 4                 Philip Atkins-Pattenson for Robert Stumpf

       Commission on Judicial Performance

       Judge Curtis Karnow

       Judge Scott Kays

       Brian Taylor
       Court Executive Officer
       Superior Court of Solano County



2

Exhibit 5

1    JUNHO HYON
     816 Brookside Ln.
2    RIO VISTA, CA 94571
3    707 374-5133

4

5    JUNHO HYON, IN PRO PER

**FILED**
Clerk of the Superior Court

DEC  2 2016

By _____
        DEPUTY CLERK

6

7              IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

8                    IN AND FOR THE COUNTY OF SOLANO

9

10                                                      FW            $435
11                              CASE NO: FCS 048068

12   JUNHO HYON,                      )    **PLAINTIFF'S COMPLAINT**
13                                    )    **FOR**
             Plaintiff,              )
14                                    )    **CONSTRUCTIVE FRAUD**
15          vs.                       )
                                      )    ASSIGNED TO
16   GOVERNOR JERRY BROWN;            )    JUDGE PAUL L. BEEMAN
17   STATE OF CALIFORNIA              )    FOR ALL PURPOSES
                                      )
18          Defendants,              )
19   _____)

20       Plaintiff respectfully requests leave of the Court to amend these pleading papers, if

21   the Court finds any defect in them.

22       Plaintiff complains and for cause of action alleges as follows:

23                                **PARTIES**

24   1.  Governor Jerry Brown and State of California

25                          **GENERAL ALLEGATIONS**

26   2.  Plaintiff does not want to sue Governor Brown and State. However, in order to

27       survive, he has to sue them. There is no other option available for plaintiff, but

28       suing them for constructive fraud.

                                      1

3. Plaintiff believes that Governor Brown is fully accountable for destruction of plaintiff's life because of his constructive fraud.

4. Plaintiff has pleaded with both US Senator Dianne Feinstein and Governor Brown to help him, as being a constituent for both. Senator Feinstein has been always responsive and very helpful in federal matters. Conversely, Governor Brown has never been responsive and totally ignored plaintiff's pleas.

5. Senator Feinstein sent plaintiff a letter stating that Governor Brown's staff would work hard to help him. However, it has never happened. Governor Brown lied to Senator Feinstein and plaintiff. **See Exhibit 1.**

6. Governor Brown had been informed of wrongful conduct of Judge Scott Kays ("Judge Kays") of Superior Court of Solano County and wrongful conduct of Commission on Judicial Performance.

7. **Judge Kays had rejected true evidence, fabricated false evidence and then dismissed defendants.** Plaintiff filed a complaint against Judge Kays with Commission on Judicial Performance. However, the commission rejected his complaint. Plaintiff informed Governor Brown of this fact.

8. Judge Scott Kays had devastated plaintiff's life in August 2013. There was a court hearing of Judge Kays' tentative ruling on SHORT FORM DEED OF TRUST AND ASSIGNMENT OF RENTS ("Deed") in July 2013. **See Exhibit 2.** The deed is bogus. Plaintiff had never seen it until he discovered it around July 2010. Plaintiff informed Governor Brown of this fact.

9. Plaintiff's lawyers Jeffrey W Shopoff ("Shopoff") and Philip C Putnam ("Putnam") contrived the deed to defraud him. Shopoff and co-conspirators had filed and recorded it with Solano County in July 2005 under the supervision of Judge Curtis Karnow ("Judge Karnow") of San Francisco Superior Court. They forged his signatures which were fraudulently notarized by Putnam's secretary Elizabeth Hagianakes. Before the hearing, plaintiff had repeatedly argued with

2

1    Judge Kays that the deed was bogus. However, in his tentative ruling, he

2    legitimated it and fabricated that it had existed during Judge Karnow's bench trial.

3    In fact, it had never been presented at his bench trial.

10. Plaintiff obtained the transcripts of the hearing. **See Exhibit 3.** At the hearing,

plaintiff said, *"Defendant Jeffrey Shopoff and Putnam filed and recorded the*

*fraudulent deed of trust with Solano County. They fabricated the deed of trust and*

*made me trustor against Decker Island. Putnam's secretary notarized my forged*

*signatures. It is very sad for you, as a judge, to have ignored their crimes."* Then,

Judge Kays responded to him by saying, *"Well, Mr. Hyon, let me stop you there.*

*Number one, this is a civil action, not a criminal action. If you think a crime has*

*been committed, then that's something you need to report to the local police*

*department."* Plaintiff submitted the deed to Judge Kays long before the hearing.

Judge Kays should have realized they committed a crime and advised plaintiff to

report to the local police. But he had ignored to do so. If he had done so, plaintiff

might have won the trial. Plaintiff informed Governor Brown of the court hearing.

11. Judge Kays said, in his final ruling after the hearing, *"In the current action,*

*plaintiff claims that his signature on the December 19, 2003 deed of trust and*

*assignment of rents was forged. However, this deed of trust and assignment of*

*rents merely confirm the $2.6 Million obligation contained in the October 15,*

*2003 Global Settlement Agreement (which by its terms required plaintiff to sign a*

*deed of* trust *for this debt.) The San Francisco interpleader action necessarily resolved*

*that obligation, by confirming the sale of Decker Island and a distribution of net*

*accets made after payoff of that existing debt, which it identified as secured by a*

*deed of trust. Plaintiff, represented by counsel in that San Francisco interpleader*

*action, and subsequent appeals. raised or could have raised in those proceedings*

*any concerns about the underlying debt as secured by the subject deed of trust and*

*assignment of rents. Therefore, all claims against these defendants are barred*

*under the principles of res judicata and collateral estoppels."* Judge Kays

3

fabricated his false statements. Plaintiff informed Governor Brown of Judge Kays' fabrications.

12. Shopoff paid off the $2.6 million in October 2005 and sold DI for $6.6 million in July 2007. How could Judge Kays' fabricated statement *"a distribution of net assets made after payoff of that existing debt"* be possible since Shopoff paid off the 2.6 million debt in October 2005, which is 19 months before his sale of DI? Plaintiff informed Governor Brown of this fact.

13. Judge Kays had deceived plaintiff by saying, *"Plaintiff, represented by counsel in that San Francisco interpleader action, and the subsequent appeals, raised or could have raised in those proceeding any concerns about the underlying debt as secured by the subject deed of trust and assignment of rents. Therefore, all claims against these defendants are barred under the principals of res judicata and collateral estoppels."* Plaintiff had argued repeatedly with Judge Kays that he discovered the deed around July 2010 and it had not been presented at Judge Karnow's bench trial (from September 2004 to February 2009). However, Judge Kays had ignored his arguments and lied. **Judge Kays had rejected true evidence and fabricated false evidence. Then, he dismissed defendants.** Plaintiff informed Governor Brown of this fact.

14. Plaintiff filed a complaint against Judge Kays for his ruling on the deed with Commission on Judicial Performance in August 2013. However, the commission rejected plaintiff's complaint. **See Exhibit 4.** Plaintiff informed Governor Brown of this fact.

15. Plaintiff discovered 16 sets of fraudulent documents related to DI at Solano County in July 2010. He consulted with 2 lawyers to sue Shopoff and co-conspirators from his discovery of the documents. They advised him that he has 2 years of statute of limitations. He had tried hard to find a contingency lawyer and contacted over 40 lawyers in vain. Because of the statute of the limitations, he had to file a lawsuit against Shopoff and co-conspirators in May 2012.

4

16. Today, plaintiff feels bitter with those lawyers who had not told him that Shopoff and co-conspirators had committed crimes and he should report to District Attorney of Solano County, request them to investigate Shopoff and co-conspirators and prosecute them. If one of over the 40 lawyers had told plaintiff that, his life might have been saved.

17. The 16 sets of the documents were filed and recorded by Shopoff and his co-conspirators under Judge Karnow's supervision. Plaintiff had submitted the 16 sets of the documents to Judge Kays and Governor Brown.

18. The very first set of the documents is NOTICE OF TRUSTEE SALE. **See Exhibit 5.** Shopoff, with the notice of trustee sale, conveyed DI to himself. Judge Kays had approved his fraudulent conveyance. Shopoff had never been Plaintiff's trustee. Judge Kays had ignored the notice and then dismissed Shopoff. Plaintiff informed Governor Brown of this fact.

19. When Shopoff filed and recorded the notice of trustee sale, around the same time he and co-conspirators secretly filed fraudulent motions to appoint a receiver with Judge Karnow. **See Exhibit 6 and Exhibit 7.** They committed crimes without telling Judge Karnow and plaintiff. Judge Kays had ignored their crimes. Plaintiff informed Governor Brown of this fact.

20. In their fraudulent motions, they accused plaintiff of stealing equipment worth more than a half million dollars from DI. In fact, he lost about $200,000 to preserve assets of DI. They also accused him of not accepting a bogus $9 million offer to purchase DI. Judge Kays had approved their fraudulent motions. Plaintiff informed of Governor Brown of this fact.

21. Judge Karnow appointed Donald Savage as a receiver in June 2005. Receiver Savage took away the control of DI from plaintiff immediately to sell it. However, he could not sell it right away because a legitimate $9 million offer to purchase DI had never existed. Judge Kays had been aware of this fact. Plaintiff informed Governor Brown of this fact.

5

22. Shopoff sold DI in July 2007 after 2 years and a month later since Receiver Savage was appointed in June 2005. This proves their fraudulent motions to appoint a receiver were bogus. Judge Kays had been aware of this fact. Plaintiff informed Governor Brown of this fact.

23. There was a court hearing on Shopoff's sale of DI in June 2007. Judge Karnow, Shopoff, his lawyer Ronald Mallen, Receiver Savage, his lawyer Michael Donner and then plaintiff's lawyer Robert Stumpf ("Stumpf") broke a law which says, *"The receiver is the agent of the court and not any party, and is neutral, and acts for the benefit of all who may have an interest in the receivership property, and hold assets for the court and not for the plaintiff or the defendant."* First of all, Receiver Savage had performed as the agent of Shopoff, not the agent of the court. Furthermore, Shopoff had held assets for himself. The sale of DI should have been done by Receiver Savage for the benefit of all who may have an interest in the receivership property. Judge Kays had been aware of this fact. Plaintiff informed Governor Brown of this fact.

24. At the court hearing, Shopoff said that he found a buyer who would pay $7 million for DI. Then, plaintiff demanded him to disclose the buyer. But he refused to disclose. Plaintiff requested Judge Karnow to order him to disclose the buyer. However, Judge Karnow rejected his request. Judge Kays had been aware of this fact. Plaintiff informed Governor Brown of this fact.

25. Last January, plaintiff had tried to obtain the transcript of the court hearing on Shopoff's sale of DI, but the court told plaintiff that he could not obtain it because Judge Karnow sealed the proceedings of the court hearing. Judge Kays had been aware of this fact. Plaintiff informed Governor Brown of this fact.

26. Shopoff sold DI for $6.6 million instead of $7 million, citing there was oil leak on DI. In fact, there is no such oil leak. He discounted $400,000 without a court hearing. Judge Kays had been aware of this fact. Plaintiff informed Governor Brown of this fact.

6

27. There was a court hearing on the distribution of the sale of DI without Stumpf's and plaintiff's attendance. Plaintiff is not sure if he was not notified on the hearing by Stumpf. Shopoff's lawyers, Receiver Savage and then defendant lawyer Tom Nunziato had publicly stated that Stumpf attended the court hearing. Judge Kays had been aware of this fact. Plaintiff informed Governor Brown of this fact.

28. Shopoff, Receiver Savage and co-conspirators received money from the sale of DI. For example, Shopoff received nearly $1.5 million. But plaintiff received no money, although he owned about 66% of DI. Judge Kays had approved that plaintiff received no money from the sale. Plaintiff informed Governor Brown of this fact.

29. Receiver Savage's lawyers demurred on plaintiff's complaint by accusing him of his complaint being *res judicata* of Judge Karnow's bench trial. They were wrong. Plaintiff said, in his complaint, *"On or around July1, 2010 plaintiff discovered the above mentioned 17 sets of fraudulent documents at the office of Assessor/Recorder of Solano County. In or around July 2010, plaintiff had consulted with 2 different lawyers who advised him to sue defendants within 2 years after July1, 2010."* It is important to note that plaintiff sued defendants following his discovery of the fraudulent documents. Furthermore, plaintiff said, in his First Amend Complaint, *"In or around July 2010, plaintiff had consulted with 2 different lawyers who advised plaintiff to sue defendant within 2 years after July 1, 2010. Thus, he filed the complaint on May 7, 2012, following his discovery of their involvement in filing and recording the 17 sets of them."*

30. Plaintiff had argued with Judge Kays repeatedly that his lawsuit was not *res judicata*, but Judge Kays had ignored his arguments. Instead, he adopted their demurrers and dismissed Receiver Savage and his lawyers. Plaintiff informed Governor Brown of this fact.

7

31. Plaintiff filed a complaint against Receiver Savage and his lawyers with Commission on Judicial Performance, but the commission rejected it. Governor Brown has been aware of this fact.

32. Judge Kays had dismissed all of the defendants based on *res judicata* of Judge Karnow's bench trial. Plaintiff informed Governor Brown of this fact.

33. Plaintiff appealed to Court of Appeal in San Francisco for Shopoff and co-conspirators in May 2013. Then, plaintiff started to find a contingency lawyer because he could not draft a opening brief. He had contacted about 20 lawyers in vain. Thus, he had to draft and file it by himself.

34. Plaintiff lost because the Court adopted Judge Kays' rulings and ignored plaintiff's arguments in his opening brief. I informed Governor Brown of this fact.

35. Shopoff sent plaintiff the draft of a fraudulent tax return in November 2007. **See Exhibit 8.** In it, he reported that plaintiff and Laurence Colangelo ("Colangelo") (Shopoff's co-conspirator) made a capital gain of $1,804,565 from his sale of DI. This was outrageous. In fact, plaintiff and Colangelo made no capital gain because they acquired DI in exchange for a $7.6 million judgment against Yasunori Umeno who owned DI. Judge Kays had been aware of this fact. Plaintiff informed Governor Brown of this fact.

36. Plaintiff demanded Shopoff to produce evidence that they made the capital gain of $1,804,565, but he had refused to do so. Instead, he sent Plaintiff just the 2 pages of the tax return he filed with IRS in March 2008. **See Exhibit 9.** In it, Shopoff reported that plaintiff and Colangelo made a capital gain of 961,393, whereas they made no capital gain. Judge Kays had been aware of this fact. Plaintiff informed Governor Brown of this fact.

37. Plaintiff obtained the complete tax return from IRS in May 2011. It says that Shopoff paid Franchise Tax Board $144,659.20 for plaintiff's portion of capital gain from the proceeds of Shopoff's sale of DI. Judge Kays had been aware of this fact. Plaintiff informed Governor Brown of this fact.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

38. The tax return also states that Shopoff received $1,443,807.07 from his sale of DI, whereas plaintiff received no money from it. Judge Kays had been aware of this fact. Plaintiff informed Governor Brown of this fact.

39. Shopoff embezzled over a million dollars from his sale of DI. Plaintiff reported, in April 2008, to IRS that the Shopoff's tax return was bogus and he embezzled over a million dollars from his sale of DI. Then, plaintiff had requested repeatedly IRS to investigate Shopoff and prosecute him. However, IRS had never responded to him. Instead, they had harassed him. Judge Kays had been aware of this fact. Plaintiff informed Governor Brown of this fact.

40. Plaintiff, since November 2008, had requested San Francisco Police Department, State Bar, Attorney General and District Attorney of Solano County to investigate Shopoff and prosecute him for his fraudulent tax return and his embezzlement of over a million dollars. However, all of them had done nothing for plaintiff. Judge Kays had been aware of this fact. Plaintiff informed Governor Brown of this fact.

41. Plaintiff wanted to donate DI to State which has 34 acres of natural habitat at northern tip of DI. His plan was that he start mining sand adjacent to the natural habitat and donates the mined area to State. Eventually, he would donate whole DI to State. Judge Kays had been aware of this fact. Plaintiff informed Governor Brown of this fact.

42. Curt Schmutte of Department of Water Resources, in May 2005, met with plaintiff and told him that State was ready to make an offer to purchase DI for their need of sand to repair the existing levees and construct new levees.

43. Shortly after Judge Karnow appointed Receiver Savage, plaintiff informed Receiver Savage of State's interest in purchasing DI. There was a court hearing on the issue. After discussions, plaintiff, Eric Selten who was his best friend/consultant/confidant, Shopoff and Receiver Savage, agreed to meet with Schmutte. Then, Receiver Savage's lawyer Donner told plaintiff that he would make an appointment with Schmutte and let him know when plaintiff, Receiver

9

1    Savage, Shopoff and Selten would meet with Schmutte. However, Receiver

2    Savage, Shopoff and Selten without plaintiff visited State and met with Schmutte.

3    Donner lied to plaintiff. Judge Kays have been aware of this fact. Plaintiff

4    informed Governor Brown of this fact.

5    44. Plaintiff received a threatening letter from Shopoff in April 2014. **See Exhibit 10.**

6    Shopoff sent plaintiff the letter 2 months after the notice of prove-up hearing was

7    served to him and just 5 days before the prove- up hearing on April 29, 2014.

8    Plaintiff believes that if Shopoff wanted to oppose the prove-up hearing, he should

9    file his opposition to the hearing with Judge Kays long before April 29, 2014. In

10    addition, Shopoff did not send a copy of the letter to Judge Kays. Plaintiff hand-

11    delivered his letter to Judge Kays on April 23, 2014.

12    45. Shopoff, in his letter, said, *"You did name Shopoff Group in your original*

13    *complaint, but you dismissed Shopoff Group when you filed a First Amended*

14    *Complaint on April 22, 2013, which did not name Shopoff as a defendant."* His

15    statement was wrong. Plaintiff dismissed Shopoff Group because Shopoff Group

16    defaulted on his original complaint. Being not a lawyer, plaintiff did not think that

17    he should include Shopoff Group in the first amended complaint. The point which

18    plaintiff is making here is that Shopoff should address his argument to Judge Kays

19    long before the court hearing on April 29, 2014. He had 2 months to do that. It was

20    totally unjust for Shopoff to accuse plaintiff just 5 days before April 29, 2014.

21    Judge Kays had been aware of this fact. Plaintiff informed Governor Brown of this

22    fact.

23    46. Shopoff, in his letter, *"You never effected service of process on Shopoff Group,*

24    *and the Proof of Service which you filed on October22, 2013, is not truthful,*

25    *because there was never any personal service of the original Complaint on*

26    *Shopoff Group. Service by mail is not enough."* Shopoff lied. Once again, he

27    should present his argument to Judge Kays. The personal service was made on

28    October 4, 2012. Plaintiff filed it on October 22, 2012, whereas Shopoff said that

plaintiff filed it on October 22, 2013, which was wrong. **See Exhibit 11.** Plaintiff informed Governor Brown of this fact.

47. Judge Kays adopted the Shopoff's threatening letter and dismissed Shopoff Group. Plaintiff filed a complaint against Shopoff with Commission on Judicial Performance. However, the commission rejected his complaint. Plaintiff informed Governor Brown of this fact.

48. Plaintiff believes that Shopoff conveyed DI to his brother's company Shopoff Group in which he is a director. Plaintiff, last December, investigated how Shopoff conveyed DI to Shopoff Group. He found out that Chicago Title Co.("CTC") had handled the escrow. Plaintiff called CTC in San Francisco and asked if they had handled the escrow. An agent said that they did not handle the escrow and suggested plaintiff to contact CTC in Oakland. So, he called the CTC, but an agent said they did not handle the escrow and suggested him to contact CTC in Sacramento. So, he contacted it, but once again an agent said they did not handle the escrow and suggested him to contact CTC in Ranch Cordova. By then, plaintiff had become suspicious that CTC was hiding something. Somehow, he had succeeded in contacting an agent who had access to the escrow file in CTC. in San Francisco. Plaintiff requested her to provide him with the escrow file. She denied his request because he was not the seller of DI. She said the seller was Receiver Savage. In fact, Shopoff was the seller. I informed Judge Kays and Governor Brown of this fact.

49. Plaintiff had learned from a title insurance co. how Shopoff conveyed DI to his brother's co. Shopoff Group. An agent emailed me 4 sets of documents:

**Exhibit 12.** Deed of Trust with Assignment of Rents

**Exhibit 13.** Notice of Default and Election to Sell under Deed of Trust: The content of this document is bogus. Shopoff, lawyers Ronald Johnson and Peter Johnson fabricated it.

11

**Exhibit 14.** Notice of Trustee's Sale: The document is bogus. Shopoff fabricated it. Shopoff falsely claimed he was trustee for plaintiff. Plaintiff had never named him trustee.

**Exhibit 15.** Trustee's Deed upon Sale: The document is bogus. Shopoff fabricated it.

The agent explained to plaintiff that Shopoff foreclosed Deed of Trust with Assignment of Rents which was encumbered with $10,049,079 described in Notice of Default and Election to Sell under Deed of Trust. Then, with Notice of Trustee's Sale he conveyed DI to himself. Plaintiff believes that with Trustee's Deed upon Sale he conveyed DI to his brother's company Shopoff Group. Plaintiff informed Judge Kays and Governor Brown of this fact.

50. Judge Kays dismissed plaintiff's lawyers Harold Light ("Light") and Stumpf who had victimized plaintiff. Plaintiff retained Light and had paid Light about $1.2 million to fight Shopoff and co-conspirators at Judge Karnow's bench trial. Plaintiff retained Stumpf for appeal and had paid Stumpf about $250,000. They both had performed such way in which plaintiff lost and Shopoff won. He filed First Amended Complaint against Light and Stumpf with Judge Kays. **See Exhibit 16.** Plaintiff informed Governor Brown of these facts.

51. Plaintiff appealed to Court of Appeal Division 4 for Light and Stumpf. He filed his opening brief in June 2014, and the appeal is still pending. Plaintiff informed Governor Brown of this fact.

52. Governor Brown has been informed of wrongful conduct of Judge Kays who had dismissed plaintiff's 3 lawyers Shopoff, Light and Stumpf who had destroyed plaintiff's life:

53. Governor Brown has had numerous opportunities to help save plaintiff's life, but he has failed to do so.

12

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**CAUSE OF ACTION**

**(Constructive Fraud)**

54. Plaintiff incorporates herein by reference the allegations made in paragraph 5, 6, 7, 8, 10, 11, 12, 13, 14, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 30, 31, 32, 34, 35, 36, 37, 38, 39, 40, 41, 43, 45, 46, 47, 48, 49, 50 and 51 inclusive, as though fully set forth herein.

55. At all times relevant herein, Defendant Governor Brown had committed constructive fraud.

WHEREFORE, Plaintiff prays for relief as follows:

**JURY TRIAL**

56. Plaintiff hereby demands a trial by jury in this matter.

**PRAYER**

1. For compensatory damages

2. For exemplary and punitive damages

3. For declaratory relief as may be ordered by the Court

Dated:  December 2, 2016

By: _Junho Hyon_

Junho Hyon

In Pro Per

13

# Exhibit 1

DIANNE FEINSTEIN
, CALIFORNIA

SELECT COMMITTEE ON
INTELLIGENCE—CHAIRMAN
COMMITTEE ON APPROPRIATIONS
COMMITTEE ON THE JUDICIARY
COMMITTEE ON RULES AND
ADMINISTRATION

# United States Senate

WASHINGTON, DC 20510–0504
http://feinstein.senate.gov
January 24, 2014

Mr. Junho Hyon
725 Livingston Pl
Rio Vista, California 94571

Dear Mr. Hyon:

Thank you for taking the time to write to me. I am sorry to hear about your difficulties with the Commission on Judicial Performance. I appreciate your trust in me and the opportunity to help in this matter. Unfortunately, many issues within the State of California are beyond my jurisdiction as a United States Senator.

I want to be sure that your concern reaches someone who can help you; therefore, I suggest you contact the office of Governor Jerry Brown. His office is set up to help in matters within the jurisdiction of the Governor of the State of California, and I have been assured that his staff will work hard to help you in your endeavors. You can start by calling his Constituent Affairs office directly at (916) 445-2841. You may also submit an e-mail with an outline of the matter through the Governor's website, http://gov.ca.gov/m_contact.php, or mail a signed letter to his office:

Office of Governor Jerry Brown
Attn: Constituent Affairs
State Capitol, First Floor
Sacramento, California 95814

Again, thank you for your letter and the opportunity to serve you. Please do write to me again if I can be of any assistance to you on a federal government issue.

Sincerely,

Dianne Feinstein
United States Senator

DF:dc

FRESNO OFFICE:
2500 TULARE STREET
SUITE 4290
FRESNO, CA 93721
(559) 485-7430

LOS ANGELES OFFICE:
11111 SANTA MONICA BOULEVARD
SUITE 915
LOS ANGELES, CA 90025
(310) 914-7300

SAN DIEGO OFFICE:
880 FRONT STREET
SUITE 3296
SAN DIEGO, CA 92101
(619) 231-9712

SAN FRANCISCO OFFICE:
ONE POST STREET
SUITE 2450
SAN FRANCISCO, CA 94104
(415) 393-0707

# Exhibit 2

RECORDING REQUESTED BY

AND WHEN RECORDED MAIL TO
Hishigen Inc and Oon Hwang Jang
c/o The Johnson Law Firm
430 Railroad AVenue
Pittsburg, CA 94565
Attn: Ronald R. Johnson

Recorded in Official Records, Solano County

**Skip Thomson**
Assessor/Recorder

P TCS

Doc#: **200500099337**

7/05/2005
1:17 PM
AR18
07

| Titles: 2 | Pages: 7 |
|---|---|

Fees      34.00
Taxes      0.00
Other      0.00
PAID     $34.00

(SPACE ABOVE THIS LINE FOR RECORDER'S USE)

## SHORT FORM DEED OF TRUST AND ASSIGNMENT OF RENTS

This **Deed of Trust**, made this _____ day of December, 2003, between

Junho Hyon, Laurence Colangelo, International Development and Consultants, Inc., and Hyon International, Inc.,

herein called **TRUSTORS**, whose address is

c/o Monteleone & McCrory, LLP
725 S. Figueroa Street, Suite 3750
Los Angeles, California 90017,

**CHICAGO TITLE COMPANY**, a California Corporation, herein called **TRUSTEE**, and

**\*\*See vesting below**                              , herein called **BENEFICIARIES**,

**Witnesseth:** That Trustors IRREVOCABLY GRANT, TRANSFER AND ASSIGN TO TRUSTEE IN TRUST, WITH POWER OF SALE, that property in Solano County, California, described as:

Commonly known as Decker Island, Assessor's Parcel Nos. 90-210-90 and 90-210-50, and more particularly described in Exhibit "A" attached hereto and incorporated herein by reference

**\*\*Hishigen, Inc., a Japanese corporation, as to 95%, whose address is 143 Manjuji-Cho Takakura Nishiiru, Kojo-Tori, Shimokyo-Ku, Kyoto, Japan, attn: CEO Akio Hishita and Oon Hwan Jang, as to the remaining 5%, whose address is 1948 Desert Cir. #5, Walnut Creek, CA 94598, an individual**

TOGETHER WITH the rents, issues and profits thereof, SUBJECT, HOWEVER, to the right, power and authority given to and conferred upon Beneficiaries by paragraph (5) of this Deed of Trust to collect and apply such rents, issues and profits.

For the Purpose of Securing:

A.  Performance of each agreement of Trustors incorporated by reference or contained herein.

B.  Payment of the indebtedness evidenced by a Global Settlement Agreement dated 10/15/03 in the principal sum of $2,600,000.00, payable as follows:

- $400,000.00 payable on or before October 15, 2005;

- $425,000.00 payable on or before October 15, 2006;

- $450,000.00 payable on or before October 15, 2007;

- $475,000.00 payable on or before October 15, 2008;

- $500,000.00 payable on or before October 15, 2009;

- $350,000.00 payable on or before October 15, 2010.

Trustors may prepay this obligation in whole or in part at any time without penalty, and this obligation shall not bear any interest prior to default.

This Deed of Trust shall be prior to any other lien or obligation created by Trustors; Trustors do not warrant that this Deed of Trust will be prior to any currently existing liens or obligations.

The undersigned Trustors request that a copy of any Notice of Default and of any Notice of Sale hereunder be mailed to them at their address hereinbefore set forth.

Due on Sale:    If Trustors shall sell, convey, hypothecate, or alienate (collectively referred to as a "sale") more than 50% of the property subject to this Deed of Trust (as described in Exhibit "A" hereto), or more than a 50% beneficial interest therein, without the written consent of the beneficiaries being first had and obtained, beneficiaries shall collectively have the right, at beneficiaries' option, except as prohibited by law, to declare any indebtedness or obligations secured hereby, irrespective of the maturity date specified, immediately due and payable. A sale or transfer of the property or any portion thereof by Trustors to any entity where the beneficial ownership of said entity does not differ by more than 50% from Trustors' beneficial ownership of the property, or a sale of less than a 50% of the property or less than a 50% beneficial interest in the property, shall not be a sale of said property for purposes of this due on sale clause.

To Protect the Security of This Deed of Trust, Trustors agree:

(1) To keep said property in good condition and repair; not to commit or permit waste thereof; not to commit, suffer, or permit any act upon said property in violation of law; to cultivate, irrigate, fertilize, fumigate, prune and do all other acts which from the character or use of said property may be reasonably necessary, the specific enumerations herein not excluding the general.

(2) That by accepting payment of any sum secured hereby after its due date, Beneficiaries do not waive their right to require prompt payment when due of all other sums so secured.

(3) That at any time or from time to time, without liability therefor and without notice, upon written request of any Beneficiary and presentation of this Deed of Trust, and without affecting the personal liability of any person for payment of the indebtedness secured hereby, Trustee may: reconvey any part of said property; consent to the making of any map or plat thereof; join in granting any easement thereon; or join in any extension agreement or any agreement subordinating the lien or charge hereof.

(4) That upon written request of any Beneficiary or their agent stating that all sums secured hereby have been paid, and upon surrender of this Deed of Trust to Trustee for reconveyance and upon payment of its fees, Trustee shall reconvey, without warranty, the property then held hereunder. The recitals in such reconveyance of any matters or facts shall be conclusive proof of the truthfulness thereof. The grantee in such reconveyance may be described as "the person or persons legally entitled thereto." Five years after issuance of such full reconveyance, Trustee may destroy this Deed of Trust (unless directed in such request to retain it).

(5) That as additional security, and only in the event of default, Trustors hereby give to and confer upon Beneficiaries the right, power and authority, during the continuance of these Trusts, to collect the rents, issues and profits of said property, as they become due and payable. Upon any such default, Beneficiaries may at any time without notice, either in person, by agent, or by a receiver to be appointed by a court, and without regard to the adequacy of any security for the indebtedness hereby secured, enter upon and take possession of said property or any part thereof, in their own name sue for or otherwise collect such rents, issues and profits, including those past due and unpaid, and apply the same, less costs and expenses of operation and collection, including reasonable attorney's fees, upon any indebtedness secured hereby, and in such order as Beneficiaries may determine. The entering upon and taking possession of said property, the collection of such rents, issues and profits and the application thereof as aforesaid, shall not cure or waive any default or notice of default hereunder or invalidate any act done pursuant to such notice.

(6) Upon default by Trustors in the payment of any installment of the indebtedness secured hereby, Beneficiaries may deliver to the Trustee a written declaration of the default and demand for sale and of written notice of default and of election to cause to be sold said property, which notice Trustee shall cause to be filed for record. Beneficiaries shall deposit with Trustee this Deed of Trust and all documents evidencing expenditures secured hereby.

After the lapse of such time as may then be required by law following the recordation of said notice of default, and notice of sale having been given as then required by law, Trustee, without demand on Trustors, shall sell said property at the time and place fixed by it in said notice of sale, either as a whole or in separate parcels, and in such order as it may determine, at public auction to the highest bidder for cash in lawful money of the United States, payable at time of sale. Trustee may postpone sale of all or any portion of said property by public announcement at such time and place of sale, and from time to time thereafter may postpone such sale by public announcement at the time fixed by the preceding postponement. Trustee shall deliver to such purchaser its deed conveying the property so sold, but without any covenant or warranty, express or implied. The recitals in such deed of any matters or facts shall be conclusive proof of the truthfulness thereof. Any person, including Trustor, Trustee, or any Beneficiary as hereinafter defined, may purchase at such sale.

After deducting all costs, fees and expenses of Trustee and of this Trust, including cost of evidence of title in connection with sale, Trustee shall apply the proceeds of sale to payment of: all sums expended under the terms hereof, not then repaid; all other sums then secured hereby and then in default; and the remainder, if any, to the person or persons legally entitled thereto.

(7) Any Beneficiary, or any successor in ownership of any indebtedness secured hereby, may from time to time, by instrument in writing, substitute a successor or successors to any Trustee named herein or acting hereunder, which instrument, executed by the Beneficiary and duly acknowledged and recorded in the office of the recorder of the county or counties where said property is situated, shall be conclusive substitution of such successor Trustee or Trustees, who shall, without conveyance from the Trustee predecessor, succeed to all its title, estate, rights, powers and duties. Said instrument must contain the name of the original Trustor, Trustee and Beneficiary hereunder, the book and page and/or instrument number where this Deed is recorded and the name and address of the new Trustee.

(8) That this Deed applies to, inures to the benefit of, and binds all parties hereto, their heirs, legatees, devisees, administrators, executors, successors, and assigns. In this Deed, whenever the context so requires, the masculine gender includes the feminine and/or the neuter, and the singular number includes the plural.

(9) The Trustee accepts this Trust when this Deed, duly executed and acknowledged, is made a public record as provided by law. Trustee is not obligated to notify any party hereto of pending sale under any other Deed of Trust or of any action or proceeding in which Trustor, Beneficiary or Trustee shall be a party unless brought by Trustee.

Dated   December 17, 2003

JUNHO HYON

LAURENCE COLANGELO

INTERNATIONAL DEVELOPMENT
AND CONSULTANTS, INC.

BY:

Its: Peesident

HYON INTERNATIONAL, INC.

BY:

Its: President

STATE OF CALIFORNIA )
                           ) ss.
COUNTY OF LOS ANGELES )

On December _19_, 2003, before me, Elizabeth Hagianakes, a Notary Public, personally appeared
JUNHO HYON, ~~personally known to me~~ (or proved to me on the basis of satisfactory evidence) to be
the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that
he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their
signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted,
executed the instrument.

WITNESS my hand and official seal.

   [SEAL]

NOTARY

```
ELIZABETH HAGIANAKES
Commission # 1253685
Notary Public - California
Los Angeles County
My Comm. Expires Mar 14, 2004
```

STATE OF CALIFORNIA )
                           ) ss.
COUNTY OF LOS ANGELES )

On December _19_, 2003, before me, Elizabeth Hagianakes, a Notary Public, personally appeared
LAURENCE COLANGELO, ~~personally known to me~~ (or proved to me on the basis of satisfactory
evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and
acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and
that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which
the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

   [SEAL]

NOTARY

```
ELIZABETH HAGIANAKES
Commission # 1253685
Notary Public - California
Los Angeles County
My Comm. Expires Mar 14, 2004
```

STATE OF CALIFORNIA    )
                            ) ss.

COUNTY OF LOS ANGELES   )

On December 19, 2003, before me, Elizabeth Hagianakes, a Notary Public, personally appeared LAURENCE COLANGELO as PRESIDENT of INTERNATIONAL DEVELOPMENT AND CONSULTANTS, INC., personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

[SEAL]

_____
NOTARY



ELIZABETH HAGIANAKES
Commission # 1253685
Notary Public - California
Los Angeles County
My Comm. Expires Mar 14, 2004

STATE OF CALIFORNIA    )
                            ) ss.

COUNTY OF LOS ANGELES   )

On December 19, 2003, before me, Elizabeth Hagianakes, a Notary Public, personally appeared JUNHO HYON as PRESIDENT of HYON INTERNATIONAL, INC., personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

[SEAL]

_____
NOTARY

ELIZABETH HAGIANAKES
Commission # 1253685
Notary Public - California
Los Angeles County
My Comm. Expires Mar 14, 2004

Comm # 1253685





Exhibit "A"
TS Number 43321

THOSE CERTAIN LANDS SITUATE IN SECTIONS 13, 14, 22, 23 AND 24, TOWNSHIP 3 NORTH,
RANGE 2 EAST, MOUNT DIABLO BASE AND MERIDIAN, DESCRIBED AS FOLLOWS:

PARCEL ONE:

COMMENCING AT A POINT, WHICH IS NORTH 82° 41' EAST, 6383 FEET FROM AN ESTABLISHED
POINT KNOWN AS U.S. GEOLOGICAL PIER NO. 4, SAID POINT BEING ON THE SOUTHEASTERLY
LINE OF SACRAMENTO RIVER; THENCE FROM SAID POINT OF BEGINNING NORTH 47° 39' EAST,
4820.4 FEET ALONG THE SOUTHEASTERLY BOUNDARY OF SAID NEW CHANNEL OF SACRAMENTO
RIVER TO A POINT BETWEEN THE LANDS FORMERLY OF H. GLASSELL AND OTHERS TO LAND
ACQUIRED BY THE U.S. OF AMERICA; THENCE ALONG THE SAME, SOUTH 67° 29' EAST, 1584.6
FEET TO LAND OF W.R. HANSEN; THENCE ALONG SAID LINE SOUTH 0° 45' WEST, 264 FEET;
THENCE SOUTH 11° 15' WEST, 132 FEET; THENCE SOUTH 17° 45' WEST, 396 FEET; THENCE
SOUTH 16° WEST, 858 FEET; THENCE SOUTH 26° 30' W, 178.2 FEET; THENCE SOUTH 32° WEST,
396 FEET; THENCE SOUTH 28° 30' WEST, 396 FEET; THENCE SOUTH 39° 15' WEST, 198 FEET;
THENCE SOUTH 46° 30' WEST, 442.2 FEET; THENCE SOUTH 51° WEST, 264 FEET; THENCE SOUTH
46° 30' WEST, 990 FEET; THENCE SOUTH 49° 30' WEST, 369.6 FEET; THENCE SOUTH 54° 30'
WEST, 198 FEET; THENCE SOUTH 58° 15' WEST, 198 FEET; THENCE SOUTH 63° 30' WEST,
224.40 FEET; THENCE SOUTH 35° 15' WEST, 178.2 FEET; THENCE SOUTH 46° 30' WEST, 396
FEET; THENCE SOUTH 75° 53' WEST, 144.3 FEET; THENCE NORTH 34° 26' WEST, 2566 FEET TO
THE POINT OF BEGINNING.

APN:  90-210-090 AND PORTION OF 090

PARCEL TWO:

BEGINNING AT A POINT WHICH IS NORTH 82° 41' EAST, 6383 FEET FROM AN ESTABLISHED
POINT KNOWN AS U.S. GEOLOGICAL SURVEY PIER NO. 4, THENCE FROM SAID POINT OF
BEGINNING, SOUTH 34° 26' EAST, 2566 FEET TO A POINT ON THE BOUNDARY LINE BETWEEN
LANDS OF DOZIER AND PRESSLEY COMPANY AND LAND OF R.W. HANSEN; THENCE ALONG THE
BOUNDARY LINE OF LANDS OF DOZIER AND PRESSLEY COMPANY, A CORPORATION, TO LANDS OF
R.W. HANSEN AS FOLLOWS:  SOUTH 28° 8' WEST, 165.8 FEET; THENCE SOUTH 45° 30' WEST,
231 FEET; SOUTH 51° 20' WEST 640.2 FEET; SOUTH 38° 30' EAST, 142.6 FEET TO A POINT
ON THE NORTH SHORE LINE OF SACRAMENTO RIVER, AS IT EXISTED IN THE YEAR 1880; THENCE
FOLLOWING THE MEANDERINGS OF THE NORTH SHORE LINE OF SACRAMENTO RIVER AS THEN
EXISTING AS FOLLOWS:  SOUTH 26° 15' WEST, 244 FEET; THENCE SOUTH 64° 34' WEST, 600.0
FEET; THENCE SOUTH 86° WEST, 429 FEET; THENCE NORTH 70° 15' WEST, 805.2 FEET; THENCE
NORTH 67° 45' WEST, 1069.2 FEET; THENCE NORTH 67° 45' WEST, 587.4 FEET; THENCE NORTH
59° WEST, 161.9 FEET; THENCE NORTH 47° 39' EAST, 3680 FEET TO THE POINT OF
BEGINNING.

APN:  90-210-090 AND PORTION OF 090

PARCEL THREE:

COMMENCING AT A POINT WHICH IS NORTH 82° 41' EAST 6383 FEET FROM AN ESTABLISHED
POINT KNOWN AS H.C. GEOLOGICAL PIER NO. 4, SAID POINT BEING ON THE SOUTHEASTERLY
LINE OF THE SACRAMENTO RIVER; THENCE NORTH 47° 39' EAST, 4820.4 FEET ALONG THE

Exhibit "A"
TS Number 43321

SOUTHEASTERLY BOUNDARY OF SAID NEW CHANNEL OF SACRAMENTO RIVER TO A POINT BETWEEN THE LANDS FORMERLY OF H. GLASSELL AND OTHERS, TO LAND ACQUIRED BY THE U.S. OF AMERICA; THENCE ALONG THE SAME, SOUTH 67° 29' EAST, 1584.6' FEET TO THE LAND OF W.R. HANSEN AND POINT OF BEGINNING OF THE FOLLOWING DESCRIBED PARCEL OF LAND; THENCE FROM SAID POINT OF BEGINNING SOUTH 0° 45' WEST, 264 FEET; THENCE SOUTH 11° 15' WEST, 132 FEET; THENCE SOUTH 17° 45' WEST, 395 FEET; THENCE SOUTH 16° 0' WEST, 856 FEET; THENCE SOUTH 26° 30' WEST, 178.2 FEET; THENCE SOUTH 32° 0' WEST, 396 FEET; THENCE SOUTH 28° 30' WEST, 396 FEET; THENCE SOUTH 39° 15' WEST, 198 FEET; THENCE SOUTH 46° 30' WEST, 442.2 FEET; THENCE SOUTH 51° 0' WEST, 264 FEET; THENCE SOUTH 46° 30' WEST, 990 FEET; THENCE SOUTH 49° 30' WEST, 396.6 FEET; THENCE SOUTH 54° 30' WEST, 198 FEET; THENCE SOUTH 58° 15' WEST, 198 FEET; THENCE SOUTH 63° 30' WEST, 224.4 FEET; THENCE SOUTH 35° 15' WEST, 178.2 FEET; THENCE SOUTH 46° 30' WEST, 396 FEET; THENCE SOUTH 75° 33' WEST, 144.3 FEET; THENCE SOUTH 28° 08' WEST, 165.8 FEET; THENCE SOUTH 45° 30' WEST, 231 FEET; THENCE SOUTH 51° 20' WEST, 640.20 FEET; THENCE SOUTH 39° 30' EAST, 142.60 FEET; THENCE SOUTH 33° WEST, 22 FEET; THENCE SOUTH 54° 14' WEST, 196 FEET; THENCE SOUTH 49° 29' WEST, 241.7 FEET; THENCE SOUTH 47° 50' WEST, 533.5 FEET; THENCE SOUTH 48° 46' WEST, 297 FEET; THENCE SOUTH 47° 20' WEST, 297 FEET; THENCE SOUTH 49° 04' WEST, 272.50 FEET; THENCE SOUTH 58° 35' WEST, 242.30 FEET; THENCE SOUTH 55° 0' WEST, 245.5 FEET; THENCE SOUTH 48° 46' WEST, 228 FEET; THENCE SOUTH 47° 43' WEST, 265 FEET; THENCE SOUTH 46° 15' WEST, 210.3 FEET; THENCE SOUTH 44° 55' WEST, 333.5 FEET; THENCE SOUTH 47° 51' WEST, 484 FEET; THENCE SOUTH 49° 41' WEST, 324.5 FEET; THENCE SOUTH 42° 42' WEST, 306.5 FEET; THENCE SOUTH 36° 16' WEST, 97.7 FEET; THENCE SOUTH 28° 03' WEST, 391.30 FEET; THENCE SOUTH 35° 46' WEST, 256.8 FEET; THENCE SOUTH 31° 41' WEST, 189.3 FEET; THENCE SOUTH 24° 41' WEST, 187 FEET; THENCE SOUTH 14° 07' WEST, 420 FEET; THENCE NORTH 75° 06' WEST, 190 FEET; THENCE NORTH 9° 05' EAST, 205.50 FEET; THENCE NORTH 01° 40' WEST, 303 FEET; THENCE NORTH 09° 35' EAST, 447 FEET; THENCE NORTH 00° 26' WEST, 236 FEET; THENCE NORTH 67° 29' WEST, TO THE POINT OF BEGINNING.

APN:  90-210-050 AND PORTION OF 090

EXCEPTING THEREFROM ANY PORTION OF PARCELS ONE, TWO AND THREE ABOVE LYING WITHIN THE NATURAL BED OF THE SACRAMENTO RIVER BELOW THE LINE OF ORDINARY HIGH WATER.

ALSO EXCEPTING THEREFROM THE FOLLOWING MINERAL RIGHTS:  OIL, GAS, AND OTHER PETROLEUM INTERESTS LYING MORE THAN 500 FEET BELOW THE SURFACE OF THE GROUND, AS RESERVED IN THE DEED RECORDED JULY 9, 1993, SERIES NO. 1993-00062208, OFFICIAL RECORDS.

ASSESSOR'S PARCEL NOS.:  0090-210-050 AND A PORTION OF 090

END OF
DOCUMENT

-------------------- DO NOT RECORD --------------------------

### REQUEST FOR FULL RECONVEYANCE

*To be used only when note has been paid*

To Chicago Title Company:                    Dated _____

    The undersigned is the legal owner and holder of all indebtedness secured by the foregoing Deed of Trust. Said indebtedness secured by said Deed of Trust, has been fully paid and satisfied; and you are hereby requested and directed, on payment to you of any sums owing to you under the terms of said Deed of Trust, to cancel all evidence of indebtedness secured by said Deed of Trust delivered to you herewith, together with the said Deed of Trust, and to reconvey, without warranty, to the parties designated by the terms of said Deed of Trust, all the estate now held by you under the same.

Please mail Deed of Trust and          *Signatures must be notarized.*
Reconveyance to:

_____          _____

_____          _____

_____          By_____

_____          By_____

Do not lose or destroy this Deed of Trust OR THE EVIDENCE OF INDEBTEDNESS which it secures. Both must be delivered to the Trustee for cancellation before reconveyance will be made.

STATE OF CALIFORNIA        )
                                ) ss.
COUNTY OF                  )

On _____, ____, before me, _____, a Notary Public, personally appeared _____, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

[SEAL]

                          _____
                                NOTARY

END OF DOCUMENT

Exhibit 3

1                IN THE SUPERIOR COURT OF CALIFORNIA

2                         COUNTY OF SOLANO

3            THE HONORABLE SCOTT L. KAYS, JUDGE PRESIDING

4                             --oOo--

5    JUNHO HYON,

6         Plaintiff

7         vs.                              FCS039786

8    SHOPOFF & CAVALLO LLP, et al,

9         Defendants.
                                    /
10   _____

11                            --oOo--

12            REPORTER'S TRANSCRIPT OF PROCEEDINGS

13                            MOTION

14                           DEMURRER

15                        JULY 30, 2013

16                            --oOo--

17                              .

18

19

20

21

22

23

24

25

26

27                            --oOo--
                       HOLLY ERION, CSR
28                  Official Court Reporter
                    CSR License No. 12427

1                          A P P E A R A N C E S

2                                --oOo--

3

4    FOR THE PLAINTIFF:                    JUNHO HYON
                                           In Propria Persona
5

6    FOR THE DEFENDANTS:                   WILLIAM R. BAERG
                                           Attorney at Law
7                                          MONTELEONE & McCRORY
                                           725 S. Figueroa St.
8                                          Suite 3200
                                           Los Angeles, CA 90017
9

10

11

12                               --oOo--

13

14

15   EXHIBITS

16    (None)

17

18
     WITNESSES
19
      (None
20

21

22

23

24

25

26

27

28

JULY 30, 2013

TELEPHONIC HEARING

--oOo--

The above-entitled matter came on regularly this date for MOTION and DEMURRER, in the Superior Court of the State of California, in and for the County of Solano, before the Honorable SCOTT L. KAYS, Judge presiding.

The Plaintiff, JUNHO HYON, was present In Propria Persona.

The Defendants were represented by WILLIAM R. BAERG, Attorney at Law.

HOLLY ERION, CSR, Official Court Reporter, was present and acting.

The following proceedings were had and taken, to wit:

P R O C E E D I N G S

--oOo--

*(The following telephonic hearing was reported pursuant to California Rule of Court 3.670.  The record will reflect proceedings that were telephonically transmitted.  Failures in transmission or lack of speaker identification will be noted.)*

THE COURT:  Next is Hyon versus Shopoff and Cavallo and others.

MR. BAERG:  Your Honor, William Baerg on CourtCall representing the moving defendants.

THE COURT:  All right.  And Mr. Hyon appears.  Good morning.

MR. HYON:  Good morning.

THE COURT:  All right.  The Court posted a tentative ruling on the demurrers, and also on the motion to furnish

1    security.  I will hear argument on the demurrers first.

2    I believe, Mr. Hyon, you wanted to present some further

3    argument about the Court's tentative ruling on the rulings on

4    demurrer.  You may proceed.

5    MR. HYON:  Yes, Your Honor.  In my opinion, your tentative

6    rulings are wrong because you have adopted defendant demurrers,

7    which are mostly lies.  Your tentative rulings are wrong because

8    you have ignored my response to defendant demurrer in which I

9    pointed out their lies.  In paragraph two through paragraph

10   eight --

11   THE COURT:  Of the tentative ruling, correct?

12   MR. HYON:  Yes.

13   THE COURT:  Okay.  Go ahead.

14   MR. HYON:  You have stated as if I had tried to litigate

15   defendant.  That is not true.  I have never litigated them

16   before this current actions.  I have submitted the evidence to

17   this Court, but you have ignored the evidence.

18   In paragraph eight you state -- you state that the

19   December 19, 2003 deed of trust and assignment of rents

20   identified in the first amended complaint as the basis for this

21   current action was an integral part of the interpleader

22   proceedings initiated in September 2004 in San Francisco by

23   other attorneys who had represented plaintiff in other earlier

24   litigation and who sought recovery of their contingency fees.

25   This is not true.  I, nor my lawyer, didn't know the

26   December 19, 2003 deed of trust existed.  I believe even the

27   Judge Curtis Karnow didn't know the December 19, 2003 deed of

28   trust existed.  So it has never been tried on the deed of trust.

1    Your statement is false.

2         Defendant Jeffrey Shopoff and Putnam filed and recorded

3    the fraudulent deed of trust with Solano County.  They

4    fabricated the deed of trust and made me trustor against Decker

5    Island.  They forged my signature.  Putnam's secretary notarized

6    my forged signatures.  I submitted the evidence to this Court,

7    but you have ignored it.  To record forged document with any

8    public place is a crime.  It is very sad for you, as a judge, to

9    have ignored their crimes.

10        THE COURT:  Well, Mr. Hyon, let me stop you there.  Number

11   one, this is a civil action, not a criminal action.  If you

12   think a crime has been committed, then that's something you need

13   to report to the local police department.

14        For purposes of this case, I have not ignored anything

15   that you have written.  I have considered everything that you

16   have written.  And I understand your argument is you believe

17   that I ignored it based upon my tentative ruling, but I have not

18   ignored your paperwork.  I have considered your paperwork and

19   issued a tentative ruling which is against your position.  I

20   certainly understand that.

21        But to indicate that this Court condones criminal behavior

22   is not an accurate representation of the Court's tentative

23   ruling.  You may proceed.

24        MR. HYON:  I have reported their filing forged document

25   with Solano County to District Attorney's Office of Solano

26   County, but they have done nothing, nothing.  In my opinions,

27   your tentative rulings are a restatement of defendant's

28   demurrers.

1          THE COURT:  Understood.

2          MR. HYON:  Thank you.

3          THE COURT:  All right.  Anything else that you want to say

4    before I hear from Mr. Baerg?

5          MR. HYON:  No.

6          THE COURT:  All right.  Mr. Baerg.

7          MR. BAERG:  Well -- thank you, Your Honor.  I will just be

8    brief.  The plaintiff admitted in his original complaint that he

9    already sued my clients, that my clients already paid him

10   $158,000 to settle a case in which the deed of trust was an

11   integral part of the underlying dispute.

12         Ten years later, nearly ten years later, he's simply come

13   back to the well for more money under a different legal theory.

14   The tentative decision correctly and thoroughly explains why

15   this action is now barred by the statute of limitations, res

16   judicata, collateral estoppel, and I would submit on the

17   tentative.

18         THE COURT:  All right.  Mr. Hyon, anything else that you

19   would like to say?

20         MR. HYON:  Yes, Your Honor.  I want to say about $158,000

21   payment, if I may.

22         THE COURT:  You may.

23         MR. HYON:  It was not during the trial.  It was before the

24   trial started.  Defendant Putnam settled with me, yes.  It was

25   not during the trial.  So it has never been tried until this

26   current actions.  That is a very lie.  That's what I am saying.

27         THE COURT:  Understood.

28         All right.  Anything further, Mr. Hyon, on the demurrers?

1    MR. HYON: No. No, sir.

2    THE COURT: All right. And Mr. Baerg, anything further on
3    the demurrers?

4    MR. BAERG: No, Your Honor.

5    THE COURT: All right. I will deem all the demurrers
6    submitted to the Court. I will consider the arguments and I
7    will issue a written ruling on the demurrers.

8    On the motion to furnish security, the Court did post a
9    tentative ruling. I don't think there's any request to argue
10    the tentative on the motion to furnish security.

11    Is that accurate, Mr. Baerg?

12    MR. BAERG: Your Honor, I did not make that motion.

13    THE COURT: I believe you're right. And counsel who made
14    that motion is not on the line.

15    Mr. Hyon, you didn't wish to argue the motion to furnish
16    security, which was the Court indicated --

17    MR. HYON: Because I didn't know anything about it.

18    THE COURT: Well, the Court was going to deny the motion.

19    So at this point I will adopt the tentative ruling on the
20    motion for an order to furnish security, and that motion is
21    denied for the reasons set forth in the tentative ruling. I
22    will adopt that as the order of Court on that motion.

23    And then the three demurrers are submitted to the Court,
24    and I will issue a written ruling on the three demurrers and you
25    will receive that ruling in the mail, as we have done in the
26    past with other demurrers in the case.

27    All right. That concludes the hearing. Thank you.

28    MR. HYON: Thank you.

1          MR. BAERG:   Thank you.

2          (Proceedings adjourned.)

3                          --o0o--

1          CERTIFICATE OF CERTIFIED SHORTHAND REPORTER

2                           --oOo--

3

4       I, HOLLY ERION, CSR, hereby certify that I am a Certified

5   Shorthand Reporter, and that I recorded verbatim in machine

6   shorthand, to the best of my ability, the telephonically

7   transmitted proceedings in the above case, pursuant to

8   California Rule of Court 3.670.

9

10      COURT:                    SUPERIOR COURT OF CALIFORNIA
                                  COUNTY OF SOLANO
11

12      JUDGE:                    SCOTT L. KAYS

13

        ACTION:                   JUNHO HYON, Plaintiff, vs.
14                                SHOPOFF & CAVALLO, LLP, et al,
                                  Defendants
15                                Case No. FCS039786

16

        DATES:                    JANUARY 28, 2013/FEBRUARY 14, 2013
17                                MAY 31, 2013/JULY 30, 2013

18

19      I FURTHER CERTIFY that I have caused said

20  telephonically transmitted proceedings to be transcribed

21  into typewriting by Computer-Aided Transcription, and that

22  the preceding pages 1 through 93, inclusive, constitute an

23  accurate and complete transcription of all of my shorthand

24  writing for the date specified.

25

26      DATED:  FEBRUARY 3, 2014

27                              _____
                                HOLLY ERION, CSR
28                              Official Court Reporter
                                CSR License No. 12427

Exhibit 4



𝔖𝔱𝔞𝔱𝔢 𝔬𝔣 𝔠𝔞𝔩𝔦𝔣𝔬𝔯𝔫𝔦𝔞

**Commission on Judicial Performance**

455 Golden Gate Avenue, Suite 14400
San Francisco, CA 94102-3660
(415) 557-1200
FAX (415) 557-1266
Web Site: http://cjp.ca.gov

August 27, 2013

Junho Hyon
725 Livingston Place
Rio Vista, CA 94571

Dear Junho Hyon:

This letter is to acknowledge receipt of your complaint about a California judge(s). We are presently reviewing this information and you will be advised in writing, at a later date, of the Commission's action in this matter.

Very truly yours,

Sarah Herbert
Secretary to Staff Counsel

Confidential under California Constitution,
Article VI, Section 18, and Commission Rule 102

September 12, 2013

To:     Sarah Herbert
Secretary to Staff Counsel
Commission on Judicial Performance
455 Golden Gate Avenue, Suite 14400
San Francisco, CA 94102-3660

From:   Junho Hyon
725 Livingston Place
Rio Vista, CA 94571

Dear Ms Herbert,

I thank you for your letter dated August 27, 2013. When do you think I will receive a reply from the Commission?

Here is my serious problem. I need a contingency lawyer as soon as possible. Otherwise, I am doom to lose. In the past few years, I have contacted more than 50 would-be contingency lawyers, but none of them has step out to help me. It has been a mystery why I have failed to find the lawyer. But the mystery is solved when a lawyer recently told me at a face-to face meeting that I have so many judgments against me so that no lawyer wants to take my case.

Any lawyer has an instant access to my file in Superior Court of Solano County online. The lawyer whom I had the meeting with showed me many pages of judgments against me. He told me it would be impossible for me to find a lawyer.

Judge Scott Kays has dismissed over 20 defendants, but I have filed appeals against seven key defendants.

I think if I receive a letter from the Commission which states that they take action against Judge Kays, I will have a good chance to find a contingency lawyer.

Do you think I will hear from the Commission within next 2 weeks? Your reply will be appreciated greatly.

Sincerely,

Junho Hyon



State of California
**Commission on Judicial Performance**
455 Golden Gate Avenue, Suite 14400
San Francisco, CA 94102-3660
(415) 557-1200
FAX (415) 557-1266
Web Site: http://cjp.ca.gov

September 19, 2013

Junho Hyon
725 Livingston Place
Rio Vista, CA 94571

Dear Mr. Hyon:

Thank you for your correspondence dated September 12, 2013. This matter is still under consideration. We will be in touch with you after the commission has reached a decision regarding your complaint, which will likely be sometime within approximately one month.

Very truly yours,

David Lane
Staff Counsel

DL:ej/l091913Hyon

Confidential under California Constitution,
Article VI, Section 18, and Commission Rule 102

*By Fax*

November 7, 2013

To:     David Lane, Esq.
        Commission on Judicial Performance
        435 Golden Gate Avenue, Suite 14400
        San Francisco, CA 94102 – 3660

From:   Junho Hyon
        725 Livingston Place
        Rio Vista, CA 94571

Email:   jhyon@frontier.com

Dear Mr. Lane,

     Thank you for the Commission's consideration for my complaint. I have been anxiously waiting for the Commission's decision, hopefully in my favor.

     I stopped searching a contingency lawyer until I hear the Commission's decision. I must find the lawyer who takes care of my appeals against the following defendants whom Judge Scott L. Kays has dismissed. (Judge Kays has abused power in dismissing all.)

1. Jeffrey Shopoff and Shopoff & Cavallo LLP
2. Ronald Mallen, David Winnett and Hinshaw & Culbertson LLP
3. Tom Nunziato, Esq.
4. Donald Savage (Receiver)
5. Theodore Griffinger, Michael Donner and Stein & Lubin LLP
6. Philip Putnam, Elizabeth Haginakes-Hill and Monteleone & McCrory LLP
7. Harold Light and Law Offices of Harold Light
8. Robert Stumpf and Sheppard Mullin Richter & Hampton LLP

Obtaining Court Fee Waivers has made me be able appeal.

Your reply would be appreciated greatly.

Sincerely,

Junho Hyon

*By Fax*

November 20, 2013

To:      David Lane, Esq.
         Commission on Judicial Performance
         435 Golden Gate Avenue, Suite 14400
         San Francisco, CA 94102 – 3660

From:    Junho Hyon
         725 Livingston Place
         Rio Vista, CA 94571

Email:   jhyon@frontier.com

Dear Mr. Lane,

    I have been anxiously waiting for your reply to my letter sent on November 7, 2013 and started having daunting feeling. In your letter of September 19, 2013, you said, "Thank you for your correspondence dated September 12, 2013. We will be in touch with you after the commission has reached a decision regarding your complaint, which will likely be sometime within approximately one month." I have not heard from you for exactly two months.

    As I said to you before, I have contacted many would-be contingency lawyers in vain because they have accessed my case files and found judgments/orders after court hearings and declined to take my case. 95% of the lawyers have not bothered to reply to me.

    I believe that the only way to retain a contingency lawyer is that if the commission takes actions against Judge Scott L. Kays.

    As I said to you before, I must retain the lawyer who will take care of my 8 appeals in Court of Appeal against the following defendants whom Judge Kays has dismissed. Judge Kays has abused power in dismissing all.

1. Jeffrey Shopoff and Shopoff & Cavallo LLP
   Judge Kays dismissed them without my response to their demurrer.

2. Ronald Mallen, David Winnett and Hinshaw & Culbertson LLP
   Judge Kays dismissed them without my response to their demurrer.

3. Tom Nunziato, Esq.
   Judge Kays dismissed him without my response to his demurrer.

4. Donald Savage (Receiver)
   Judge Kays vacated his default and dismissed him.

5. Theodore Griffinger, Michael Donner and Stein & Lubin LLP
   Judge Kays adopted their demurrer which were lies and ignored my response to their demurrer.

6. Philip Putnam, Elizabeth Haginakes-Hill and Monteleone & McCrory LLP
   Judge Kays adopted their demurrer which were lies and ignored my response to their demurrer. I sent this complaint to you on August 23, 2013, which is under Commission's consideration.

7. Harold Light and Law Offices of Harold Light
   Judge Kays dismissed them without my response to their demurrer.

8.  Robert Stumpf and Sheppard Mullin Richter & Hampton LLP
   Judge Kays dismissed them without my response to their demurrer.

Obtaining Court Fee Waivers has made me be able to appeal.

I must retain a contingency lawyer. Otherwise, I am doom to lose my appeals. Thus, I am pleading with the Commission to take actions against Judge Kays.

Your reply would be appreciated greatly.

Sincerely,

Junho Hyon

# Fax Transmission

Date:        December 4, 2013

To:          David Lane, Esq.
             Commission on Judicial Performance
             435 Golden Gate Avenue, Suite 14400
             San Francisco, California 94102

From:        Junho Hyon
             725 Livingston, Rio Vista, CA 94571
Phone/fax:   707 374-5133
Email:       jhyon@frontier.com

Re:          Commission's decision

Dear Mr. Lane,

I have been waiting anxiously for your reply. As I have said to you, I stopped searching a contingency lawyer until I learn the Commission's decision. The decision is critical for me to find the lawyer. Please have decency to tell me what is happening. Your prompt reply would be appreciated greatly.

Sincerely,

Junho Hyon

State of California
Commission on Judicial Performance
455 Golden Gate Avenue, Suite 14400
San Francisco, CA  94102-3660
(415) 557-1200
FAX (415) 557-1266
Web Site: http://cjp.ca.gov

December 12, 2013

Junho Hyon
725 Livingston Place
Rio Vista, CA  94571

Dear Mr. Hyon:

At its December 2013  meeting, the Commission on Judicial Performance determined not to take further action with respect to your complaint dated August 23, 2013.

The commission determined that there is no basis for commission proceedings with respect to the judge you have named.  Your complaint addresses, in part, legal rulings made by a judge.  Ordinarily, individual legal rulings are not a basis for review by this commission, which is not a court and does not have the authority to reverse legal rulings or intervene in legal proceedings.  Even a judicial decision or administrative act later determined to be incorrect is not itself a violation of the Code of Judicial Ethics and is not misconduct.

As to the remainder of your complaint, it was the commission's conclusion that the actions of the judge that were the subject of your letter provided an insufficient basis for commission proceedings.

We do appreciate your time and effort in bringing this matter to the commission's attention.

Very truly yours,

David Lane
Staff Counsel

DL:ej/112213Hyon

Confidential under California Constitution,
Article VI, Section 18, and Commission Rule 102

December 14, 2013

To:     David Lane, Esq.
         Commission on Judicial Performance
         435 Golden Gate Avenue, Suite 14400
         San Francisco, CA 94102 – 3660

From:   Junho Hyon
         725 Livingston Place
         Rio Vista, CA 94571

Email:   jhyon@frontier.com

Dear Mr. Lane,

     I received your letter dated December 12, 2013, which depressed me deeply.

     Being not a lawyer, I do not understand your statement that "Your complaint addresses, in part, legal rulings made by a judge". I believe Judge Scott L. Kays intentionally made wrong ruling with bogus information and dismissed 3 defendants. The bogus information is the attached Short Form Deed of Trust and Assignment of Rents. Prior to his ruling, I have informed several times Judge Kays that Defendants Monteleone & McCrory, LLP, Philip C. Putnam, Elizabeth Hagianakes-Hill, Defendants Jeffrey W. Shopoff and Shopoff & Cavallo LLP contrived the short form deed and forged my signatures. Judge Kays has ignored me.

     In his ruling, Judge Kays stated, "In the current action, Plaintiff claims that his signature on the December 19, 2003 deed of trust and assignment of rent was forged. However, this deed of trust and assignment of rents merely confirms the $2.6 Million obligation contained in the October 15, 2003 Global Settlement Agreement (which by its terms required plaintiff to sign a deed of trust for this debt.) The San Francisco interpleader action necessarily resolved that obligation, by confirming the sale of Decker Island and a distribution of net assets made **after payoff of that existing debt**, which it identified as secured by a deed of trust." **Judge Kays fabricated his statement.** In truth, the $2.6 million debt was paid off with $1.85 million around **October 2005.** Shopoff sold Decker Island in **July 2007. The $2.6 million was paid off 21 months before the sale of Decker Island.** Judge Kays abused power.

     I oppose the Commission's decision.

     Sincerely,

*Junho Hyon*

# Exhibit 5

Recorded in Official Records, Solano County                5/26/2005
                                                                    1:48 PM
**Skip Thomson**                                           AR28
Assessor/Recorder                                          3N

P TCS

Recording requested by
and when recorded mail to:
Alliance Title Company
33 New Montgomery Street, Suite 290
San Francisco, California 94105
TS No.: 43321

Doc#: **200500077802**

| Titles: 1 | Pages: 4 |
|---|---|
| Fees | 16.00 |
| Taxes | 0.00 |
| Other | 0.00 |
| PAID | $16.00 |

------------------------------------------ SPACE ABOVE THIS LINE FOR RECORDER'S USE -----------
## NOTICE OF TRUSTEE'S SALE
Notice
YOU ARE IN DEFAULT UNDER A DEED OF TRUST DATED February 2, 1994. UNLESS YOU TAKE ACTION TO PROTECT YOUR PROPERTY, IT MAY BE SOLD AT A PUBLIC SALE. IF YOU NEED AN EXPLANATION OF THE NATURE OF THE PROCEEDING AGAINST YOU, YOU SHOULD CONTACT A LAWYER. On June 21, 2005, at 10:30 am, at the Santa Clara Street entrance to the City Hall, 555 Santa Clara Street, Vallejo, California; Alliance Title Company, as duly appointed trustee, will sell, at public auction to the highest bidder, in lawful money of the United States, all payable at the time of sale, that certain property situated in Solano County, California, known as assessor's parcel number 90-210-090 and 90-210-050, Decker Island, and further described in Exhibit "A" hereto. The Trustee disclaims any liability for any incorrectness of the street address and other common designation, if any, shown herein. The name and address of the Beneficiary (or Beneficiary's counsel or agent) at whose request the sale is being conducted is Jeffrey W. Shopoff, as Trustee c/o Shopoff & Cavallo LLP Attn: Jeffrey W. Shopoff, 353 Sacramento Street, Suite 1040, San Francisco, CA 94111. Directions to the property may be obtained pursuant to a written request submitted to the Beneficiary within ten (10) days from the first publication of this notice (June 1, 2005). Said sale will be made without covenant or warranty, express or implied, regarding title, possession or encumbrances, to pay the remaining unpaid balance of the obligations secured by and pursuant to the power of sale contained in that certain Deed of Trust with Assignment of Rents (together with any modifications thereto), executed by Mega Sand, Incorporated, a California corporation, as trustor, and recorded February 8, 1994, as Instrument Number 1994-00015039 in the office of the Solano County Recorder. The total amount of the unpaid balance of the obligations secured by the property to be sold and reasonable estimated costs, expenses and advances at the time of the initial publication of this Notice of Trustee's Sale is estimated to be $10,074,158.50, provided, however, prepayment premiums, accrued interest and advances will increase this figure prior to sale. Beneficiary's bid at said sale may include all or part of said amount. In addition to cash, the Trustee will accept a cashier's check drawn on a state or national bank, a check drawn by a state or federal credit union or a check drawn by a state or federal savings and loan association, savings association or savings bank specified in Section 5102 of the California Financial Code and authorized to do business in California, or other such funds as may be acceptable to the trustee. In the event tender other than cash is accepted, the Trustee may withhold the issuance of the Trustee's Deed Upon Sale until funds become available to the payee or endorsee as a matter of right. Beneficiary has elected and hereby elects to conduct a unified foreclosure sale pursuant to the provisions of California Commercial Code Section 9604(a)(1)(B)(ii) and to include in the nonjudicial foreclosure of the estate described in this Notice of Trustee's Sale all of the personal property and fixtures described in the Deed of Trust and in any other instruments in favor of Beneficiary, which property is more particularly described in Exhibit "B" hereto. Beneficiary reserves the right to revoke its election as to some or all of said personal property and/or fixtures, or to add additional personal property and/or fixtures to the election herein expressed, at Beneficiary's sole election, from time to time and at any time until the consummation of the trustee's sale to be conducted pursuant to the Deed of Trust and this Notice of Trustee's Sale. The property offered for sale excludes all funds held on account by the property receiver, if applicable.

Date: May 24, 2005

Alliance Title Company, 33 New Montgomery St., #290, San Francisco, CA 94105 {415} 442-5120

By: _____, Authorized Signature

**Sale Information at 714-573-1965 or logon to www.priorityposting.com
Use TS Number 43321**

Exhibit "A"
TS Number 43321

THOSE CERTAIN LANDS SITUATE IN SECTIONS 13, 14, 22, 23 AND 24, TOWNSHIP 3 NORTH, RANGE 2 EAST, MOUNT DIABLO BASE AND MERIDIAN, DESCRIBED AS FOLLOWS:

PARCEL ONE:

COMMENCING AT A POINT, WHICH IS NORTH 82° 41' EAST, 6383 FEET FROM AN ESTABLISHED POINT KNOWN AS U.S. GEOLOGICAL PIER NO. 4, SAID POINT BEING ON THE SOUTHEASTERLY LINE OF SACRAMENTO RIVER; THENCE FROM SAID POINT OF BEGINNING NORTH 47° 39' EAST, 4820.4 FEET ALONG THE SOUTHEASTERLY BOUNDARY OF SAID NEW CHANNEL OF SACRAMENTO RIVER TO A POINT BETWEEN THE LANDS FORMERLY OF H. GLASSELL AND OTHERS TO LAND ACQUIRED BY THE U.S. OF AMERICA; THENCE ALONG THE SAME, SOUTH 67° 29' EAST, 1584.6 FEET TO LAND OF W.R. HANSEN; THENCE ALONG SAID LINE SOUTH 0° 45' WEST, 264 FEET; THENCE SOUTH 11° 15' WEST, 132 FEET; THENCE SOUTH 17° 45' WEST, 396 FEET; THENCE SOUTH 16° WEST, 858 FEET; THENCE SOUTH 26° 30' W, 178.2 FEET; THENCE SOUTH 32° WEST, 396 FEET; THENCE SOUTH 28° 30' WEST, 396 FEET; THENCE SOUTH 39° 15' WEST, 198 FEET; THENCE SOUTH 46° 30' WEST, 442.2 FEET; THENCE SOUTH 51° WEST, 264 FEET; THENCE SOUTH 46° 30' WEST, 990 FEET; THENCE SOUTH 49° 30' WEST, 369.6 FEET; THENCE SOUTH 54° 30' WEST, 198 FEET; THENCE SOUTH 58° 15' WEST, 198 FEET; THENCE SOUTH 63° 30' WEST, 224.40 FEET; THENCE SOUTH 35° 15' WEST, 178.2 FEET; THENCE SOUTH 46° 30' WEST, 396 FEET; THENCE SOUTH 75° 53' WEST, 144.3 FEET; THENCE NORTH 34° 26' WEST, 2566 FEET TO THE POINT OF BEGINNING.

APN:  90-210-090 AND PORTION OF 090

PARCEL TWO:

BEGINNING AT A POINT WHICH IS NORTH 82° 41' EAST, 6383 FEET FROM AN ESTABLISHED POINT KNOWN AS U.S. GEOLOGICAL SURVEY PIER NO. 4, THENCE FROM SAID POINT OF BEGINNING, SOUTH 34° 26' EAST, 2566 FEET TO A POINT ON THE BOUNDARY LINE BETWEEN LANDS OF DOZIER AND PRESSLEY COMPANY AND LAND OF R.W. HANSEN; THENCE ALONG THE BOUNDARY LINE OF LANDS OF DOZIER AND PRESSLEY COMPANY, A CORPORATION, TO LANDS OF R.W. HANSEN AS FOLLOWS:  SOUTH 28° 8' WEST, 165.8 FEET; THENCE SOUTH 45° 30' WEST, 231 FEET; SOUTH 51° 20' WEST 640.2 FEET; SOUTH 38° 30' EAST, 142.6 FEET TO A POINT ON THE NORTH SHORE LINE OF SACRAMENTO RIVER, AS IT EXISTED IN THE YEAR 1880; THENCE FOLLOWING THE MEANDERINGS OF THE NORTH SHORE LINE OF SACRAMENTO RIVER AS THEN EXISTING AS FOLLOWS:  SOUTH 26° 15' WEST, 244 FEET; THENCE SOUTH 64° 34' WEST, 600.0 FEET; THENCE SOUTH 86° WEST, 429 FEET; THENCE NORTH 70° 15' WEST, 805.2 FEET; THENCE NORTH 67° 45' WEST, 1069.2 FEET; THENCE NORTH 67° 45' WEST, 587.4 FEET; THENCE NORTH 59° WEST, 161.9 FEET; THENCE NORTH 47° 39' EAST, 3680 FEET TO THE POINT OF BEGINNING.

APN:  90-210-090 AND PORTION OF 090

PARCEL THREE:

COMMENCING AT A POINT WHICH IS NORTH 82° 41' EAST 6383 FEET FROM AN ESTABLISHED POINT KNOWN AS H.C. GEOLOGICAL PIER NO. 4, SAID POINT BEING ON THE SOUTHEASTERLY LINE OF THE SACRAMENTO RIVER; THENCE NORTH 47° 39' EAST, 4820.4 FEET ALONG THE

Exhibit "A"
TS Number 43321

SOUTHEASTERLY BOUNDARY OF SAID NEW CHANNEL OF SACRAMENTO RIVER TO A POINT BETWEEN
THE LANDS FORMERLY OF H. GLASSELL AND OTHERS, TO LAND ACQUIRED BY THE U.S. OF
AMERICA; THENCE ALONG THE SAME, SOUTH 67° 29' EAST, 1584.6 FEET TO THE LAND OF W.R.
HANSEN AND POINT OF BEGINNING OF THE FOLLOWING DESCRIBED PARCEL OF LAND; THENCE
FROM SAID POINT OF BEGINNING SOUTH 0° 45' WEST, 264 FEET; THENCE SOUTH 11° 15' WEST,
132 FEET; THENCE SOUTH 17° 45' WEST, 395 FEET; THENCE SOUTH 16° 0' WEST, 856 FEET;
THENCE SOUTH 26° 30' WEST, 178.2 FEET; THENCE SOUTH 32° 0' WEST, 369 FEET; THENCE
SOUTH 28° 30' WEST, 396 FEET; THENCE SOUTH 39° 15' WEST, 198 FEET; THENCE SOUTH 46°
30' WEST, 442.2 FEET; THENCE SOUTH 51° 0' WEST, 264 FEET; THENCE SOUTH 46° 30' WEST,
990 FEET; THENCE SOUTH 49° 30' WEST, 396.6 FEET; THENCE SOUTH 54° 30' WEST, 198
FEET; THENCE SOUTH 58° 15' WEST, 198 FEET; THENCE SOUTH 63° 30' WEST, 224.4 FEET;
THENCE SOUTH 35° 15' WEST, 178.2 FEET; THENCE SOUTH 46° 30' WEST, 396 FEET; THENCE
SOUTH 75° 33' WEST, 144.3 FEET, THENCE SOUTH 28° 08' WEST, 165.8 FEET; THENCE SOUTH
45° 30' WEST, 231 FEET; THENCE SOUTH 51° 20' WEST, 640.20 FEET; THENCE SOUTH 39° 30'
EAST, 142.60 FEET; THENCE SOUTH 33° WEST, 22 FEET; THENCE SOUTH 54° 14' WEST, 196
FEET; THENCE SOUTH 49° 29' WEST, 241.7 FEET; THENCE SOUTH 47° 50' WEST, 533.5 FEET;
THENCE SOUTH 48° 46' WEST, 297 FEET; THENCE SOUTH 47° 20' WEST, 297 FEET; THENCE
SOUTH 49° 04' WEST, 272.50 FEET; THENCE SOUTH 58° 35' WEST, .242.30 FEET; THENCE.
SOUTH 55° 0' WEST, 245.5 FEET; THENCE SOUTH 48° 46' WEST, 228 FEET; THENCE SOUTH 47°
43' WEST, 265 FEET; THENCE SOUTH 46° 15' WEST, 210.3 FEET; THENCE SOUTH 44° 55'
WEST, 333.5 FEET; THENCE SOUTH 47° 51' WEST, 484 FEET; THENCE SOUTH 49° 41' WEST,
324.5 FEET; THENCE SOUTH 42° 42' WEST, 306.5 FEET; THENCE SOUTH 36° 16' WEST, 97.7
FEET; THENCE SOUTH 28° 03' WEST, 391.30 FEET; THENCE SOUTH 35° 46' WEST, 256.8 FEET;
THENCE SOUTH 31° 41' WEST, 189.3 FEET; THENCE SOUTH 24° 41' WEST, 187 FEET; THENCE
SOUTH 14° 07' WEST, 420 FEET; THENCE NORTH 75° 06' WEST, 190 FEET; THENCE NORTH 9°
05' EAST, 205.50 FEET; THENCE NORTH 01° 40' WEST, 303 FEET; THENCE NORTH 09° 35'
EAST, 447 FEET; THENCE NORTH 00° 26' WEST, 236 FEET; THENCE NORTH 67° 29' WEST, TO
THE POINT OF BEGINNING.

APN:  90-210-050 AND PORTION OF 090

EXCEPTING THEREFROM ANY PORTION OF PARCELS ONE, TWO AND THREE ABOVE LYING WITHIN
THE NATURAL BED OF THE SACRAMENTO RIVER BELOW THE LINE OF ORDINARY HIGH WATER.

ALSO EXCEPTING THEREFROM THE FOLLOWING MINERAL RIGHTS:  OIL, GAS, AND OTHER
PETROLEUM INTERESTS LYING MORE THAN 500 FEET BELOW THE SURFACE OF THE GROUND, AS
RESERVED IN THE DEED RECORDED JULY 9, 1993, SERIES NO. 1993-00062208, OFFICIAL
RECORDS.

ASSESSOR'S PARCEL NOS.:  0090-210-050 AND A PORTION OF 090

Exhibit "B"
TS Number 43321

All furnishings, equipment, inventory, accounts, and other personal property assets of every nature and kind, tangible and intangible, including but not limited to, Trustor's interests as Lessee uner lease pursuant to which Trustor leases the premises commonly known as 110 L Street, Suite 2, Antioch, CA.

END OF
DOCUMENT

Exhibit 6

ALFRED B. STEDMAN  SBN 58384
Attorney At Law
10324 Balboa Blvd., Ste 200
Granada Hills, CA 91344
Telephone: (818) 366-6139
Telecopier: (661) 296-6117

Attorney For Defendant Laurence Colangelo

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN FRANCISCO

UNLIMITED JURISDICTION

| | |
|---|---|
| SHOPOFF & CAVALLO LLP and , JEFFREY W. SHOPOFF, Trustee, <br><br> Plaintiff, <br><br> vs. <br><br> JUNHO HYON; HYON INTERNATIONAL, INC.; LAURENCE COLANGELO; INTERNATIONAL DEVELOPMENT and CONSULTANTS, INC.; ERIC SELTEN, NATIONAL LEGAL NETWORK; JEFFREY D. KIRK; ELLIOT BIEN; ERVIN, COHEN & JESSUP LLP; NORMAN H. PINE; PINE & PINE; CHARLES WETZEL; GLORIA WETZEL; KOICHI ASHIKAWA; KAYUKO ASHIKAWA; TAKUJU KIMURA; TOSHIKO KIMURA; and DOES 1 through 10, <br><br> Defendants. <br><br> And Related Cross-complaints | Case no. CGC 04-434563 <br><br> The Honorable Curtis Karnow <br> Assigned for all purposes <br> Complaint Filed September 9, 2004 <br><br> **COLANGELO'S EMERGENCY SUPPLEMENTAL REPLY BRIEF IN SUPPORT OF MOTION TO APPOINT RECEIVER; DECLARATION OF LAURENCE COLANGELO** <br><br> Hearing <br><br> Date:  June 3, 2005 <br> Time:  3:30 p.m. <br> Dept:  003 <br><br> Trial: Not set |

Defendant Laurence Colangelo submits the following supplemental reply brief because of new developments that he first learned at 4:45 p.m. on Tuesday, May 31, 2005, that is, the removal GSA Recovery assets is no longer a mere "danger," it is a REALITY. Junho Hyon is at this moment in the process of removing all of the sand mining equipment from Decker

1  Island.

2      Specifically, as set forth in more detail in the attached Declaration of Laurence Colangelo

3  it is case that Mr. Hyon has sold the <u>all of the equipment</u> at Decker Island to Rock Systems, Inc.,

4  a Sacramento sand and gravel equipment dealer, which is <u>now</u> in the process of removing it from

5  the island. The equipment is part of the assets acquired in the settlement with the defendants in the

6  Underlying Litigation, that is, the conveyors, hoppers, generators and other equipment necessary

7  for the operation of a sand mining business.

8      This equipment is essential to maximizing market value of the GSA Recovery. It has been

9  removed, or is in the process of being removed, without the knowledge or consent of Colangelo.

10

11  Date: June 1, 2005

12

13                              ALFRED B. STEDMAN

14

15

16                              _____
                                Attorney for Defendant Laurence Colangelo

17

18

19

20

21

22

23

24

25

26

27

28

                                        2
                    Colangelo's Emergency Reply Brief: Appointment of a Receiver

## DECLARATION OF LAURENCE COLANGELO

I, Laurence Colangelo, declare:

1.    I am a defendant in this Interpleader Action filed by Shopoff & Cavallo LLP and Jeffrey W. Shopoff. I make this declaration based upon my personal first-hand knowledge and if called as a witness herein, I could and would competently testify thereto under oath.

2.    At approximately 2:50 p.m. on Tuesday, May 31, 2005, Christian Lind left an urgent telephone massage on my voice mail service.

3.    I have known Christian "Chris" Lind for approximately two years. I know that he is a principal in Jerico Products, which is one of the major dredging and barging operations in the Sacramento River near Decker Island. Mr. Lind, having been involved in the sand mining operation on the island under the former owners, is very familiar with Decker Island and the equipment located there.

4.    At approximately 4:45 p.m. on Tuesday, May 31, 2005, I returned his telephone. He informed me that Junho Hyon was in the process of selling all of the equipment on the island. When I asked him to describe what he meant, he told me that Rock Systems, Inc. was dismantling everything, conveyers, hoppers, generators, everything on the island and hauling it away. That company's advertisement on the Internet is, "Rock Systems, Inc. offers new, used and reconditioned equipment for rock, sand and gravel, aggregate, mining and recycle industries," In other words, Rock Systems is a dealer in exactly the kind of equipment the plaintiffs acquired in the Global Settlement of the underlying lawsuit.

5.    I believe Chris Lind. From my experience with him, I know him to be a straight shooter and not given to exaggeration.

6.    I never authorized Junho Hyon to get rid of the equipment in this or any other manner.

7.    The loss of the equipment on the island will severely negatively impact marketability of the GSA Recovery and the price we will be able to get for it. Any purchaser will

JUN 01 2005 9:54AM   LAW

05/31/2005 21:29    7910

MAY 31 2005 8:28PM   LAW

661-296-8117    P.5

PAGE 02

661-296-8117    p.3

Case 2:19-cv-00259-KJM-EFB     Document 1-14   Filed 02/11/19     Page 123 of 221

1   be required to replace that equipment which will cost upwards of $500,000, if not double that,

2   with a corresponding decrease in the price it will be willing to buy the remaining assets for.

3        I declare under penalty of perjury under the laws of the State of California that the

4   foregoing is true and correct.

5

6   May 31, 2005

7

8                         Lawrence Colangelo

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

## PROOF OF SERVICE

### STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 12121 Wilshire Boulevard, Suite 205, Los Angeles, California 90025.

On June 1, 2005 I served the foregoing document entitled **COLANGELO'S EMERGENCY SUPPLEMENTAL REPLY BRIEF IN SUPPORT OF MOTION TO APPOINT RECEIVER; DECLARATION OF LAURENCE COLANGELO** on all interested parties in the manner(s) indicated:

### ATTACHED SEE SERVICE LIST

[   ]    BY PERSONALLY HAND-DELIVERING: I personally hand-delivered such envelope to the attorneys for the Plaintiff, as listed above.

[XX]    BY TELECOPIER    I telecopied such document to the addressee at the telecopier number listed for each addressee.

[   ]    BY MAIL    I deposited such envelope in the mail at Los Angeles, California. The envelope was mailed with postage thereon fully prepaid. As follows: I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice, it would be deposited with U.S. postal service on the same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date is more than one day after date of deposit for mailing in affidavit.

[   ]    BY OVERNIGHT DELIVERY: I delivered the envelope to a drop box authorized by an Overnight Delivery Service to receive such documents in an envelope or package designated by such service with delivery fees paid or provided for.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Date:    June 1, 2005

3

Colangelo's Emergency Reply Brief: Appointment of a Receiver

1 | Shopoff v. Hyon et al, San Francisco Superior Court Case Number 04-43456

2 | Service List

3 | Harold J. Light, Esquire
Law Offices of Harold J. Light
4 | 2800 28th Street, Suite 315
Santa Monica, CA 90405
5 | Tel: (310) 452-5588
Fax: (310) 452-5519-

Elliot L. Bien, Esquire
Law Offices of Elliot L. Bien
23 Palomino Road
Novato, CA 94947
Tel: (415) 898-2900
Fax: (415) 898-1922

6

7 | Jeffrey D. Kirk, Esq.
Law Offices of Jeffrey D. Kirk
8 | 1414 Park Avenue
Alameda, CA 94501
9 | Tel: (510) 522-0822
Fax: (510) 864-8898
10 | E-mail: jdk43law@msn.com

Allan Cooper, Esquire
Ervin, Cohen & Jessup LLP
9401 Wilshire Boulevard, 9th Floor
Beverly Hills, CA 90212-2974
Tel: (310) 281-6396
Fax: (310) 859-2325
E-mail: acooper@ecjlaw.com

11 | Normal Pine, Esquire
Pine & Pine
12 | 14156 Magnolia Blvd., #200
Sherman Oaks, CA 91423
13 | Tel: (818) 379-9710
Fax: (818) 379-9749

Ronald Edward Mallen
Hinshaw & Culbertson
244 Jackson St. #300
San Francisco, CA 94111
Tel: (415) 362-6000
Fax: (415) 634-9070

14

15 | Jeffrey W. Shopoff, Esquire
Shopoff & Cavallo LLP
353 Sacramento Street, Suite 1040
16 | San Francisco, CA 94111
Tel: (415) 984-1975
17 | Fax: (415) 984-1978

Tom A. Nunziato, Esquire
Shaub, Williams & Nunziato LLP
10201 Wilshire Blvd., Ste 205
Los Angeles, CA 90025
Tel: (310) 806-0087
Fax: (310) 806-0090

18

19

20

21

22

23

24

25

26

27

28

4

# Exhibit 7



1  ALFRED B. STEDMAN, ESQUIRE (Cal Bar No. 58384
   10324 Balboa Blvd., Ste 200
2  Granada Hills, CA 91344
   Telephone: (818) 366-6139, Facsimile: (661) 296-6117
3  Attorney For Defendant Laurence Colangelo

4  SHAUB, WILLIAMS & NUNZIATO LLP
   Tom A. Nunziato, Esq. (CA Bar No. 68271)
5  Illece Buckley-Weber, Esq., (CA Bar No. 130645)
   12121 Wilshire Boulevard, Suite 205
6  Los Angeles, California 90025
   Telephone: (310) 806-0087, Facsimile:   (310) 806-0090
7  Attorneys for Defendant, Eric Selten

8

9              SUPERIOR COURT OF THE STATE OF CALIFORNIA

10                  COUNTY OF SAN FRANCISCO

11                      **UNLIMITED JURISDICTION**

12

13  SHOPOFF & CAVALLO LLP and ,          )   Case no.  GCG 04-434563
    JEFFREY W. SHOPOFF, Trustee,         )
14                                       )   NOTICE OF MOTION AND MOTION BY
              Plaintiff,                 )   DEFENDANTS LAURENCE
15                                       )   COLANGELO AND ERIC SELTEN TO
          vs.                            )   APPOINT A RECEIVER
16                                       )
    JUNHO HYON; HYON INTERNATIONAL,, )     JOINED BY DEFENDANT JEFFREY D.
17  INC.; LAURENCE COLANGELO;            )   KIRK
    INTERNATIONAL DEVELOPMENT and,       )   JOINED BY PLAINTIFF SHOPOFF &
18  CONSULTANTS, INC.; ERIC SELTEN,      )   CAVALLO LLP
    NATIONAL LEGAL NETWORK; ,            )
19  JEFFREY D. KIRK; ELLIOT BIEN; ERVIN,, )  Date:  June 3. 2005
    COHEN & JESSUP LLP; NORMAN H.,       )   Time:       9  A.M.
20  PINE; PINE & PINE; CHARLES WETZEL;,  )   Dept:      003
    GLORLA WETZEL; KOICHI ASHIKAWA;, )     Trial Date:   Not set
21  KAYUKO ASHIKAWA; TAKUJU              )
    KIMURA;, TOSHIKO KIMURA; and DOES )    ACCOMPANYING PAPERS:
22  1 through, 10,                       )   MEMORANDUM OF POINTS AND
                                         )   AUTHORITIES; DECLARATIONS OF
23            Defendants.                )   1. DEFENDANT, JEFFREY D. KIRK,
                                         )   2. DEFENDANT, L. COLANGELO,
24  ─────────────────────────────       )   3. DEFENDANT, ERIC SELTEN
                                         )   4. PLAINTIFF, JEFFREY W. SHOPOFF
25  RELATED CROSS ACTION                 )
    ─────────────────────────────       )

26

27  TO ALL INTERESTED PARTIES AND TO THEIR ATTORNEYS OF RECORD:

28  PLEASE TAKE NOTICE that on June 3, 2005, at 9 a.m. in Department 003 of the

                                    1
          NOTICE AND JOINT MOTION TO APPOINT A RECEIVER

1   above-referenced Court located at 575 Polk Street, San Francisco, CA 94102, defendants

2   Laurence Colangelo, Eric Selten, and Jeffrey D. Kirk and plaintiff Shopoff & Cavallo LLP will

3   and hereby do make a motion to appoint a receiver to take possession of all assets obtained as a

4   result of a Global Settlement Agreement for the purpose of safeguarding and liquidating those

5   assets and for approval of the pending sale.  The moving parties believe that a receiver will

6   benefit all parties who may assert a valid claim.

7        The grounds of this motion are that the defendants Junho Hyon, Hyon International, Inc.,

8   Laurence Colangelo and International Development and Consultants, Inc., (collectively the

9   "clients") have had an irremediable breakdown in their relationship such that the assets obtained

10   in a Global Settlement Agreement are in an immediate danger of being lost or squandered.

11   Laurence Colangelo has stated in not uncertain terms that any partnership that he had with Junho

12   Hyon is dissolved and that he have demanded liquidation of the partnership assets.  In fact, the

13   the only thing Junho Hyon and Laurence Colangelo can agree upon is that they cannot and will

14   not work with each other.  They have not spoken to each other since July 2004.

15        In addition, Hyon has sued Jeffrey Shopoff, the clients' lead attorney and trustee of the

16   Recovery, for malpractice, conversion, and other causes of action the absurdity of which is

17   highlighted by the fact that Shopoff was the attorney who achieved a $7,600,000 jury verdict for

18   the clients which verdict is the source of the Global Settlement Agreement.

19        Because of the lawsuit, Shopoff cannot take any action without the agreement of the

20   clients which is virtually impossible to obtain.  Because of the acrimony between Hyon and

21   Colangelo, the malpractice lawsuit and the continuous and escalating threats and accusations by

22   Hyon's attorney, the situation has spiraled into insanity.  The result is that no one with an interest

23   in the Global Settlement Agreement is able or willing to do the work necessary to maintain and

24   protect the assets of the Global Settlement Agreement which are in immediate danger.

25        There are also pending offers to buy the assets that must be evaluated and actively

26   maintained pending resolution of this matter. In addition, Shopoff is constantly subjected to

27   unreasonable demands and threats by Hyon.  In the midst of the malpractice and conversion

28

NOTICE AND JOINT MOTION TO APPOINT A RECEIVER

1   claims by Hyon,  Shopoff cannot reasonably be asked to continue to perform his trustee duties.

2   A receiver is necessary to take possession of the assets, take all necessary steps to keep

3   the permits in place, open the mail, file tax returns, investigate the status of the assets obtained in

4   the Recovery and report his recommendations, review the pending $9 million contract, negotiate

5   the most advantageous promissory note and security for the $4.5 million not to be paid in cash,

6   and if that contract falls through, to consummate a sale to the highest offeror, and distribute the

7   proceeds to the parties in accordance with their various interests, or to the Court if the claimants

8   have not yet otherwise determined how such proceeds should be apportioned.

9   This motion shall be based upon this notice, motion, memorandum of points and

10   authorities, Declarations of Jeffrey D. Kirk, Jeffrey W. Shopoff Laurence Colangelo, Eric Selten,

11   and such other and further evidence and arguments which may be presented at the hearing on

12   this motion.

13

14   Dated: April 22, 2005                ALFRED B.  STEDMAN

15

16   _____

17   Attorney for Defendant Laurence Colangelo

18

19   Dated: April 22, 2005                SHAUB, WILLIAMS & NUNZIATO LLP

20

21   _____

22   By.  Tom A. Nunziato Attorneys for Defendant
     ERIC SELTEN

23

24

25

26

27

28

NOTICE AND JOINT MOTION TO APPOINT A RECEIVER

**TABLE OF CONTENTS**

1.    MEMORANDUM OF POINTS AND AUTHORITIES  IN SUPPORT
      OF MOTION TO APPOINT A RECEIVER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      I.     PROPERTY TO BE PLACED IN RECEIVERSHIP . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      II.    PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      III.   PROBLEMS REQUIRING RECEIVERSHIP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

             A.    Clients Are In Dispute . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

                   1.    EVENT 1: SALE OF THE GSA RECOVERY . . . . . . . . . . . . . . . . . 8

                   2.    EVENT 2: OREGON TRANSACTIONS . . . . . . . . . . . . . . . . . . . . 10

             B.    Threat Of Immediate Loss Of Recovery . . . . . . . . . . . . . . . . . . . . . . . . . . 11

             C.    Because of Conflicting Instructions From the Clients and Litigation Filed by Hyon,
                   The Trustee is in an Untenable Position and is Unable and is Unwilling to Act.  11

      IV.    A RECEIVERSHIP IS NECESSARY AND ALLOWED UNDER LAW . . . . . . . . . . 13

             A.    The Court Should Appoint A Receiver To Preserve The Value Of The Recovery
                   Pending A Sale . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

             B.    Receiver Should Be Empowered To Liquidate The Recovery . . . . . . . . . . . . . 15

                   1.    THE FEE HOLDERS CANNOT BE PAID ABSENT A LIQUIDATION
                         OF THE RECOVERY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

                   2.    COLANGELO AS A "PARTNER" HAS THE ABSOLUTE RIGHT TO
                         DISSOLVE THE PARTNERSHIP AND
                         LIQUIDATE THE PARTNERSHIP ASSETS . . . . . . . . . . . . . . . . . . . 16

                   3.    TO THE EXTENT THAT COLANGELO DOES NOT HAVE
                         A UNILATERAL RIGHT TO DISSOLVE THE
                         PARTNERSHIP, BOTH SELTEN AND COLANGELO
                         REQUEST THAT THE COURT MAKE AN ORDER TO
                         DISSOLVE THE PARTNERSHIP . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

             C.    There Is No Adequate Remedy Short Of Appointment Of Receiver . . . . . . . . . 18

             D.    There Are Adequate Funds To Compensate Receiver . . . . . . . . . . . . . . . . . . . 19

             E.    Donald Savage, The Proposed Receiver, Is Well-Qualified To Undertake The
                   Tasks Necessary To Preserve The Value of the Recovery For Everyone's Benefit 19

      V.     CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

2.    DECLARATION OF JEFFREY W. SHOPOFF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

3.    DECLARATION OF JEFFREY D. KIRK    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

4.    DECLARATION OF LAURENCE COLANGELO . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

5.    DECLARATION OF ERIC SELTEN    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

---

4

TABLE OF CONTENTS

**MEMORANDUM OF POINTS AND AUTHORITIES**

**IN SUPPORT OF MOTION TO APPOINT A RECEIVER**

## I.    PROPERTY TO BE PLACED IN RECEIVERSHIP

This is an interpleader action to resolve conflicting claims pertaining to a recovery obtained by Larry Colangelo and Junho Hyon and their respective corporations (collectively the "clients") in Solano Superior Court Case No. LS001781. As the complaint alleges, on October 15, 2003, the clients entered into a Global Settlement Agreement (hereinafter "GSA") with Yasunori Umeno; Chika Takashima; Taiki Corporation, USA; Mega Sand, Inc.; Yoshiji Aizawa; Toshiyuki Hemmi; Hikoichi Mori; Akio Hishida; Akio Tomita; and Motokazu Kim (hereinafter "GSA defendants") resolving that and two other cases among the clients and GSA defendants. (Colangelo Decl. Ex. 1).

As a result of the GSA, the clients became entitled to receive the common stock of two corporations, Mega Sand Incorporated and Taiki Corporation USA, which in turn owns real property commonly known as Decker Island, some components of a sand mining business and related use permits; unrecorded instruments conveying rights to security interests in Decker Island; cash; and miscellaneous other tangible and intangible property. (Complaint 3.) This is referred to in the complaint as the "GSA Recovery." (Complaint 2:16.)

## II.    PARTIES

As stated in the complaint, there are essentially two classes of interests in the GSA Recovery: (1) the clients, consisting of Junho Hyon; Hyon International,, Inc.; Laurence Colangelo and International Development and, Consultants, Inc.; (2) the fee holders consisting of Shopoff & Cavallo LLP, Eric Selten , Jeffrey D. Kirk, Elliot Bien, Erwin Cohen and Jessup LLP, Norman H. Pine and Pine & Pine.

Moving party Laurence Colangelo is one of the clients in whose favor the judgment was rendered. He also owns a portion of the GSA Recovery in conjunction with Junho Hyon. Colangelo alleges that he agreed to accept a less than 50% interest in exchange for Hyon's agreement to admit Eric Selten into the partnership to own Decker Island with specific percentage interests. Hyon has since repudiated the three-way partnership, and Colangelo has

*what* [handwritten]

*34.18%* [handwritten]

*Never existed* [handwritten]

6

1   rescinded the agreement to accept less than 50% of the clients' share of the GSA Recovery.  The

2   extent of Colangelo's interest is now disputed by Hyon.

3        Moving party Eric Selten is a consultant who was hired by Colangelo and Hyon in 1997

4   to assist them and their attorneys in the legal proceedings.  There is a pending dispute between

5   Selten and Hyon with respect to Selten's interest in the GSA Recovery.  Selten was a fee holder

6   with a ten percent (10%) interest in the GSA Recovery based upon a written contract which was

7   increased to twelve percent (12%) also by a written contract.  Selten contends that following the

8   GSA, he, Colangelo and Hyon agreed to form a partnership and in fact, actually commenced

9   business as a partnership which they referred to as Newco.  Hyon now disputes that Selten was

10  part of any business to own and exploit assets from the GSA Recovery.  Hyon also claims that

11  Selten was practicing law without a license or engaged in an illegal attorney referral service, and

12  thus is not entitled to any fees based on his contract, or otherwise, which claims Selten denies.

13       In ruling on this motion the Court need not determine whether Selten is a partner.  The

14  mere fact that Colangelo and Hyon vehemently disagree as to Selten's rights as a partner is fact

15  enough for this Court to conclude that whichever partnership exists is a dysfunctional

16  partnership that cannot responsibly handle the GSA Recovery to the detriment of all of the

17  parties to this lawsuit.  Selten can bring this motion either as a partner or a 12% claimant,

18       Shopoff & Cavallo, LLP is a fee holder with a twenty-one percent (21%) interest in the

19  GSA Recovery based upon a written contract for legal services rendered. Shopoff & Cavallo was

20  the lead counsel in prosecuting Solano Superior Court case number SL001781 resulting in a

21  judgment in favor of the clients for $7.6 million.  The $7.6 million is the corpus of the GSA

22  Recovery.

23       Elliot Bien is a fee holder with a six percent (6%) interest in the GSA Recovery based

24  upon a written contract for legal services rendered. Bien successfully prosecuted an appeal of an

25  order granting judgment notwithstanding the verdict in favor of defendants, and judgment based

26  thereon.

27       Norman Pine is a fee holder with a six and one half percent (6.5%) interest in the GSA

28  Recovery based upon a written contract for legal services rendered. Pine successfully prosecuted

**MEMORANDUM OF POINTS AND AUTHORITIES**
**RE: JOINT MOTION TO APPOINT A RECEIVER**

1    an appeal of an order sustaining a demurrer in favor of defendants without leave to amend, and

2    judgment based thereon.

3        Jeffrey D. Kirk is an attorney and a fee holder with a five percent (5%) interest in the

4    GSA Recovery based upon a written contract for legal services rendered.  Kirk assisted all the

5    lead Attorneys in various aspects of the litigation.

6

7    **III.    PROBLEMS REQUIRING RECEIVERSHIP**

8        **A.    Clients Are In Dispute**

9        After years of litigation, whereupon the clients have finally obtained possession and

10   control of the GSA Recovery, they have fallen into dissension and litigation such that no one can

11   take the essential steps necessary to either effectively manage or liquidate the GSA Recovery for

12   the benefit of all concerned, and pay the fee holders and assignees, and indeed themselves.

13       Junho Hyon has filed suit against Colangelo, Selten and Phillip Putnam (Phillip Putnam

14   was a business attorney hired by Hyon/Colangelo/Selten partnership to provide business and

15   organizational advice), in Los Angeles Superior Court Case No. BC321546 alleging causes of

16   action for fraud, breach of fiduciary duty, negligence breach of contract, and others.  The gist of

17   that action is that Hyon was allegedly deprived of a controlling interest in the Decker Island

18   business opportunity by the actions of the others.  As a result of this litigation, Selten, who had

19   been spearheading the efforts to meet with potential buyers and otherwise conduct the business

20   incident to managing Decker Island, has curtailed his efforts. (Selten Decl. 2.)

21       In addition, the clients, with or without Selten, have been unable to elect officers and

22   directors for Taiki Corporation USA and Mega Sand, Inc., (assets included in the GSA

23   Recovery) and thus, have been unable to take action for those entities.

24       The dissension by and among Hyon, Selten and Colangelo imperils the GSA Recovery.

25   Two relatively recent events highlight this imminent disaster.

26       **1.    EVENT 1:  PROPOSED SALE OF THE GSA RECOVERY** Consistent with

27   Colangelo's efforts to dissolve the partnership and liquidate the GSA Recovery, with Selten or

28   alone, a contract has been signed to sell the GSA Recovery to a new third party entity, to be

**MEMORANDUM OF POINTS AND AUTHORITIES
RE: JOINT MOTION TO APPOINT A RECEIVER**

1    named Decker Island Gravel & Sand, LLC ("DIGS"), for $9 million (hereinafter "the $9 million

2    contract"). The terms of the $9 million contract called for payment of $4.5 million upon close of

3    escrow and the balance of $4.5 million in five annual payments of $900,000, plus 10% interest

4    on the unpaid balance paid quarterly. The $4.5 million balance will be secured by the assets of

5    DIGS, which would include both real and personal property. DIGS is currently conducting its

6    due diligence.

7            Selten and Colangelo have each requested that Hyon join with them in effectuating the $9

8    million contract. Hyon thus far has refused to agree to the $9 million contract, stating that he has

9    "serious problems" with certain of the terms. The parties had a conference call to discuss the

10   situation on December 2, 2004. Hyon had retained yet another lawyer, Mike Mills, to review the

11   $9 million contract. Although Hyon and his lawyers offered plenty of criticism regarding the

12   security for the $4.5 million balance, they presented no meaningful alternative.

13           Instead, Hyon was promoting an offer made by Teichert, a construction company, to

14   enter into a long-term lease providing for minimum payments of $200,000 per year. The GSA

15   requires payments to the GSA defendants in the sum of $450,000 beginning on October 1, 2005

16   and continuing for six years thereafter until $2.6 million is paid. Hyon refused to answer basic

17   questions as to how this offer which provides for substantial losses for the first six years is

18   superior to the $9 million contract providing for $4.5 million to be paid upon close of escrow,

19   how the substantial losses will be financed, and how the creditors, including the attorneys, will

20   be paid. (Selten Decl. 7). None of the other parties are willing to accept the purported Teichert

21   offer promoted by Hyon.

22           By his actions and by the statements of his attorney is appears that Hyon is claiming that

23   he is the sole owner of the GSA Recovery, and that he is answerable to no one. All that is

24   certainly known is that Hyon opposes the $9 million contract. It seems as though Hyon would

25   be perfectly satisfied to lose the entire economic benefit of the GSA Recovery as long as the

26   Court agrees that he is a 100% owner. This self destructive, irrational behavior on the part of

27   Hyon is obviously unacceptable to anyone else who does or may have an interest in the GSA

28   Recovery.

9

MEMORANDUM OF POINTS AND AUTHORITIES
RE: JOINT MOTION TO APPOINT A RECEIVER

1    Both Colangelo and Selten have expressed, in no uncertain terms, that they can no longer

2    do business with Hyon as partner, or upon any other basis. (Selten Decl. 9-13; Colangelo Decl.

3    29-32). Hyon does not disagree that he cannot and/or does not wish to conduct business with

4    either Colangelo or Selten. Therefore, it is inevitable that the partnership will be dissolved and

5    wound up and the partnership assets sold. The only question is when and upon what terms? The

6    $9 million contract represents the best alternative for liquidation for the GSA Recovery at a fair

7    and reasonable price in a prompt manner, and the Court should, upon recognizing the reality that

8    these parties are deadlocked, make a finding that the partnership is dissolved, and should be

9    wound up, that the pending offer is reasonable and should be approved, and order the property

10   sold upon those terms.

11        **2.        EVENT 2: OREGON TRANSACTIONS**  The second problem which points to

12   the need for a receiver in this matter concerned certain transactions in Oregon. In addition to

13   Decker Island, some of the assets which form a portion of the GSA Recovery concern certain

14   real property and partnership interests in Oregon. After a great deal of arm twisting, Hyon

15   finally agreed to allow the sale of an unimproved lot in Oregon, as a result of which

16   approximately $150,000 has been deposited in Shopoff's trust account. However, M & H Taiki,

17   one of the partnership interests which clients acquired in the GSA Recovery, has been sued for

18   approximately $30,000 in Oregon. Because of the parties' dissension and inability to even hire

19   counsel to address this lawsuit, the lawsuit was lost by default. If there are any other assets of M

20   & H Taiki which could have been recovered, they will likely be lost to enforcement of the

21   default judgment. In addition, there is evidence that after the GSA was signed by the parties,

22   John Jang, an employee of the defendants (and signor of the GSA on behalf of all the GSA

23   defendants as attorney-in-fact) conveyed an unimproved lot in Oregon to a third-party. Given

24   their propensity for fraudulent conveyances to avoid creditors' claims, there is a high likelihood

25   that this conveyance could be avoided, and another $150,000-$200,000 could be recovered for

26   the benefit of the clients. Hyon, Selten and Colangelo were unable to agree to retain counsel or

27   defend a lawsuit against M & H Taiki and to investigate the circumstances of this conveyance by

28   Jang. Selten had arranged for the law firm of Dunn Carney to do the work. Hyon objected, and

10

1 | at the last minute, on January 28, 2005, insisted on hiring another lawyer to do the work, to

2 | which Selten objected. As a result, it is likely that this potential GSA Recovery will be lost.

3 |

4 | **B.    Threat Of Immediate Loss Of The GSA Recovery**

5 | The paralysis over decision making has undermined the potential for any future GSA

6 | Recovery arising out of the Oregon assets. If allowed to continue, it will destroy the entire value

7 | of the GSA Recovery.

8 | There is a real threat of immediate loss because the GSA provides for the first payment

9 | of $400,000 to the GSA defendants on October 15, 2005. Decker Island, the major asset

10 | obtained in the GSA Recovery, was pledged as security for this and subsequent payments. The

11 | assets obtained in the GSA Recovery are not generating any income. None of the clients have

12 | demonstrated any ability or willingness to make these payments individually. It does not appear

13 | that these payments can be made absent a sale of the GSA Recovery. Naturally, if the payments

14 | are not made, the GSA defendants may pursue foreclosure on the real property, resulting in a

15 | total loss to all of the parties in this case.

16 | The effort necessary to obtain a bona fide offer is considerable, and takes no less than six

17 | months. Most of the potential buyers have insisted and will insist on a lengthy due diligence

18 | period to evaluate the property. It is unlikely that another sale can be put in place prior to

19 | October 15, 2005 if the pending sale fails.

20 |

21 | **C.    Because of Conflicting Instructions From the Clients and Litigation Filed by**

22 | **Hyon, The Trustee is in an Untenable Position and is Unable and is Unwilling to Act.**
He was not the trustee

23 | The clients have given conflicting instructions to Jeffrey W. Shopoff, the trustee of the

24 | GSA Recovery, regarding his obligation to manage the GSA Recovery This, in itself, is reason

25 | enough for the appointment of a receiver.

26 | For example, Hyon has demanded that the trustee turn over the corporate stock to **him**

27 | while Colangelo has instructed the trustee to do no such thing. Hyon has demanded that the *Outrageov*

28 | trustee handle a variety of business matters, and make business decisions to preserve the GSA

11

1  Recovery while at the same time instructing the trustee that neither Mr. Colangelo nor Selten,

2  has any authority to give the trustee any information about the business, and in the Los Angeles

3  action he has asserted claims of damage against Colangelo and Selten for giving the trustee

4  information. Hyon, through his attorney Harold Light, has distorted the trustee's responsibility

5  over the GSA Recovery. Contrary to Hyon's assertions, the trustee is not responsible for all

6  management and operational decisions and never has been. From the time of the execution of

7  the GSA, Colangelo Hyon, and Selten made all business decisions and they gave Mr. Shopoff

8  direction on business matters which directions Mr. Shopoff justifiable relied upon and followed.

9  With the breakdown of the Colangelo/Hyon/Selten relationship, there is no one in control and

10  the trustee has no one that he can justifiable rely upon for instructions.

11      Mr. Shopoff's ability to function is made even more difficult, if not impossible, because

12  Hyon has sued him for legal malpractice on a claim arising out of the exact same GSA Recovery

13  over which he is the designated trustee. In fact, it appears that in his malpractice action Hyon is

14  claiming that Mr. Shopoff is holding the GSA Recovery unlawfully, and that even the filing of

15  this interpleader action was wrongful and an abuse of process.

16      Hyon is seeking millions of dollars in damages on his malpractice claim against Mr.

17  Shopoff and his firm, but at the same time Hyon, through his attorney Harold Light, issues daily

18  demands and instructions to Mr. Shopoff demanding that he act in accordance with his

19  directions, and that Mr. Shopoff is to ignore Colangelo's interests.

20      As it stands, the situation is impossible and very dangerous to the interests of all

21  claimants, including Hyon. There are numerous business matters which must be attended to, and

22  many of them present the risk of loss or liability if they are not handled correctly. Not only does

23  the trustee have no direction from the clients on how to act, but Hyon continues to insist that the

24  trustee has no right even to the information that would be necessary to make decisions. Under

25  these circumstances, even if the trustee had the power to act, it would be unreasonable and

26  dangerous to expect him to do so.

27

28

**MEMORANDUM OF POINTS AND AUTHORITIES**
**RE: JOINT MOTION TO APPOINT A RECEIVER**

IV.   **A RECEIVERSHIP IS NECESSARY AND ALLOWED UNDER LAW**

No one is going to be paid (including Hyon) if the assets obtained in the GSA Recovery are not liquidated. The clients, in their present state of mind, are unable to conduct the business necessary to convert the GSA Recovery into cash. They are unable to even agree to liquidate the GSA Recovery. Therefore, the court must appoint a receiver to undertake the following activities: (1) take possession and control of Decker Island and the rest of the GSA Recovery; (2) take all necessary action to preserve the value of the GSA Recovery by insuring that the mail is opened and an appropriate response provided; the permits are kept in place; all other claims regarding the GSA Recovery are properly investigated (such as did not take place with respect to the Oregon transactions) (3) timely respond to all offers and inquiries; (4) liquidate the GSA Recovery for the highest and best price, as represented by the $9 million contract; and (5) distribute the proceeds to the various claimants in accordance with their respective interests, as agreed or by court order.

If a receiver is not appointed, it is highly unlikely that the GSA Recovery can be turned into cash because the clients cannot agree even to talk about business issues given their present disputes.

A.   **The Court Should Appoint A Receiver To Preserve The Value Of The GSA Recovery Pending A Sale.**

The only means to preserve the value of the GSA Recovery, and to pay the fee holders, is to have a receiver take control and possession of the GSA Recovery and proceed to liquidate it as soon as reasonably possible. *Cal. Civ. Proc.* §564(b) provides in pertinent part:

> "(b) A receiver may be appointed by the court in which an action or proceeding is pending, or by a judge thereof, in the following cases:
>
> (1) In an action * * * by a creditor to subject any property or fund to the creditor's claim, or between partners or others jointly owning or interested in any property or fund, on the application of the plaintiff, or of any party whose right to or interest in the property or fund, or the proceeds thereof, is probable, and where it is shown that the property or fund is in danger of

13

1    being lost, removed, or materially injured. * * *

2         (9) In all other cases where necessary to preserve the property or rights of

3    any party."

4    It is apparent that the clients cannot cooperate to profitably conduct the business. Hyon

5    claims to be a majority owner of the GSA Recovery, while Selten and Colangelo disagree. As a

6    result of this disagreement, all efforts to market Decker Island and otherwise liquidate the GSA

7    Recovery are in doubt. Selten and Colangelo dispute Hyon's rights to act unilaterally and Hyon

8    disputes their right to act at all. Hyon apparently opposes liquidating the GSA Recovery, but has

9    no plan to pay the fee holders.

10   A receiver may be appointed to take charge of property in an action between partners,

11   joint venturers or other co-owners (e.g., spouses) if: (1) The moving party has a probable interest

12   in or right to the property; and (2) There is a danger that the property will be lost, removed or

13   materially injured. *Cal. Civ. Proc.* §564(b)(l); *Neider v. Dardi* (1955) 130 Cal. App.2d 646, 649;

14   *Baldwin v. Baldwin* (1945) 67 Cal. App.2d 175,177-178. Also, the court has authority to appoint

15   a receiver when the owners' conflict prevents them from operating the business. *Golden State*

16   *Glass Corp. v. Superior Court* (1939) 13 Cal.2d 384, 399; *Boyle v. Superior Court* (1917) 176

17   Cal. 671, 674.

18   Colangelo has an undisputed interest in or right to a portion of the GSA Recovery.

19   Colangelo Decl. at 13-15; Hyon Answer to Cross-complaint 8-9. Hyon claims that Colangelo

20   forfeited his interest in the property by conspiring with Selten to harm Hyon and the Decker

21   Island business. Hyon's Answer to Cross-complaint at 11-13. There are no supporting facts that

22   Colangelo conspired with Selten to harm Hyon or the Decker Island business, and no law

23   supporting the notion that Colangelo would, by reason of an alleged unlawful conspiracy, forfeit

24   his property rights.

25   There is a danger that the property will be lost, removed or materially injured. The GSA

26   provides for payment of $400,000 on October 15, 2005. The GSA defendants have a deed of

27   trust to secure the payments. If payment of this installment or future installments is not made,

28   Decker Island will be subject to foreclosure. Certainly, without a receiver this property cannot

**MEMORANDUM OF POINTS AND AUTHORITIES**
**RE: JOINT MOTION TO APPOINT A RECEIVER**

1    be protected from devaluation and foreclosure.

2

3    **B.    Receiver Should Be Empowered To Liquidate The GSA Recovery**

4    **1.    THE FEE HOLDERS CANNOT BE PAID ABSENT A LIQUIDATION OF**

5    **THE GSA RECOVERY**  In addition to appointing a receiver to manage and take care of the

6    GSA Recovery, the receiver should be specifically authorized to sell the GSA Recovery pursuant

7    to the terms of the $9 million contract.  The fee holders have a right to be paid for their services.

8    The most potentially valuable asset acquired in the GSA Recovery is Decker Island.  Without

9    liquidation of Decker Island, none of the fee holders can be paid anything approaching the

10   reasonable value of the services rendered in this mammoth litigation.  Shopoff & Cavallo have

11   made numerous demands of the clients to formulate a plan to pay the fee holders.  None has been

12   forthcoming.  Attorney Bien has an *express contractual right to compel the clients to liquidate*

13   *the GSA Recovery and pay him.  Cal. Civ. Proc.* § 564(b)(9) is broad enough to authorize the

14   Court to appoint a receiver to preserve the property or rights of any party.  Ahart, <u>Cal. Prac.</u>

15   <u>Guide</u>: Enforcing Judgments §4:860.

16           It is generally acknowledged and understood that the fee holders cannot be paid absent a

17   sale of Decker Island.  Neither Colangelo nor Hyon have the necessary independent financial

18   resources to fulfill their contractual obligations without liquidating the GSA Recovery.  The

19   implied covenant of good faith and fair dealing mandates the liquidation of the GSA Recovery to

20   pay these fees.

21           In *Careau & Co. v. Security Pacific Business Credit* (1990) 222 Cal.App.3d 1371,1383,

22   the Court stated:

23           "Every contract imposes on each party a duty of good faith and fair dealing in

24           each performance and in its enforcement.  Simply stated, the burden imposed is

25           that neither party will do anything which will injure the right of the other to

26           receive the benefits of the agreement.  Or, to put it another way, the implied

27           covenant imposes upon each party the obligation to do everything that the

28           contract presupposes they will do to accomplish its purpose, [internal citations

                                                    15

1    and quotations omitted]."

2         The benefit to the fee holders contained in their various fee agreements is payment for

3    their services. By obstructing the sale of the GSA Recovery, or simply not cooperating in the

4    sale, Hyon has breached this implied covenant. Moreover, by all appearances, this is an

5    intentional course of conduct. In meetings with Selten, Hyon stated that he intended to purchase

6    certain of the fee holders' interests at a sharply discounted rate based on the premise that the

7    GSA Recovery is valueless, and then go into partnership with a third person, presumably to reap

8    the full benefit of the GSA Recovery himself. At no time has Hyon discussed paying the fee

9    holders for their substantial contribution in obtaining the GSA Recovery. Hyon has been

10   conspicuously silent, whereas Colangelo and Selten favor the liquidation of the GSA Recovery

11   at the highest possible price in accordance with the $9 million contract and pay the legitimate

12   obligations.

13        Hyon's conduct appears to conform to the "conscious and deliberate act, which unfairly

14   frustrates the agreed common purposes and disappoints the reasonable expectations of the other

15   party thereby depriving that party of the benefits of the agreement." *Careau*, *supra*, at pg. 1395.

16   This Court should not reward such conduct.

17

18   **2.     COLANGELO AS A "PARTNER" HAS THE ABSOLUTE RIGHT TO**

19   **DISSOLVE THE PARTNERSHIP AND LIQUIDATE THE PARTNERSHIP ASSETS.**

20   In addition, Colangelo, as a partner has an absolute right to declare the partnership at an end.

21   *Corp. Code* §16801 states in pertinent part:

22             "A partnership is dissolved, and its business shall be wound up, only upon the

23             occurrence of any of the following events: (1) In a partnership at will, by the

24             express will to dissolve and wind up the partnership business of at least half of the

25             partners * * *"

26        In this case Colangelo, by Hyon's reckoning, is one-half of the partners and therefore has

27   the absolute right to dissolve the partnership. Colangelo has already unequivocally expressed his

28   desire to dissolve the partnership. (Colangelo Decl. at 32).

1    Once dissolved, the partnership must be wound up.  *Corp. Code* §16802 provides:

2        "Subject to subdivision (b), a partnership continues after dissolution only for the

3        purpose of winding up its business.  The partnership is terminated when the

4        winding up of its business is completed."

5    The winding up process includes sale of all the assets, payment of all debts and

6    distribution to the partners.  *Corp. Code* §16807 provides:

7        "16807.  (a) In winding up a partnership's business, the assets of the partnership,

8        including the contributions of the partners required by this section, shall be

9        applied to discharge its obligations to creditors, including, to the extent permitted

10       by law, partners who are creditors.  Any surplus shall be applied to pay in cash

11       the net amount distributable to partners in accordance with their right to

12       distributions under subdivision (b).

13   Taking these sections together, Colangelo as a partner has the right to dissolve the

14   partnership at will which right he has exercised.  Upon dissolution the partnership must be

15   wound up, which entails the sale of assets, payment of debts and distribution of the surplus to the

16   partners.

17

18   **3.      TO THE EXTENT THAT COLANGELO DOES NOT HAVE A**

19   **UNILATERAL RIGHT TO DISSOLVE THE PARTNERSHIP, BOTH SELTEN AND**

20   **COLANGELO REQUEST THAT THE COURT MAKE AN ORDER TO DISSOLVE**

21   **THE PARTNERSHIP.**  Because Colangelo, by Hyon's reckoning, constitutes one half of the

22   partners in the Hyon-Colangelo partnership, he has an absolute unilateral right to dissolve the

23   partnership.

24   Colangelo does not acknowledge a partnership with Hyon alone, but rather with Hyon

25   and Selten to own and operate the GSA Recovery.  Regardless, Colangelo and Selten both

26   request that the court make an order that any and all partnerships by and among them be

27   dissolved and that the GSA Recovery be liquidated and distributed pursuant to the parties'

28   provable interests.

MEMORANDUM OF POINTS AND AUTHORITIES
RE: JOINT MOTION TO APPOINT A RECEIVER

1  This request is made pursuant to *Corp. Code* §16801(5) which states:

2    "A partnership is dissolved, and its business shall be wound up, only upon the

3    occurrence of any of the following events:

4    ...

5    (5) On application by a partner, a judicial determination that any of the following

6    apply:

7    (A) The economic purpose of the partnership is likely to be unreasonably

8    frustrated.

9    (B) Another partner has engaged in conduct relating to the partnership business

10    that makes it not reasonably practicable to carry on the business in partnership

11    with that partner.

12    (C) It is not otherwise reasonably practicable to carry on the partnership business

13    in conformity with the partnership agreement.

14   All three of the parts of subsection 5 apply here.

15   As this Court knows, Hyon has sued both Selten and Colangelo, among others, in Los

16  Angeles Superior Court case number BC321546 alleging fraud, breach of fiduciary duty, and

17  other miscellaneous torts and breaches of contract. The parties have not spoken, except through

18  counsel, since prior to the filing of this lawsuit in September of 2004. The parties'

19  communication by e-mail is vituperative. They are unable to conduct any business or make any

20  decisions. The economic purpose of the partnership has already been unreasonably frustrated.

21  The lawsuit among them makes it not reasonably practicable to carry on the partnership

22  business.

23  *Cal. Civ. Proc.* §568.5 specifically authorizes a receiver, with the Court's permission, to sell

24  real property.

25   Therefore, to the extent that Colangelo cannot himself dissolve the partnership,

26  Colangelo and Selten seek appointment of a receiver and sale of the GSA Recovery.

27

28

**MEMORANDUM OF POINTS AND AUTHORITIES
RE: JOINT MOTION TO APPOINT A RECEIVER**

1    **C.    There Is No Adequate Remedy Short Of Appointment Of Receiver**.

2    Decker Island does not presently support an operating sand business. There are no

3    ongoing business operations, and based upon recent events, it does not appear that there will be

4    any ongoing business operation in the near future. A sale of the GSA Recovery will convert the

5    illiquid GSA Recovery to cash for the benefit of all the parties. The $9 million contract will

6    require the Court's confirmation. *Cal. Civ. Proc.* § 568.5. The receiver should undertake his

7    duties with the goal of gaining possession and control of all of the assets constituting the GSA

8    Recovery, evaluate the $9 million contract and report to the court consistent with his

9    responsibility to convert the GSA Recovery to cash at the best possible price.

10    Generally speaking, a receiver is the provisional remedy of last resort due principally to

11    the costs associated with a receivership. In this case, there is no other provisional remedy which

12    would be efficacious. Neither attachment, claim and delivery, an injunction nor lis pendens is

13    sufficient to preserve that value. The parties need an independent neutral representative to

14    evaluate the $9 million contract and to apply to the court for confirmation of sale of the GSA

15    Recovery thereunder.

16

17    **D.    There Are Adequate Funds To Compensate Receiver**

18    Shopoff has more than $175,000 in his trust account from the GSA Recovery. Shopoff

19    Decl. 15. These funds could be used to pay receivership costs. The real property, judging by the

20    $9 million contract, has sufficient value to support any additional costs of the receivership.

21    **E.    Donald Savage, The Proposed Receiver, Is Well-Qualified To Undertake The**

22    **Tasks Necessary To Preserve The Value of the GSA Recovery For**

23    **Everyone's Benefit**.

24    The movants propose that Donald G. Savage, CRE , be appointed as receiver. He is

25    experienced in reals estate asset management. His background includes property management,

26    leasing, acquisitions, dispositions and foreclosures. He has served as a California Superior Court

27    Receiver in over 35 cases since 1986. As such, he is well qualified to take possession of the GSA

28    Recovery real and tangible personal property, to manage and maintain it, to evaluate the $9

19

1  million dollar offer and, if necessary, negotiate other offers to purchase the GSA Recovery. He

2  has no pre-existing relationship with any of the parties which would disqualify him. His

3  curriculum vitae is attached as Exhibit 2.

4      He has also agreed to accept $150 per hour as his compensation as receiver. His

5  compensation can be paid out of funds on deposit in Shopoff's trust account.

6  **V.    CONCLUSION**

7      Defendants Colangelo, Selten and Kirk's, and Plaintiff Shopoff & Cavallo LLP's motion

8  for appointment of a receiver should be granted. As a result of dissension among the clients,

9  there is no one managing the assets obtained in the GSA Recovery or taking any action. The $9

10  million contract, if confirmed by the Court, will provide sufficient cash to pay off the note and

11  deed of trust to the GSA defendants and provide payment in part to the clients and the fee

12  holders in accordance with their provable claims.

13      A receiver is necessary to take possession and control of the GSA Recovery, evaluate the

14  $9 million contract and report to the court, and generally manage the property in the interim

15  period.

16      The failure of the court to appoint a receiver will likely mean that none of the parties to

17  this litigation will receive anything of value for the years of hard work necessary to achieve the

18  GSA Recovery. The $9 million contract must be confirmed by this Court. The parties' disputes,

19  whatever they may be, can be resolved in a leisurely fashion after the GSA Recovery is

20  converted from stock, real estate and related assets to cash.

21      The receiver's expenses can be paid from the funds on hand with Shopoff. It is therefore

22  respectfully submitted that the court should grant this motion to appoint a receiver.

23  Dated: April 22, 2005                    ALFRED B.  STEDMAN

24

25                                          _____
                                           Attorney for Laurence Colangelo

26  Dated: April 22, 2005                    SHAUB, WILLIAMS & NUNZIATO LLP

27

28                                          _____
                                           Tom A.  Nunziato, Attorneys for ERIC SELTEN

20

**DECLARATION OF JEFFREY W. SHOPOFF**

I, Jeffrey W. Shopoff, declare:

1.    I make this declaration based upon my personal first-hand knowledge. If called as a witness herein I could and would competently testify thereto under oath.

2.    I filed this interpleader action in my capacity as trustee of the assets described below ( "GSA Recovery") and on behalf of Shopoff & Cavallo LLP. I am a member of Shopoff & Cavallo LLP and an attorney licensed to practice in California. Shopoff & Cavallo was the attorney of record for Junho Hyon and Laurence Colangelo and their related corporations ("clients") in Solano Superior Court Case No. LS001781 and two other related cases ("Underlying Litigation"). The Underlying Litigation was resolved by way of a Global Settlement Agreement ("GSA") with the defendants therein, Yasunori Umeno, Chika Takashima, Taiki Corporation, USA, Mega Sand, Inc., Yoshiji Aizawa, Toshiyuki Hemmi, Hikoichi Mori, Akio Hishida, Akio Tomita, and Motokazu Kim.

3.    The assets obtained by way of the GSA were, the common stock of two corporations, Mega Sand Incorporated and Taiki Corporation USA, and the assignment of certain deeds of trust encumbrances of the real property commonly known as Decker Island. Mega Sand Incorporated owns Decker Island, some components of a sand mining business and related use permits, and miscellaneous other tangible and intangible property.

4.    I was appointed by the clients as trustee to hold the GSA Recovery. My role as trustee has been limited to three specific items:

    a.    I have custody of the original stock certificates of Taiki USA and Mega Sand, Inc.;

    b.    I hold cash in the client trust account of Shopoff & Cavallo LLP, all of which was recovered through my activities in implementation of the Global Settlement Agreement;

    c.    I hold, as trustee, the Assignments of Deeds of Trust recovered under the Global Settlement Agreement. These assignments were prepared by Phillip Putnam, the attorney

21

DECLARATION OF JEFFREY W. SHOPOFF IN SUPPORT
OF MOTION TO APPOINT A RECEIVER

1   for Decker Sand, LLC, with the express participation and approval of Hyon and Colangelo.

2      5.    This interpleader was filed when I learned that our clients Laurence Colangelo

3   and Junho Hyon had developed an irreconcilable dispute over their relative interests. This

4   dispute was so fundamental that they could not agree even on a decision-making process for

5   giving me instructions. More than seven months later they are in ever-escalating litigation

6   between themselves over their ownership and decision making power, and are unable to agree on

7   instructions to me.

8      5.    Specifically, and most importantly, Hyon has demanded, and continues to

9   demand, that the corporate stock be turned over to *him*. Colangelo has instructed me not to turn

10  over the stock to Hyon.

11     6.    Hyon has also sued us in a cross-complaint in this action for attorney malpractice

12  and many other claims. Hyon takes the position that we are holding the GSA Recovery

13  unlawfully, and that even the filing of this interpleader action was an abuse of process and

14  otherwise wrongful, and he seeks millions of dollars in damages for that. At the same time

15  Hyon, through his attorney Harold Light, issues daily demands and instructions to me that I act

16  in accordance with his directions, and that I ignore Colangelo's interests.

17     7.    I as trustee, and Shopoff & Cavallo LLP, are in an untenable position. We filed

18  this interpleader to preserve the GSA Recovery (which we believe to be worth millions of

19  dollars) for the benefit of all claimants. However, every decision I make brings a new threat

20  from Hyon of additional liability. Hyon's First Amended Cross-Complaint, just filed on or

21  about April 13, 2005, contains numerous paragraphs alleging claims based on actions we have

22  taken since we filed this interpleader, for example, Paragraphs 48, 49, 50, 55 (pages 21 and 22),

23  92, and others.

24     8.    At the same time as he demanded that I handle a variety of business matters, and

25  make business decisions to preserve the GSA Recovery, Hyon has informed me that neither

26  Mr. Colangelo, my client, nor Selten, their alleged partner, has any authority to give me any

27  information about the business, and in the Los Angeles action he has asserted claims of damage

28

22
DECLARATION OF JEFFREY W. SHOPOFF IN SUPPORT
OF MOTION TO APPOINT A RECEIVER

1  against Colangelo and Selten for giving me information.  As a result, all of us are in peril of

2  claims from Hyon whether we act or do not act.

3       9.    Hyon, through his attorney Harold Light, has grossly distorted my responsibility

4  during the past year.  Hyon insists that, as trustee of the GSA Recovery, I am responsible for all

5  management and operational decisions.  That has never been so.  From the time of the Global

6  Settlement Agreement, Colangelo, Hyon, and Selten made all business decisions and gave me

7  direction on business matters where my participation was desired.  The three of them informed

8  me that they had formed Decker Sand, LLC, that all three of them were members, and that they

9  had established an office at Selten's address.  All business mail was sent there.  In fact, I was

10  excluded from almost all business information and decisions, and my requests for information

11  were met with responses from Hyon and Selten that the information was "proprietary" and I was

12  not entitled to it.

13       10.    Recently I began receiving all Mega Sand and Decker Sand mail.  I know from

14  reading Hyon's complaint against Selten in the Los Angeles action that Hyon now asserts that

15  Selten has no role in decision making and that only Hyon can make any decisions.  On the other

16  hand, Colangelo and Selten assert that any two of the three can make a decision.  I then learned

17  that, because of Hyon's position, including the claims asserted in the Los Angeles action, Selten

18  had ordered all Mega Sand and Decker Sand mail forwarded to me for fear of incurring liability

19  to Hyon.

20       11.    On March 21, 2005, I wrote in detail to Colangelo and Hyon, and to their

21  attorneys of record in these disputes, stating that I had a conflict with Hyon, that I would not

22  take any responsibility for business mail or business decisions, and requesting that the clients

23  reach an agreement on a process for dealing with these matters which was suitable to both of

24  them.  They have not reached any agreement or informed me of any hope for resolution.

25       12.    In my March 21, 2005 letter to the clients, I stated my belief that a receiver would

26  be necessary to protect the interests of all parties, and to provide a method for making decisions

27  with the protection of the court if the two of them could not reach some resolution.  No

28

DECLARATION OF JEFFREY W.  SHOPOFF IN SUPPORT
OF MOTION TO APPOINT A RECEIVER

1    resolution has been reached.

2    13.    Today the situation is impossible and very dangerous to the interests of all

3    claimants, including Hyon.  There are numerous business matters which must be attended to, and

4    many of them present the risk of loss or liability if they are not handled correctly.  Not only do I

5    have no direction from the clients on how to act, but Hyon continues to insist that I have no right

6    even to the information that would be necessary to make decisions.  Under these circumstances,

7    even if I had the power to act, it would be unreasonable and dangerous to expect me to do so.

8    14.    I believe that only a receiver under the supervision of the court can protect the

9    interests of the parties in this extremely valuable GSA Recovery.

10    15.    I hold more than $175,000 in the client trust account, all of which is proceeds of

11    the GSA Recovery.  A portion of this must be reserved for actions, including foreclosure

12    proceedings, which we are under court order to perform as part of the Global Settlement

13    Agreement.  However, I believe that there are sufficient uncommitted funds in the trust account

14    to permit the hiring of a receiver, and I believe that making them available for the cost of a

15    receiver is the most prudent use of the funds for the preservation of the value of the GSA

16    Recovery.

17    I declare that the foregoing is true and correct under penalty of perjury under the laws of the

18    State of California.  Executed this ___ day of April, 2005, at San Francisco, California.

19

20

21                                                    _____
                                                     Jeffrey W. Shopoff

22

23

24

25

26

27

28
                                            24
                    DECLARATION OF JEFFREY W. SHOPOFF IN SUPPORT
                         OF MOTION TO APPOINT A RECEIVER

24

**DECLARATION OF JEFFREY D. KIRK IN SUPPORT OF**

**MOTION TO APPOINT A RECEIVER**

I, Jeffrey D. Kirk, hereby declare and state as follows:

1.      I am a defendant in the above-referenced matter.  I was retained by Junho Hyon, Hyon International, Inc., Laurence Colangelo, and International Development and Consultants, Inc. ("the clients") to assist in litigation involving Decker Island.  I obtained a written fee agreement signed by each of them.

2.      I assisted in prosecuting three civil litigation cases: (1) Solano County Superior Court case number LS001781 entitled Colangelo etc. v. Taiki etc.  (2) Contra Costa Superior Court case number C-00-02077 entitled Colangelo etc. v. Takashima etc.  and (3) Solano Superior Court case number 19508 entitled Colangelo etc. v. Mega Sand etc.

3.      These cases were resolved on October 15, 2003 by means of a Global Settlement Agreement among all the parties.

4.      The Glbal Settlement Agreement provided, among other things that the clients were to obtain possession and control of the stock of MEGA SAND and Taiki Corp. USA, which in turn owns or has control of Decker Island and other assets specified therein (herein referred to as the GSA Recovery).

5.      I am aware that   Shopoff had on many occasions attempted to solicit a plan from the clients to pay the fees to the fee holders based upon the value of the GSA Recovery. To my knowledge he never received a response with a plan to pay the fee holders.

6.      I have received a copy of a lawsuit entitled Hyon v.  Selten pending in the Los Angeles Superior Court bearing case number BC 321546.  Upon reviewing the complaint, it appears that Hyon is complaining that defendants Selten Colangelo, and Philip Putnam, their former business Attorney, separately or jointly operated to deprive Hyon of his majority ownership in Decker Island.

7.      I have reviewed the $9 million contract.  I also had an exchange of e-mail communications with Harold light and Mike Mills regarding this $9 million contract.  While I

25

DECLARATION OF JEFFREY D.  KIRK IN SUPPORT OF
OF MOTION TO APPOINT A RECEIVER

1    appreciated their concern about improving the security for the $4.5 million note, as I mentioned
2    to them, assuming the worst, that DIGS paid the initial $4.5 million into escrow and never paid
3    another penny, that that outcome would be infinitely better than the present situation and
4    eventually losing the asset in foreclosure. I never received the benefit of their analysis of my
5    observations.

6         8.       Whether  Hyon is entitled to majority ownership of the GSA Recovery or is not
7    so entitled, from my point of view, he will be no worse off if the GSA Recovery is liquidated,
8    and will probably be much better off, than if the GSA Recovery remains unliquidated. I would
9    certainly not object to any of the parties, including  Hyon, having a right of first refusal to make
10   a matching offer to purchase the GSA Recovery.

11        9.       Prior to making this motion, I wrote a letter to  light requesting his cooperation in
12   appointing a neutral party to take care of the GSA Recovery until the Court could make its
13   determination as to the claimants' rights and interests.   Light was disinclined to cooperate in the
14   appointment of a neutral party.

15        10.      I proposed to nominate Steven Shower as the receiver. He has substantial
16   experience in the industry, and could competently manage the property as well as negotiate for
17   its immediate sale. His curriculum vitae is attached hereto marked Exhibit 2 to this Motion and
18   incorporated by reference herein.

19        11.      Given the substantial litigation already undertaken, it is my opinion that if a
20   receiver is not appointed to take control of the GSA Recovery, and ultimately to liquidate it, the
21   property will be mired in endless litigation for the foreseeable future, for an uncertain outcome.

22        12.      Conversely, if a receiver is appointed and is able to obtain confirmation of the $9
23   million contract, the issue of control of the Decker Island business will be set at large, and the
24   only issue will be distribution of the funds. While that issue may take some time, and there may
25   be some disputes, that is nowhere near as large or difficult as whether the assets obtained in the
26   GSA Recovery should be operated?, by whom?, for how long?, how the fee holders would be
27   paid? and other difficult issues.

28

DECLARATION OF JEFFREY D.  KIRK IN SUPPORT
OF MOTION TO APPOINT A RECEIVER

1      13.    It was my understanding when I entered into the fee agreement with the clients

2    that they would pay my fees upon settlement of the underlying litigation.  If necessary, I thought

3    that they in good faith would make their best effort to liquidate the GSA Recovery.  I did not

4    consent and do not consent to a solution where the clients ignore substantial pending offers to

5    operate their own sand business and that, if they are successful, I may get paid some amount in

6    the distant future.  I have reason to believe that the other fee holders agree with this position.  I

7    have reviewed  Bien's answer to the complaint wherein he quotes his fee agreement as giving

8    him the right to compel the clients to liquidate the GSA Recovery and to pay his fee in cash.

9        I declare under penalty of perjury that the foregoing is true and correct.  Executed on

10    April___, 2005, at Alameda, California.

11

12

13                                    Jeffrey D.  Kirk

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF JEFFREY D.  KIRK IN SUPPORT
OF MOTION TO APPOINT A RECEIVER

27

## DECLARATION OF LAURENCE COLANGELO IN SUPPORT OF
## MOTION TO APPOINT A RECEIVER

I, Laurence Colangelo, hereby declare and state as follows:

### The Interpleader Action

1.    I am a defendant in this Interpleader Action filed by Shopoff & Cavallo LLP and Jeffrey W. Shopoff which was brought to resolve multiple, conflicting claims with respect to the interests of the parties hereto in the GSA Recovery from a case entitled *Colangelo v. Morgan, et al.,* SC Number SL001781 (the "Underlying Litigation"). The Underlying Litigation was settled on or around October 15, 2003, which settlement was manifested in a Global Settlement Agreement ("GSA"), a true and correct copy of which is attached hereto as Exhibit "1." As a result of the GSA, the Underlying Litigation, and all related actions were fully resolved.

2.    As alleged in Paragraph 3 of the Interpleader complaint, the GSA Recovery consists of all of the common stock of two corporations, Mega Sand Incorporated and Taiki Corporation, U.S.A., which in turn own a valuable sand mining assets and related use permits, equipment, and real property commonly known as Decker Island and miscellaneous tangible and intangible personal property.

3.    I agree with the following allegations, among others, made by Shopoff & Cavallo LLP and Jeffrey W. Shopoff in the Interpleader complaint:

(a)    I believe that the value of the GSA Recovery is equal to or greater than the Judgment amount of $7,600,000, as alleged in Paragraph 3 of the Interpleader complaint;

(b)    I believe that intervention of this Court is necessary to protect the GSA Recovery and will benefit of all persons having a claim thereto, as alleged in Paragraph 3 of the Interpleader complaint;

(c)    I believe that, through no fault of his, Jeffrey W. Shopoff is unable to obtain direction on how to handle the GSA Recovery and is being subjected to multiple and conflicting claims, as alleged in Paragraph 11 of the Interpleader complaint; and

(d)    I believe that a written offer has been made for the GSA Recovery, as

28

1  alleged in Paragraph 3 of the Interpleader complaint.

2

3  **Reason for this Motion**

4  4.    As described in detail below, the major portion of the GSA Recovery was owned

5  by a partnership consisting of Junho Hyon, Eric Selten and me. As further described below, the

6  partnership with Hyon has suffered an irremediable breakdown so that the assets obtained in the

7  GSA Recovery are in a clear and immediate danger of being lost or squandered. Unless

8  immediate action is taken to safeguard and liquidate the GSA Recovery assets by an independent

9  third party, every party to the Interpleader action will suffer irremediable harm.

10

11  **Background**

12  5.    Beginning in the early 1990s and through the year 2004, Hyon and I were co-

13  plaintiffs (as individuals and/or through our respective business entities) in the Underlying

14  Litigation. Hyon and I filed the Underlying Litigation to recover a promised fee for finding an

15  investor for a start-up sand mining business.

16  6.    At various times during the course of the Underlying Litigation, Hyon and I were

17  represented by attorneys who are also parties to this action, specifically, Ervin, Cohen & Jessup,

18  and Jeffrey D. Kirk, Elliot Bien, Jeffery Shopoff and Norman Pine.

19  7.    Throughout the pendency of the Underlying Litigation Hyon and I had difficulty

20  communicating with each other and were often in disagreement. Moreover, Hyon and I were

21  both busy on other matters and needed the assistance of a litigation facilitator. To that end, in

22  1997 we hired Defendant Eric Selten on a contingent fee basis to assist us to find and work with

23  our attorneys as our agent and case facilitator.

24  8.    Although beyond the scope of this declaration, I want to make clear that I believe

25  that Hyon's contention that Eric Selten was improperly practicing law has no merit and is made

26  in bad faith. At all times, Eric Selten's work in connection with the Underlying Litigation was

27  under the supervision of our attorneys. This relationship continued until after the GSA

28

29

DECLARATION OF LAURENCE COLANGELO IN SUPPORT
OF MOTION TO APPOINT A RECEIVER

1   Recovery, at which time both Hyon and I made Eric Selten a partner in exchange for his earned

2   fee among other things.

3        9.    Hyon and I were co-plaintiffs in the Underlying Litigation and we were each

4   entitled to one half of any GSA Recovery. However, from the commencement of the Underlying

5   Litigation, my relationship with Hyon began deteriorating. We had serious disagreements about

6   our respective rights which disagreements grew worse with the passage of time. As a stop gap

7   measure, in July 2000, Hyon and I formally agreed to postpone the final resolution of our

8   disputes until the conclusion of the Underlying Litigation.

9        10.    In early 2003, the Underlying Litigation came to trial with Shopoff as our trial

10   lawyer. The jury gave Hyon and me a verdict of $7,600,000.

11        11.    To avoid further proceedings, on or around October 15, 2003 Hyon and I entered

12   into the GSA.

13        12.    Our attorney, Jeffrey W. Shopoff, was authorized by us to take possession of the

14   GSA Recovery and to preserve it for our benefit and the benefit of others who may have a claim.

15   As described above, since Hyon and I could not agree, Shopoff was compelled to bring this

16   Interpleader action.

17

18               **The Current State of the Partnership and its Dissolution**

19        13.    Hyon and I understood and agreed that we were entitled to only a minority share

20   of the GSA Recovery. The reason for this was our attorneys were entitled to a significant

21   portion of the GSA Recovery as contingency fees. The fees were exceptionally large because

22   there were two jury trials, two related fraudulent conveyance actions, and several appeals over a

23   ten year span. Many attorneys worked on the case and were legitimately entitled to

24   compensation. Hyon and I also acknowledged that Selten was entitled to his fee.

25        14.    Hyon and I also acknowledged that the contingency fees owed to the attorneys

26   are as much as 48.5% of the GSA Recovery. We dispute Ervin, Cohen & Jessup's claim that it

27   is entitled to a 10% contingency fee. Hyon and I also acknowledged that Selten was entitled to

28

DECLARATION OF LAURENCE COLANGELO IN SUPPORT
OF MOTION TO APPOINT A RECEIVER

1   12% of the GSA Recovery. Hyon claims that he has associates who are entitled to 5.6% of the

2   GSA Recovery which I dispute.

3        15.   In any event, there is an undisputed total of 33.9% of the GSA Recovery that

4   belongs to Hyon and me. To put this into perspective, if the GSA Recovery had a value of

5   $7,600,000 (after payments to a holder of a first deed of trust), Hyon's and my combined share

6   would be worth $2,576,400.

7        16.   Up until the December settlement discussions, described below, it was my

8   contention that I was entitled to one-half of our combined 33.9% or 16.95% of the total GSA

9   Recovery. My one-half share was subject to a relatively modest adjustment for certain specified

10  litigation costs advanced by Hyon. The important point is that even though the Underlying

11  Litigation had settled, Hyon and I still had major disputes which had to be resolve.

12       17.   Hyon and I engaged in a series of negotiations to resolve our differences. Both

13  Hyon and I had worked with Eric Selten for many years and we trusted him. Thus, Hyon and I

14  envisioned a resolution of our dispute by forming a partnership which included the participation

15  of Selten.

16       18.   With the concept of a partnership that included Eric Selten as a major condition, I

17  agreed to settle my disputes with Hyon. I made several concessions to Hyon, the most important

18  being my agreement to accept a substantial reduction of my share of our collective 33.9% of the

19  GSA Recovery.

20       19.   Instead of one half of 33.9%, which would have been 16.95%, I agreed to accept

21  11.59%. This would give 22.31% to Hyon. In other words, I agreed to a one-third (1/3)

22  reduction in my share of the GSA Recovery. To put this into perspective, if the GSA Recovery

23  had a value of $7,600,000, this one-third (1/3) reduction would be represent a cost to me of

24  $406,600. If the GSA Recovery has a value of $9,000,000, which I believe it does, the 5.53%

25  reduction would represent a cost to me of $497,700

26       20.   My willingness to allow such a substantial reduction to my share of the GSA

27  Recovery was expressly conditioned upon the involvement of Eric Selten as our partner. The

28

DECLARATION OF LAURENCE COLANGELO IN SUPPORT
OF MOTION TO APPOINT A RECEIVER

3 ℓ

1  express understanding was that Eric Selten was to contribute his 12% of the GSA Recovery to

2  the new partnership and that he was to get a corresponding interest in the new partnership.

3  Hyon, Eric Selten and I agreed that Eric Selten would actively participate in the future

4  operations of the partnership.

5      21.   Hyon, Eric Selten and I agreed to and did form a partnership capitalized with our

6  combined interest in the GSA Recovery, which was 45.9% of the total of the GSA Recovery

7  (39.9% that belonged to Hyon and me plus 12% that belonged to Eric Selten.)

8      22.   Hyon, Eric Selten and I agreed that our respective interests in the new partnership

9  were to be in the same ratio that each of us had in our combined share the GSA Recovery.

10  Hyon's, Eric Selten's and my share of the GSA Recovery totaled 45.9%.  Thus, our respective

11  interests in the new partnership was computed as follows:

12          Eric Selten 12% of the total 45.9  (12/45.9)          = 26.15%

13          Hyon's 22.31% of the total 45.9  (22.31/45.9)         = 48.60%

14          My 11.59% of the total 45.9  (11.59/45.9)            = 25.25%

15                                                               100.00%

16      23.   The purpose of the partnership, which we tentatively referred to as "Newco," was

17  to operate the assets recovered by the GSA Recovery.  In addition to contributing our rights to

18  the GSA, we also agreed to contribute other capital and to provide future services.

19      24.   The creation of the partnership was in lieu of liquidating the assets recovered

20  under the GSA.  We continued to recognized the rights of our various attorneys to share in the

21  GSA Recovery.  We hoped to satisfy their claims as the Newco partnership evolved.

22      25.   I was very uncomfortable entering into a partnership business with Hyon, alone.  I

23  would not have done so except for the fact that Eric Selten would become a partner.  It was my

24  intent to be able to resolve partnership disputes with a two out of three vote of partners.

25      26.   I also doubted Hyon's business judgment.  However, I trusted Eric Selten and I

26  knew him to be a hard worker.

27      27.   But for the express understanding that I had with Hyon, that Eric Selten would be

28

1    an active partner in the new venture, I would never have agreed to a one-third (1/3) reduction in

2    my share of the GSA Recovery from 16.95% to 11.59%. *To Pilze/ control of the business.*

3        28.      Between late 2003 and July 2004, Hyon, Eric Selten and I functioned as partners,

4    discussing, taking action and deciding on many Newco business matters. Hyon regularly

5    acknowledged that Eric Selten was an owner of Newco.

6

7                        **The Destruction of the Partnership Relationship**

8        29.      Sometime in July of 2004, to my dismay, Hyon told me that he intended to take

9    control of our partnership without compensation or consideration to me. When I objected, Hyon

10    hired an attorney, Harold Light.

11        30.      Hyon, through his attorney Harold Light, threatened me with litigation if I refused

12    to surrender control over the venture to Hyon. Equally as offensive, in July of 2004, Hyon's

13    attorney unilaterally and unjustifiably declared that Eric Selten was not our partner.

14        31.      Hyon's attempt to seize unilateral control over the partnership's business and his

15    attempt to exclude Eric Selten as a partner was a complete breach of agreements we had reached.

16    The partnership was destroyed and it was no longer possible for me to do business with Hyon.

17    Shopoff became aware of our dispute and our inability to give him instructions regarding the

18    management of the GSA Recovery.

19        32.      I no longer wanted to do business with Hyon and I so advised him. I rescinded

20    my settlement agreement with him and terminated our partnership relationship.

21        33.      Understandably, Shopoff filed this interpleader action giving this court

22    jurisdiction over the GSA Recovery.

23        34.      A few days after Shopoff filed this interpleader action, Hyon filed a second suit in

24    Los Angeles County against me, Eric Selten, and astoundingly, our collective business lawyer,

25    Putnam. The Los Angeles Superior Court action is captioned *Junho Hyon v. Eric Selten etc.*,

26    LASC BC 321546 (hereafter the "Los Angeles Action").

27        35.      I countersued Hyon in the Los Angeles Action for damages and, among other

28

33

DECLARATION OF LAURENCE COLANGELO IN SUPPORT<br/>OF MOTION TO APPOINT A RECEIVER

*Ask Hal if this is true.*

things, rescission of our various settlements and dissolution of our partnership agreements.

36.    The GSA Recovery assets should be liquidated, the lawyers and other fee holders should be paid and the remainder be distributed to Hyon, Eric Selten and me in accordance to our rights.

37.    Hyon and I are unable to agree as to the management of the GSA Recovery.  In fact, I have not spoken to Hyon since July 2004.

38.    In December 2004, I signed a $9 million contract for the sale of substantially all of the GSA Recovery.  The contract calls for payment of $4.5 million upon close of escrow and the remaining $4.5 million in five years with annual principal reduction payments of $900,000. The promissory note would be secured by the assets and would bear interest at the rate of 10% per annum.  I also believe that there are other potential buyers of the GSA Recovery assets. However, because of my disputes with Hyon, I am unable to pursue sales without substantial risk of involving potential purchasers in the litigation.

39.    I am unable to conduct business with Hyon, and have declared our partnership at an end and insisted that the assets be sold and distributed to the various claimants in accordance with their provable interests.

40.    I have authorized my attorney to seek an order of this Court to appoint a receiver to supervise the sale of the GSA Recovery and to responsibly handle business issues to maximize proceeds and minimize risks and losses until this case is decided.  I have taken this action because I am fearful that Hyon's conduct will result in a substantial diminishment, or elimination, of my economic interest in the GSA Recovery.

I declare under penalty of perjury of the laws of the United States and of California that the foregoing is true and correct.  Executed on April _____, 2005 at Chicago Illinois.


_____
Laurence Colangelo

DECLARATION OF LAURENCE COLANGELO IN SUPPORT
OF MOTION TO APPOINT A RECEIVER

3 4

## DECLARATION OF ERIC SELTEN IN SUPPORT

## OF MOTION TO APPOINT A RECEIVER

I, Eric Selten, declare:

1.    I am one of the defendants in this interpleader action.  I have also been sued by Hyon in Los Angeles Superior Court Case Number BC321546 entitled *Hyon v. Selten etc.*

2.    From and after October 16, 2003 until at least July of 2004, with the understanding that I was a partner with Hyon and Colangelo, I have been working on keeping the permits in place, handling the mail, working with the attorneys and clients to enforce the GSA, negotiating with several interested buyers, and other miscellaneous tasks.  I have spent nearly full-time working on this business enterprise.  I have also spent to date approximately $7,000 out of my pocket.  I have continued to work on partnership business, but I am increasingly unwilling to do any business- related work while Hyon continues to use the work I am doing against me.

3.    On December 2, 2004,1 participated in a conference call with Harold Light, Michael Mills, Jeff Shopoff, Jeff Kirk, and my former counsel, Nancy Markoff, to discuss the $9 million offer made by DIGS.  The purpose of that conference call was to address some of the "serious concerns" that Hyon supposedly had with this $9 million contract.  I had agreed to submit to an informal – but recorded – telephonic interview demanded by Light to discuss my knowledge of the $9 million contract and my "relationship" to DIGS or its representatives (which "relationship" was nonexistent).

4.    Following that conference call, there was a general discussion about the merits of the $9 million contract.  Both  Light and  Mills had several criticisms of the proposed $9 million contract, of which $4.5 million was to be paid in cash, and the proposed security for the $4.5 million balance to be paid over five years at 10% interest.  Neither offered any alternative to the $9 million contract.  I also specifically asked  Mills to help to improve the $9 million contract by making specific comments and drafting appropriate promissory notes and/or deeds of trust or other security which would be acceptable to Hyon.  I never received any response to this

35

35

1   request.

2   5.   After I had submitted to this interview, and seeing no other comparable or better

3   offers to purchase the GSA Recovery, I signed an acceptance of the $9 million contract, on the

4   condition that the initial $4.5 million be deposited in escrow.

5   6.   The only other proposed contract regarding the sale or lease of the assets obtained

6   in the GSA Recovery was a proposed $50,000 eight-month "Exclusive Option To Lease"

7   presented by A. Teichert & Son, Inc., which I received from Hyon on or about December 14,

8   2004.  The proposed lease, assuming the option was exercised, was for a 10 year term, plus

9   options to renew,  and provided for a minimum payment of $200,000 per year.  I repeatedly

10   asked  Hyon for his explanation as to how such an offer made economic sense in light of the

11   $400,000 annual payments due to be paid to the defendants under the GSA commencing October

12   15, 2005.  He never responded to my question.

13   7.   In or about July of 2004, just prior to when  Hyon hired  Light to represent him,

14   Hyon told me that he intended to buy up the interests of the fee holders at a large discount to

15   gain a greater percentage for himself.  He also stated that he had made a deal with a financing

16   source in Japan to give that financier a 30% interest in the GSA Recovery, and that in order to

17   keep his end of the bargain, all other interests (including mine) had to be diluted or purchased.

18   When I objected to this arrangement, I was contacted by  Hyon's lawyer who threatened me with

19   this litigation.  I repeatedly demanded to know the particulars of this financial arrangement, but

20   Hyon has refused to give me that information.

21   8.   I am unable to work productively with  Hyon with respect to this Decker Island

22   business opportunity.  He continues to assert that I have no right to be involved in the business

23   and no right to information.  We have been unable to work together to maximize the value of the

24   GSA Recovery.   Hyon's apparent overriding concern is that he obtains 100% control of the

25   GSA Recovery.  So far he has opposed all of my efforts to arrange for a liquidation of the GSA

26   Recovery.

27   9.   We have also been unable to work together with respect to liquidating the assets

28   _____

36

DECLARATION OF ERIC SELTEN IN SUPPORT
OF MOTION TO APPOINT A RECEIVER

1    located in Oregon. I had retained the law firm of Dunn Carney in Oregon to defend a $30,000

2    lawsuit filed against M & H Taiki, and to investigate an apparent fraudulent conveyance made

3    by John Jang, one of the GSA Defendants' employees, after Messrs. Hyon and Colangelo had

4    obtained their judgment against the GSA. Defendants[1]. The conveyance related to an

5    unimproved lot in a luxury residential development in the Beaver Lake area near Portland. I

6    have personally visited this property and consulted real estate experts in the area and based

7    thereon estimate that the property was worth upwards of $200,000.

8          10.    In addition, I worked to arrange for the sale of one unimproved lot in Oregon

9    which was eventually accomplished, initially over Hyon's strenuous objection. As a result of

10    that sale, approximately $150,000 was deposited in  Shopoff's trust account.

11          11.    Suddenly, on January 28, 2005, I received copies of emails between Light and

12    Shopoff requesting that  Shopoff forward $2500 to a Davis, a new lawyer in Oregon, to forestall

13    a default judgment against M & H Taiki in the above-mentioned case. I had previously retained

14    Dunn Carney for that representation, over  Light's vigorous objection. At that time Light took

15    the position that the lawsuit against M&H Taiki was not worth defending. He did not address at

16    all the potential fraudulent conveyance. I did not give my consent to hiring  Davis because it

17    was not clear to me on whose behalf he would be working, and if he achieved any GSA

18    Recovery, whether that GSA Recovery would be deposited into  Shopoff's trust account pending

19    final resolution of this lawsuit. As a result of this impasse, and general paralysis of action, it is

20    likely that no further GSA Recovery will be obtained on account of the Oregon assets.

21          12.    I have suggested on many occasions that a genuinely neutral person be appointed

22    to deal with business issues pending the resolution of this lawsuit, and to assist the parties in

23    getting the best deal for the sale of the GSA Recovery. Hyon has never responded to these

24    requests.

25

26    [1] Messrs. Hyon and Colangelo were experienced with the GSA Defendants' propensity to make
fraudulent conveyances: they had sued them for just that in two cases related to the Underlying

27    Litigation, which were part of the GSA. In of those both cases the same Jang, a signatory to the
GSA, was heavily involved .

28    37

DECLARATION OF ERIC SELTEN IN SUPPORT
OF MOTION TO APPOINT A RECEIVER

13.    More recently, Light has written to the principals at DIGS informing them that no deal exists to sell any portion of the GSA Recovery. He has also demanded information from me and others regarding the escrow number and contact information of the escrow company. I am convinced that he wants to obtain this information to kill the proposed sale. Although I have requested the benefit of his comparative evaluation of the $9 million offer, he has never explained to me how an offer which provides $4.5 million in cash along with a $4.5 million note is worse than a total loss to a certain foreclosure.

14.    I am convinced that as this situation and the parties' relationship continues to deteriorate, unless a neutral receiver or business manager steps in to gain control of the situation, all of the assets will be lost. A payment of $450,000 is due to be made to the defendants on October 15, 2005. To my knowledge, none of the parties have the ability or willingness to make this payment. The only way that the value of the GSA Recovery will be preserved is for the assets to be sold and the necessary payments made. In addition, a receiver could represent all of the parties to negotiate the most advantageous terms of sale. The parties are unable to make any progress in this regard.

I declare under penalty of perjury that the foregoing is true and correct. Executed on April 22, 2005, at Los Angeles, California.

_____
Eric Selten

38

DECLARATION OF ERIC SELTEN IN SUPPORT
OF MOTION TO APPOINT A RECEIVER

38

10-15-03

## Global Settlement Agreement

1.  Defendants shall dismiss their appeal of Judgment in Solano County Action No. LS001781, ("Defendants" includes Umeno, Takashima, Taiki Corporation, Mega Sand, Inc., Aizawa.) when the paragraph 7 Deed of Trust is recorded.

2.  All the interests of Defendants and the Transferees in the two Deeds of Trust shall be assigned to Plaintiffs. Plaintiffs intend to proceed with foreclosure to eliminate junior liens; Defendants agree to cooperate fully with that process; Plaintiffs agree not to do anything to impair existing permits.

3.  All stock in Mega Sand (Taiki, Aizawa) and Taiki (Umeno, Aizawa) shall be transferred to Plaintiffs.

4.  Defendants shall pay all property taxes and penalties now due on Decker plus any future penalties 10 days prior to the last day before the right to cure the default and prevent a sale expires; But not later than 6-30-04. Plaintiffs lis pendens on the Greenhills property will remain in place until the taxes are paid. Plaintiffs will remove lis pendens upon recordation of a Deed of Trust securing this obligation and junior only to the current 1" Deed of Trust. *If property has not sold in 30 days, Defendants will refinance to pay taxes.* JH

5.  Defendants shall assign to Plaintiffs all rights in M&H Taiki LLC and Taiki-Nelson LLC.

6.  Plaintiffs will have sole and exclusive discretion to sell or operate Decker Island and the sand business.

7.  Plaintiffs will pay to Defendants, commencing at the end of two years from the date of this Agreement, the amounts set forth below:

    | | |
    |---|---|
    | Year 2 - $400,000.00 | Year 3 - $425,000.00 |
    | Year 4 - $450,000.00 | Year 5 - $475,000.00 |
    | Year 6 - $500,000.00 | Year 7 - $350,000.00 |

    Plaintiffs shall have the right to prepay at any time, in whole or in part, and this obligation shall not bear any interest prior to default. This obligation shall be incorporated in the Deed of Trust to be recorded as a security interest in Decker Island in favor of Defendants or their assignees. This Deed of Trust shall be prior to any other lien or obligation created by Plaintiffs; Parties intend to proceed with foreclosure to eliminate existing liens but Plaintiffs do not warrant that this Deed of Trust will be prior to currently existing liens, *Deed of Trust will not* JH *to be "due on sale" but, transfer to new entity, or transfer of partial interest will not trigger unless more than 50% change in beneficial ownership.*

8.  In any action or arbitration arising out of this Settlement Agreement, the prevailing party shall recover attorneys' fees.

9.  Any dispute arising out of this Settlement Agreement shall be resolved by binding arbitration in San Francisco under the AAA commercial arbitration rules.

1

34

10.   Upon performance of Paragraphs 1 through 5 by Defendants, the Judgment in Solano County Action No. LS001781 shall be deemed satisfied and Solano Action 19508, and Contra Costa Actions C-03-02612 shall be dismissed with prejudice. Recordation of the paragraph 4 Deed of Trust constitutes performance of that paragraph for the purpose of this paragraph.

11.   Each Plaintiff warrants that the signature of every Plaintiff on this Agreement is authorized and binding. Each Defendant warrants that the signature of every Defendant on this Agreement is authorized and binding.

12.   The parties intend to sign a definitive agreement forthwith but intend that this Agreement immediately be enforceable as a settlement agreement under Code of Civil Procedure Section 877.6 without further writing.

13.   Plaintiffs and Defendants each agree to use good faith efforts to achieve the objectives of this Agreement, to protect the permits and other assets related to the sand business, and to produce positive cash flow. Breach of this covenant is a default of this Agreement and of the Deed of Trust described in paragraph 7.

14.   Each Party agrees to execute all documents and to perform all acts necessary to accomplish the provisions of this Agreement.

15.   This Agreement is the product of Mediation with Judge Eugene E. Brott. All parties were represented by counsel and each party represents and warrants that said party fully understands the terms of this Agreement and is not relying on any representation not contained herein. This Agreement has been fully negotiated and shall not be interpreted against either party.

PLAINTIFFS:                                    DEFENDANTS:

LAURENCE COLANGELO                    YASUNORI UMENO

INTERNATIONAL DEVELOPMENT AND        CHIKA TAKASHIMA
CONSULTANTS, INC.

JUNHO HYON                                TAIKI CORPORATION, USA

2

*40*

GLOBAL SETTLEMENT AGREEMENT SIGNATURES CONTINUED

HYON INTERNATIONAL, INC.

MEGA SAND, INC.

YOSHIJI AIZAWA

TOSHIYUKI HEMMI

HIKOICHI MORI

AKIO HISHIDA

AKIO TOMITA

MOTOKAZU KIM

3

*41*

**DONALD G. SAVAGE, CRE**
5540 Estates Drive
Oakland, CA 94618
(510) 547-2247
E-mail: donald.savage@worldnet.att.net

Professional Experience:

He has served as California Superior Court Receiver in over thirty five cases since 1986.
The cases included various types of properties including commercial office buildings,
retail centers, multifamily residential and mobile home parks in various counties in
Central and Northern California.

He has over thirty-five years experience in real estate asset management and construction
lending with various banks and RAMPAC, a real estate investment trust. His background
includes property management, leasing, acquisitions, dispositions and foreclosures.
Consulting assignments with various lenders included problem real estate loans,
foreclosure decisions, workout solutions, and negotiations with borrowers.

POSITIONS:

| | |
|---|---|
| 2002 to Present | Real estate consulting. Specializing in leasing, construction management, receiverships, and turn around situations including liquidations. |
| 1999-2002 | Senior Vice President TRI Asset Management Services, headquartered in Walnut Creek, California. |
| 1984-1999 | Founder of Brighton Pacific Realty Asset Management; Chairman United Property Services, Inc. Property and asset management with offices in Oakland, San Bruno, San Francisco and Sacramento. |
| 1972-1984 | Executive Vice President RAMPAC (NYSE listed REIT). Built trust Assets from $50 mil. To $175 mil. RAMPAC was sold via tender offer. The sale resulted in a gain for shareholders of 65%. |

PROFESSIONAL:

> California Real Estate Brokers license No. 00207969
> Building Owners & Managers Association
> Member The Counselors of Real Estate
> Member Oakland Board of Realtors
> Director, Catholic Charities of the East Bay

EDUCATION:

> University of California, Los Angeles

# Exhibit 8

Department of the Treasury — Internal Revenue Service

## Form 1041   U.S. Income Tax Return for Estates and Trusts   2007

OMB No. 1545-0092

**A** Type of entity (see instr):   For calendar year 2006 or fiscal year beginning   1/01/2007 , 2006 and ending   11/30 , 07

- [ ] Decedent's estate
- [ ] Simple trust
- [X] Complex trust
- [ ] Qualified disability trust
- [ ] ESBT (S portion only)
- [ ] Grantor type trust
- [ ] Bankruptcy estate — Chapter 7
- [ ] Bankruptcy estate — Chapter 11
- [ ] Pooled income fund

COL-ON TRUST
JEFFREY W. SHOPOFF, TRUSTEE
505 SANSOME ST, STE 1505
SAN FRANCISCO, CA 94111

**C** Employer identification number
20-7459877

**D** Date entity created
6/30/2000

**E** Nonexempt charitable and split-interest trusts, check applicable boxes (see instr):

- [ ] Described in section 4947(a)(1)
- [ ] Not a private foundation
- [ ] Described in section 4947(a)(2)

**B** Number of Schs K-1 attached (see instructions). . . ► 2

**F** Check applicable boxes:
- [X] Initial return
- [X] Final return
- [ ] Amended return
- [ ] Change in fiduciary
- [ ] Change in fiduciary's name
- [ ] Change in trust's name
- [ ] Change in fiduciary's address

**G** Pooled mortgage account (see instructions):   [ ] Bought   [ ] Sold   Date:

| | | | Amount |
|---|---|---|---:|
| **Income** | 1 | Interest income. . . . . . . . . . . . . . . . . . . . . SEE STATEMENT 1 . . . . . . . **1** | 32,979. |
| | 2a | Total ordinary dividends. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2a** | |
| | b | Qualified dividends allocable to: (1) Beneficiaries _____ (2) Estate/trust _____ | |
| | 3 | Business income or (loss). Attach Schedule C or C-EZ (Form 1040). . . . . . **3** | |
| | 4 | Capital gain or (loss). Attach Schedule D (Form 1041). . . . . . . . . . . . . . **4** | 1,804,586. |
| | 5 | Rents, royalties, partnerships, other estates and trusts, etc. Attach Schedule E (Form 1040). **5** | |
| | 6 | Farm income or (loss). Attach Schedule F (Form 1040). . . . . . . . . . . . . **6** | |
| | 7 | Ordinary gain or (loss). Attach Form 4797 . . . . . . . . . . . . . . . . . . . . **7** | |
| | 8 | Other income. List type and amount **8** | |
| | 9 | **Total income.** Combine lines 1, 2a, and 3 through 8. . . . . . . . . . . . . . . ► **9** | 1,837,565. |
| **Deduc-tions** | 10 | Interest. Check if Form 4952 is attached ► [ ] **10** | 113,527. |
| | 11 | Taxes. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **11** | |
| | 12 | Fiduciary fees. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **12** | 47,570. |
| | 13 | Charitable deduction (from Schedule A, line 7). . . . . . . . . . . . . . . . . . **13** | |
| | 14 | Attorney, accountant, and return preparer fees. . . . . . . . . . . . . . . . . . **14** | 107,390. |
| | 15a | Other deductions **not** subject to the 2% floor (attach schedule). . . . . . . . **15a** | 268,487. |
| | b | Allowable miscellaneous itemized deductions subject to the 2% floor. . . . . . **15b** | |
| | 16 | Add lines 10 through 15b. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **16** | 268,487. |
| | 17 | Adjusted total income or (loss). Subtract line 16 from line 9 . . . . . ► **17**  1,569,078. | |
| | 18 | Income distribution deduction (from Schedule B, line 15). Attach Schedules K-1 (Form 1041). . . **18** | 1,569,078. |
| | 19 | Estate tax deduction including certain generation-skipping taxes (attach computation). . . . . . . **19** | |
| | 20 | Exemption. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **20** | 100. |
| | 21 | Add lines 18 through 20. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ► **21** | 1,569,178. |
| | 22 | Taxable income. Subtract line 21 from line 17. If a loss, see instructions. . . . . . . . . . . . **22** | -100. |
| | 23 | Total tax (from Schedule G, line 7). . . . . . . . . . . . . . . . . . . . . . . . . **23** | 0. |
| **Tax and Payments** | 24 | Payments: a 2006 estimated tax payments and amount applied from 2005 return. . . . . . . . . **24a** | |
| | b | Estimated tax payments allocated to beneficiaries (from Form 1041-T). . . . . **24b** | |
| | c | Subtract line 24b from line 24a. . . . . . . . . . . . . . . . . . . . . . . . . . . **24c** | |
| | d | Tax paid with Form 7004 (see instructions). . . . . . . . . . . . . . . . . . . . **24d** | |
| | e | Federal income tax withheld. If any is from Form(s) 1099, check ► [ ] **24e** | |
| | f | Credit for federal telephone excise tax paid. Attach Form 8913. . . . . . . . **24f** | |
| | | Other payments: g _Form 2439_ _____; h _Form 4136_ _____; Total . . . . . . . ► **24i** | |
| | 25 | Total payments. Add lines 24c through 24f, and 24i. . . . . . . . . . . . . . . ► **25** | |
| | 26 | Estimated tax penalty (see instructions). . . . . . . . . . . . . . . . . . . . . . **26** | |
| | 27 | Tax due. If line 25 is smaller than the total of lines 23 and 26, enter amount owed . . . . . . . **27** | |
| | 28 | Overpayment. If line 25 is larger than the total of lines 23 and 26, enter amount overpaid . . . . **28** | |
| | 29 | Amount of line 28 to be: a Credited to 2007 estimated tax ►      ; b Refunded . . . . ► **29** | |

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

**Sign Here**

► _____  Signature of fiduciary or officer representing fiduciary   Date

► _____  EIN of fiduciary if a financial institution

May the IRS discuss this return with the preparer shown below (see instrs)? [X] Yes [ ] No

**Paid Preparer's Use Only**

Preparer's signature ► _(signed)_   Date 11/19/2007

Check if self-employed ► [ ]

Preparer's SSN or PTIN   P00070474

Firm's name (or yours if self-employed), address, and ZIP code ►
BACHECKI, CROM & CO., LLP
180 MONTGOMERY ST. #2340
SAN FRANCISCO, CA 94104

EIN   94-2985268

Phone number   (415) 398-3534

BAA   For Privacy Act and Paperwork Reduction Act Notice, see separate instructions.   FIFA0105L  02/06/07   Form 1041 (2006)

Form 4797 (2006)  COL-ON TRUST                                    20-7459877          Page 2

**Part III** Gain From Disposition of Property Under Sections 1245, 1250, 1252, 1254, and 1255
(see instructions)

| 19(a) Description of section 1245, 1250, 1252, 1254, or 1255 property: | (b) Date acquired (mo, day, yr) | (c) Date sold (mo, day, yr) |
|---|---|---|
| A DECKER ISLAND, FAIRFIELD | 6/30/00 | 7/12/07 |
| B | | |
| C | | |
| D | | |

| These columns relate to the properties on lines 19A through 19D ▶ | | Property A | Property B | Property C | Property D |
|---|---|---|---|---|---|
| 20 Gross sales price (Note: *See line 1 before completing.*) | 20 | 6,600,000. | | | |
| 21 Cost or other basis plus expense of sale | 21 | 4,795,414. | | | |
| 22 Depreciation (or depletion) allowed or allowable | 22 | | | | |
| 23 Adjusted basis. Subtract line 22 from line 21 | 23 | 4,795,414. | | | |
| 24 Total gain. Subtract line 23 from line 20 | 24 | 1,804,586. | | | |
| 25 If section 1245 property: a Depreciation allowed or allowable from line 22 | 25a | | | | |
| b Enter the smaller of line 24 or 25a | 25b | 0. | | | |
| 26 If section 1250 property: If straight line depreciation was used, enter -0- on line 26g, except for a corporation subject to section 291. | | | | | |
| a Additional depreciation after 1975 (see instrs) | 26a | | | | |
| b Applicable percentage multiplied by the smaller of line 24 or line 26a (see instructions) | 26b | | | | |
| c Subtract line 26a from line 24. If residential rental property or line 24 is not more than line 26a, skip lines 26d and 26e | 26c | | | | |
| d Additional depreciation after 1969 before 1976 | 26d | | | | |
| e Enter the smaller of line 26c or 26d | 26e | | | | |
| f Section 291 amount (corporations only) | 26f | | | | |
| g Add lines 26b, 26e, and 26f | 26g | | | | |
| 27 If section 1252 property: Skip this section if you did not dispose of farmland or if this form is being completed for a partnership (other than an electing large partnership). | | | | | |
| a Soil, water, and land clearing expenses | 27a | | | | |
| b Line 27a multiplied by applicable percentage (see instructions) | 27b | | | | |
| c Enter the smaller of line 24 or 27b | 27c | | | | |
| 28 If section 1254 property: a Intangible drilling and development costs, expenditures for development of mines and other natural deposits, and mining exploration costs (see instructions) | 28a | | | | |
| b Enter the smaller of line 24 or 28a | 28b | | | | |
| 29 If section 1255 property: a Applicable percentage of payments excluded from income under section 126 (see instructions) | 29a | | | | |
| b Enter the smaller of line 24 or 29a (see instrs) | 29b | | | | |

**Summary of Part III Gains.** Complete property columns A through D through line 29b before going to line 30.

| 30 | Total gains for all properties. Add property columns A through D, line 24 | 30 | 1,804,586. |
|---|---|---|---|
| 31 | Add property columns A through D, lines 25b, 26g, 27c, 28b, and 29b. Enter here and on line 13 | 31 | 0. |
| 32 | Enter the portion from line 30. Enter the portion from casualty or theft on Form 4684, line 36. Enter the portion from other than casualty or theft on Form 4797, line 6 | 32 | 1,804,586. |

**Part IV** Recapture Amounts Under Sections 179 and 280F(b)(2) When Business Use Drops to 50% or Less
(see instructions)

| | | | (a) Section 179 | (b) Section 280F(b)(2) |
|---|---|---|---|---|
| 33 | Section 179 expense deduction or depreciation allowable in prior years | 33 | | |
| 34 | Recomputed depreciation (see instructions) | 34 | | |
| 35 | Recapture amount. Subtract line 34 from line 33. See the instructions for where to report | 35 | | |

BAA                              FDIZ1002L  10/17/06                        Form 4797 (2006)

Exhibit 9

Department of the Treasury — Internal Revenue Service

**Form 1041**  **U.S. Income Tax Return for Estates and Trusts**  **2006**  OMB No. 1545-0092

**A** Type of entity (see instr): For calendar year 2006 or fiscal year beginning 1/01/2007, 2006 and ending 11/30, 07

- ☐ Decedent's estate
- ☐ Simple trust
- ☒ Complex trust
- ☐ Qualified disability trust
- ☐ ESBT (S portion only)
- ☐ Grantor type trust
- ☐ Bankruptcy estate — Chapter 7
- ☐ Bankruptcy estate — Chapter 11
- ☐ Pooled income fund

COL-ON TRUST
JEFFREY W. SHOPOFF, TRUSTEE
505 SANSOME ST, STE 1505
SAN FRANCISCO, CA 94111

**C** Employer Identification number
20-7459877

**D** Date entity created
6/30/2000

**E** Nonexempt charitable and split-interest trusts, check applicable boxes (see instr):
- ☐ Described in section 4947(a)(1)
- ☐ Not a private foundation
- ☐ Described in section 4947(a)(2)

**B** Number of Schs K-1 attached (see instructions)... ► 2

**F** Check applicable boxes: ☒ Initial return  ☒ Final return  ☐ Amended return  ☐ Change in trust's name  ☐ Change in fiduciary  ☐ Change in fiduciary's name  ☐ Change in fiduciary's address

**G** Pooled mortgage account (see instructions): ☐ Bought  ☐ Sold  Date:

| | | | |
|---|---|---|---|
| **Income** | 1 Interest income.....................................SEE STATEMENT 1 | 1 | 32,979. |
| | 2a Total ordinary dividends.......................... | 2a | |
| | b Qualified dividends allocable to: (1) Beneficiaries _____ (2) Estate/trust _____ | | |
| | 3 Business income or (loss). Attach Schedule C or C-EZ (Form 1040).... | 3 | |
| | 4 Capital gain or (loss). Attach Schedule D (Form 1041)........... | 4 | 961,393. |
| | 5 Rents, royalties, partnerships, other estates and trusts, etc. Attach Schedule E (Form 1040).... | 5 | |
| | 6 Farm income or (loss). Attach Schedule F (Form 1040)........... | 6 | |
| | 7 Ordinary gain or (loss). Attach Form 4797.............. | 7 | |
| | 8 Other income. List type and amount | 8 | |
| | 9 Total income. Combine lines 1, 2a, and 3 through 8............ ► | 9 | 994,372. |
| **Deductions** | 10 Interest. Check if Form 4952 is attached ► ☐ | 10 | 113,527. |
| | 11 Taxes............................... | 11 | |
| | 12 Fiduciary fees.......................... | 12 | 13,603. |
| | 13 Charitable deduction (from Schedule A, line 7)......... | 13 | |
| | 14 Attorney, accountant, and return preparer fees....... | 14 | 533,555. |
| | 15a Other deductions not subject to the 2% floor (attach schedule)...SEE STATEMENT 2 | 15a | 8,708. |
| | b Allowable miscellaneous itemized deductions subject to the 2% floor... | 15b | |
| | 16 Add lines 10 through 15b.................... ► | 16 | 669,393. |
| | 17 Adjusted total income or (loss). Subtract line 16 from line 9... | 17 | 324,979. |
| | 18 Income distribution deduction (from Schedule B, line 15). Attach Schedules K-1 (Form 1041)... | 18 | 324,979. |
| | 19 Estate tax deduction including certain generation-skipping taxes (attach computation)......... | 19 | |
| | 20 Exemption.............................. | 20 | 100. |
| | 21 Add lines 18 through 20................... | 21 | 325,079. |
| **Tax and Payments** | 22 Taxable income. Subtract line 21 from line 17. If a loss, see instructions................ | 22 | -100. |
| | 23 Total tax (from Schedule G, line 7)............. | 23 | 0. |
| | 24 Payments: a 2006 estimated tax payments and amount applied from 2005 return..... | 24a | |
| | b Estimated tax payments allocated to beneficiaries (from Form 1041-T)...... | 24b | |
| | c Subtract line 24b from line 24a................ | 24c | |
| | d Tax paid with Form 7004 (see instructions)........... | 24d | |
| | e Federal income tax withheld. If any is from Form(s) 1099, check ► ☐ | 24e | |
| | f Credit for federal telephone excise tax paid. Attach Form 8913............ | 24f | |
| | Other payments: g Form _____; h Form _____; Total...... ► | 24l | |
| | 25 Total payments. Add lines 24c through 24f, and 24l.......... | 25 | |
| | 26 Estimated tax penalty (see instructions)......... | 26 | |
| | 27 Tax due. If line 25 is smaller than the total of lines 23 and 26, enter amount owed.......... | 27 | |
| | 28 Overpayment. If line 25 is larger than the total of lines 23 and 26, enter amount overpaid.... | 28 | |
| | 29 Amount of line 28 to be: a Credited to 2007 estimated tax ►_____; b Refunded... ► | 29 | |

**Sign Here**

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

Signature of fiduciary or officer representing fiduciary   Date  3-17-2008   EIN of fiduciary if a financial institution

May the IRS discuss this return with the preparer shown below (see instrs)? ☒ Yes ☐ No

**Paid Preparer's Use Only**

Preparer's signature   Date 3.8.2008   Check if self-employed ☐   Preparer's SSN or PTIN P00070474

Firm's name (or yours if self-employed), address, and ZIP code ► BACHECKI, CROM & CO., LLP
180 MONTGOMERY ST. #2340
SAN FRANCISCO, CA 94104

EIN 94-2985268
Phone number (415) 398-3534

BAA For Privacy Act and Paperwork Reduction Act Notice, see separate instructions.   FIFA0105L 02/06/07   Form 1041 (2006)

Form 4797 (2006)  COL-ON TRUST                                          20-7459877                          Page 2

**Part III** | Gain From Disposition of Property Under Sections 1245, 1250, 1252, 1254, and 1255
(see instructions)

| 19(a) Description of section 1245, 1250, 1252, 1254, or 1255 property: | | (b) Date acquired (mo., day, yr) | (c) Date sold (mo., day, yr) |
|---|---|---|---|
| A | DECKER ISLAND, FAIRFIELD | 5/30/00 | 7/12/07 |
| B | | 10/15/03 | |
| C | | | |
| D | | | |

| These columns relate to the properties on lines 19A through 19D. ▶ | | Property A | Property B | Property C | Property D |
|---|---|---|---|---|---|
| 20 | Gross sales price (Note: *See line 1 before completing.*) | 20 | 6,600,000. | | | |
| 21 | Cost or other basis plus expense of sale | 21 | 5,638,607. | | | |
| 22 | Depreciation (or depletion) allowed or allowable | 22 | | | | |
| 23 | Adjusted basis. Subtract line 22 from line 21 | 23 | 5,638,607. | | | |
| 24 | Total gain. Subtract line 23 from line 20 | 24 | 961,393. | | | |
| 25 | If section 1245 property: | | | | | |
| | a Depreciation allowed or allowable from line 22 | 25a | | | | |
| | b Enter the smaller of line 24 or line 25a | 25b | 0. | | | |
| 26 | If section 1250 property: If straight line depreciation was used, enter -0- on line 26g, except for a corporation subject to section 291. | | | | | |
| | a Additional depreciation after 1975 (see instrs.) | 26a | | | | |
| | b Applicable percentage multiplied by the smaller of line 24 or line 26a (see instructions) | 26b | | | | |
| | c Subtract line 26a from line 24. If residential rental property or line 24 is not more than line 26a, skip lines 26d and 26e | 26c | | | | |
| | d Additional depreciation after 1969 & before 1976 | 26d | | | | |
| | e Enter the smaller of line 26c or 26d | 26e | | | | |
| | f Section 291 amount (corporations only) | 26f | | | | |
| | g Add lines 26b, 26e, and 26f | 26g | | | | |
| 27 | If section 1252 property: Skip this section if you did not dispose of farmland or if this form is being completed for a partnership (other than an electing large partnership). | | | | | |
| | a Soil, water, and land clearing expenses | 27a | | | | |
| | b Line 27a multiplied by applicable percentage (see instructions) | 27b | | | | |
| | c Enter the smaller of line 24 or 27b | 27c | | | | |
| 28 | If section 1254 property: | | | | | |
| | a Intangible drilling and development costs, expenditures for development of mines and other natural deposits, and mining exploration costs (see instructions) | 28a | | | | |
| | b Enter the smaller of line 24 or 28a | 28b | | | | |
| 29 | If section 1255 property: | | | | | |
| | a Applicable percentage of payments excluded from income under section 126 (see instructions) | 29a | | | | |
| | b Enter the smaller of line 24 or 29a (see instrs.) | 29b | | | | |

**Summary of Part III Gains.** Complete property columns A through D through line 29b before going to line 30.

| 30 | Total gains for all properties. Add property columns A through D, line 24 | 30 | 961,393. |
|---|---|---|---|
| 31 | Add property columns A through D, lines 25b, 26g, 27c, 28b, and 29b. Enter here and on line 13 | 31 | 0. |
| 32 | Subtract line 31 from line 30. Enter the portion from casualty or theft on Form 4684, line 36. Enter the portion from other than casualty or theft on Form 4797, line 6 | 32 | 961,393. |

**Part IV** | Recapture Amounts Under Sections 179 and 280F(b)(2) When Business Use Drops to 50% or Less
(see instructions)

| | | | (a) Section 179 | (b) Section 280F(b)(2) |
|---|---|---|---|---|
| 33 | Section 179 expense deduction or depreciation allowable in prior years | 33 | | |
| 34 | Recomputed depreciation (see instructions) | 34 | | |
| 35 | Recapture amount. Subtract line 34 from line 33. See the instructions for where to report | 35 | | |

BAA                                    FDIZ1002L  10/17/06                        Form 4797 (2006)

# Exhibit 10

# Shopoff Cavallo & Kirsch LLP
Trial Attorneys

100 Pine Street, Suite 750
San Francisco, California 94111

Jeffrey W. Shopoff        jeff@scklegal.com
Gregory S. Cavallo       greg@scklegal.com
Paul F. Kirsch            paul@scklegal.com
James M. Robinson      james@scklegal.com

Phone: 415.984.1975
Fax: 415.984.1978

www.scklegal.com

April 22, 2014

**BY FEDEX**

Junho Hyon
725 Livingston Place
Rio Vista, CA 94571

Re:    **Hyon v. Shopoff & Cavallo, et al.**
       **Solano County Superior Court No. FCS039786**

Dear Mr. Hyon:

We are attorneys for Shopoff Group. We have learned that you have scheduled a "prove-up" hearing before Judge Kays on April 29, 2014. It appears that you are attempting to get a default judgment against Shopoff Group. This action is improper. The purpose of this letter is to advise you of the reasons why your action is improper, and to notify you that, if you proceed with this hearing, we will seek all available sanctions against you.

First: Shopoff Group is not a party to this action. You did name Shopoff Group in your original complaint, but you dismissed Shopoff Group when you filed a First Amended Complaint on April 22, 2013, which did not name Shopoff Group as a defendant. If an amended complaint omits a defendant named in the original complaint, it serves as a dismissal as to that defendant. *Kuperman v. Great Republic Life Ins. Co.* (1987) 195 Cal.App.3d 943, 947, 241 Cal.Rptr. 187, 189; *Fireman's Fund Ins. Co. v. Sparks Const., Inc.* (2004) 114 Cal.App.4th 1135, 1142, 8 Cal.Rptr.3d 446, 451. When you filed the First Amended Complaint and did not name Shopoff Group, you dismissed Shopoff Group. It is not a party to the action and you may not seek a judgment against it.

Second: Jeffrey Shopoff has no interest whatsoever in Shopoff Group, which is owned by his brother William Shopoff. Your long quarrel with Jeffrey Shopoff has been decided against you by several courts, and several appeals decisions. In this action, judgment was entered against you on all claims, and in favor of Jeffrey Shopoff and Shopoff & Cavallo LLP on May 13, 2013.

## Shopoff Cavallo & Kirsch LLP

April 22, 2014
Page 2

<u>Third</u>:  You claim in your application for "prove-up" that Shopoff Group was the actual purchaser of Decker Island, and that Shopoff Group is "behind DI Aggregate Management' operation."  These statements are false; you have no basis whatsoever to believe they are true; and you know they are not true.  Shopoff Group has no connection whatsoever to Decker Island, or its purchasers, or its operator.  Moreover, the transaction was approved by the Superior Court, and that judgment is final.  If you proceed to make this claim in court you will expose yourself to prosecution for perjury.

<u>Fourth</u>:  You never effected service of process on Shopoff Group, and the Proof of Service which you filed on October 22, 2012, is not truthful, because there was never any personal service of the original Complaint on Shopoff Group.  Service by mail is not enough.

Mr. Hyon, your war on your imagined antagonists has gone on far too long.  We urge you to stop, or you will suffer the consequences.

Very truly yours,

Jeffrey W. Shopoff
Shopoff Cavallo & Kirsch LLP


JWS:cm

# Exhibit 11



*In Pro Per:* Junho Hyon
525 Birch Ridge Drive
Rio Vista, CA 94571

*Telephone No:* 707-374-5133    *FAX No:*

*In Pro Per:* Plaintiff    *Ref. No. or File No.:*

*For Court Use Only*

**F I L E D**
Clerk of the Superior Court

OCT 22 2012

*By*
DEPUTY CLERK

*Insert name of Court, and Judicial District and Branch Court:*
SOLANO COUNTY SUPERIOR COURT

*Plaintiff:* JUNHO HYON

*Defendant:* SHOPOFF GROUP

| PROOF OF SERVICE SUMMONS & COMPLAINT | *Hearing Date:* | *Time:* | *Dept/Div:* | *Case Number:* FCSO39786 |
|---|---|---|---|---|

1. *At the time of service I was at least 18 years of age and not a party to this action.*

2. I served copies of the SUMMONS & COMPLAINT

3. a. *Party served:*
   b. *Person served:*

   SHOPOFF GROUP
   REGGIE SINGH, ADMINISTRATIVE ASSISTANT, AUTHORIZED TO ACCEPT SERVICE OF PROCESS, American Indian, Male, 25 Years Old, Black Hair, Brown Eyes, 5 Feet 8 Inches, 180 Pounds

4. *Address where the party was served:*
   2 PARK PLAZA, #700
   Irvine, CA 92614

5. *I served the party:*
   a. **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on: Thu., Oct. 04, 2012 (2) at: 3:37PM

6. The "Notice to the Person Served" (on the Summons) was completed as follows:
   a. as other:    SHOPOFF GROUP

7. **Person Who Served Papers:**
   a. SHAWN O'MALLEY
   b. **L.A.'s PRIME ATTORNEY NETWORK**
      24307 Magic Mountain Parkway #300
      Valencia, CA 91355
   c. 661-270-0530, FAX 661-270-0550

   Recoverable Cost Per CCP 1033.5(a)(4)(B)
   d. *The Fee for Service was:*    $85.00
   e. I am: (3) registered California process server
      (i)    Owner
      (ii)   *Registration No.:*    PSC1996
      (iii)  *County:*    Orange
      (iv)   *Expiration Date:*    Tue, Jan. 22, 2013

RECEIVED SOLANO SUPERIOR COURT 2012 OCT 19 PM 1: 59

8. *I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.*

   *Date: Tue, Oct. 09, 2012*

Judicial Council Form POS-010
Rule 2.150.(a)&(b) Rev January 1, 2007

PROOF OF SERVICE
SUMMONS & COMPLAINT

(SHAWN O'MALLEY)

73598.caw.91434

# Exhibit 12

RECORDING REQUESTED BY

AND WHEN RECORDED MAIL TO

NAME R. Gordon Baker, Jr.
ADDRESS 2033 North Main Street, #900
CITY & STATE Walnut Creek, CA 94596

Title Order No._____Escrow No._____

1994-00015039
Recorded By:           7A RecFee      22.00
R. GORDON BAKER, JR.      SurMon
                          NoPCOR
Official Records          DTTax
County of Solano          Check  $ 22.00
Robert Blechschmidt       OvrSht
Assessor/Recorder

15:27  08-FEB-94     AR89    5    Pgs __

## DEED OF TRUST WITH ASSIGNMENTS OF RENTS

This DEED OF TRUST, made                                              , between

        MEGA SAND, INCORPORATED, a California corporation

                                              herein called TRUSTOR,

whose address is 110 L Street, Antioch, California 94509

      (Number and Street)            (City)           (State)        (Zip Code)

CHICAGO TITLE COMPANY, a California Corporation, herein called TRUSTEE, and

      TAIKI CORPORATION USA, an Oregon corporation
                                              ,herein called BENEFICIARY,

WITNESSETH: That Trustor grants to Trustee in Trust, with Power of Sale that property in the
                              County of    Solano        , State of California, described as:

      COMMONLY KNOWN AS DECKER ISLAND; ASSESSOR's PARCEL NOS. 90-210-90
      and 90-210-50, AND MORE PARTICULARLY DESCRIBED IN EXHIBIT "A"
      ATTACHED HERETO AND INCORPORATED HEREIN BY REFERENCE.

Trustor also assigns to BENEFICIARY all rents, issues and profits from said real property RESERVING, HOWEVER, the right to collect and use the same so long as there is no existing default hereunder, and DOES HEREBY AUTHORIZE BENEFICIARY to collect and recover the same in the name of Trustor or his successor in interest by use of any lawful means.
FOR THE PURPOSE OF SECURING (1) payment of the sum of Fifty Thousand and No/100, plus future advances ($50,000.00** ) Dollars with interest thereon according to the terms of a promissory note or notes of even date herewith made by TRUSTOR, payable to order of BENEFICIARY, and extensions or renewals thereof; (2) the performance of each agreement of TRUSTOR incorporated by reference or contained herein; and (3) payment of any additional sums and advances hereafter made by BENEFICIARY or his assignee to TRUSTOR or his successor in ownership of the real property encumbered hereby.
TO PROTECT THE SECURITY OF THIS DEED OF TRUST TRUSTOR AGREES that all of the provisions of Section A, Paragraphs 1 through 5, and IT IS MUTUALLY AGREED that all of the provisions of Section B, Paragraphs 1 through 9, both of that certain Fictitious Deed of Trust recorded in the book and at the page of Official Records in the office of the County Recorder of the county where said property is located, noted opposite the name of such county, viz.:

| COUNTY | BOOK | PAGE | COUNTY | BOOK | PAGE | COUNTY | BOOK | PAGE | COUNTY | BOOK | PAGE |
|--------|------|------|--------|------|------|--------|------|------|--------|------|------|
| Alameda | 1288 | 556 | Kings | 858 | 713 | Placer | 1028 | 379 | Sierra | 38 | 187 |
| Alpine | 3 | 130-31 | Lake | 437 | 110 | Plumas | 166 | 1307 | Siskiyou | 506 | 762 |
| Amador | 133 | 438 | Lassen | 192 | 367 | Riverside | 3778 | 347 | Solano | 1287 | 621 |
| Butte | 1330 | 513 | Los Angeles | T-3878 | 874 | Sacramento | 71-10-26 | 615 | Sonoma | 2067 | 427 |
| Calveras | 185 | 338 | Madera | 911 | 136 | San Benito | 300 | 405 | Stanislaus | 1970 | 56 |
| Colusa | 323 | 391 | Marin | 1849 | 122 | San Bernardino | 6213 | 768 | Sutter | 655 | 585 |
| Contra Costa | 4684 | 1 | Mariposa | 90 | 453 | San Francisco | A-804 | 596 | Tehama | 457 | 183 |
| Del Norte | 101 | 549 | Mendocino | 667 | 99 | San Joaquin | 2855 | 283 | Trinity | 108 | 595 |
| El Dorado | 704 | 635 | Merced | 16540 | 753 | San Luis Obispo | 1311 | 137 | Tulare | 2530 | 108 |
| Fresno | 5052 | 623 | Modoc | 191 | 93 | San Mateo | 4778 | 175 | Tuolumne | 177 | 160 |
| Glenn | 469 | 76 | Mono | 69 | 302 | Santa Barbara | 2055 | 681 | Ventura | 2607 | 237 |
| Humboldt | 801 | 83 | Monterey | 357 | 239 | Santa Clara | 6626 | 664 | Yolo | 769 | 16 |
| Imperial | 1189 | 701 | Napa | 704 | 742 | Santa Cruz | 1638 | 607 | Yuba | 398 | 693 |
| Inyo | 165 | 672 | Nevada | 363 | 94 | Shasta | 800 | 633 | | | |
| Kern | 3756 | 690 | Orange | 7182 | 18 | San Diego Series 5 Book 1964, Page 149774 | | | | | |

(which provisions, identical in all counties, are Printed on the reverse side hereof) are hereby incorporated herein, and the parties hereto agree to be bound thereby as though fully set forth herein. All references to property, obligations and parties in the provisions of said Fictitious Deed of Trust are the property, obligations and parties set forth in this Deed of Trust.

The undersigned TRUSTOR requests that a copy of any Notice of Default and any Notice of Sale hereunder be mailed to him at the address set forth above.

STATE OF CALIFORNIA
COUNTY OF                     } ss.
On  this_____
day of_____, in the year_____
before me, the undersigned, a Notary Public in and for said County and State,
personally appeared

_____, personally known to me or
proved to me on the basis of satisfactory evidence to be the person(s)
whose name(s) is (are) subscribed to the within instrument and
acknowledged that                      executed the same.

Signature _____

_____
        NAME Typed or Printed

Signature of Trustor
MEGA SAND, INCORPORATED

By  _____
      David B. Baker, Its President

_____

(This area for official notarial seal)

FORM 2962 (10-67)

CERTIFICATE OF ACKNOWLEDGEMENT

STATE OF CALIFORNIA
COUNTY OF _____ Contra Costa } S.S.

On ___2/2/94_____ before me,

___Holley B. Giessman_____

a Notary Public in and for said County and State, personally appeared

___David B. Baker_____

personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal

Signature ___Holley B. Gss_____

F 2492 (5-91)

FOR NOTARY SEAL OR STAMP

Holley B. Giessman
Comm. #979218
NOTARY PUBLIC - CALIFORNIA
CONTRA COSTA COUNTY
Comm. Expires Nov. 20, 1996

# ADDENDUM TO
# SHORT FORM DEED OF TRUST AND
# ASSIGNMENT OF RENTS

This is Addendum Number One to the Short Form Deed of Trust and Assignment of Rents made ~~January~~ *February* 2, 1994, between MEGA SAND, INCORPORATED, a California corporation, (hereinafter called "Trustor"), CHICAGO TITLE INSURANCE COMPANY, a Missouri corporation, (hereinafter called "Trustee"), and TAIKI CORPORATION USA, an Oregon corporation, (hereinafter called "Beneficiary"), to which this Addendum is attached and made a part.

      1.    Due on Sale.  IF THE TRUSTOR SHALL SELL, CONVEY, ENCUMBER, PLEDGE, HYPOTHECATE OR ALIENATE SAID PROPERTY OR ANY PART THEREOF OR ANY INTEREST THEREIN, OR SHALL BE DIVESTED OF TRUSTOR'S TITLE OR ANY INTEREST THEREIN IN ANY MANNER OR WAY, WHETHER VOLUNTARILY OR INVOLUNTARILY, WITHOUT THE WRITTEN CONSENT OF THE BENEFICIARY BEING FIRST HAD AND OBTAINED, BENEFICIARY SHALL HAVE THE RIGHT, AT BENEFICIARY'S OPTION, EXCEPT AS PROHIBITED BY LAW, TO DECLARE ANY INDEBTEDNESS OR OBLIGATIONS SECURED HEREBY, IRRESPECTIVE OF THE MATURITY DATE SPECIFIED IN ANY NOTE EVIDENCING THE SAME, IMMEDIATELY DUE AND PAYABLE.

MEGA SAND, INCORPORATED

By: _____
David B. Baker, its President

State of California

County of Contra Costa

On _2/2_____, 1994 before me, _Holley B. Giessman_, personally appeared David B. Baker, as the President of MEGA SAND, INCORPORATED, personally known to me (or proved to me on the basis of satisfactory evidence) to be the persons whose names are subscribed to the within instrument and acknowledged to me that they executed the same in their authorized capacity, and that by their signatures on the instrument the persons, or the entity upon behalf of which the persons acted, executed the instrument.

WITNESS my hand and official seal.

Signature: _____

c:\...TAI6191.03\DEEDTRUS.ADD

Holley B. Giessman
Comm. #979218
NOTARY PUBLIC - CALIFORNIA
CONTRA COSTA COUNTY
Comm. Expires Nov. 29, 1996

EXHIBIT "A"

LEGAL DESCRIPTION

REAL PROPERTY in the County of Solano, State of California, described as follows:

Those certain lands situate in Sections 13, 14, 22, 23 and 24, Township 3 North, Range 2 East, Mount Diablo Base and Meridian, described as follows:

PARCEL ONE:

Commencing at a point, which is North 82° 41' East, 6383 feet from an established point known as U.S. Geological Pier No. 4, said point being on the Southeasterly line of Sacramento River; thence from said point of beginning, North 47° 39' East, 4620.4 feet along the Southeasterly boundary of said new channel of Sacramento River to a point between the lands formerly of H. Glassell and others to land acquired by the U.S. of America; thence along the same, South 67° 29' East, 1684.6 feet to land of W.R. Hansen; thence along said line South 0° 45' West, 264 feet; thence South 11° 15' West, 132 feet; thence South 17° 45' West, 396 feet; thence South 16° West, 858 feet; thence South 26° 30' West, 178.2 feet; thence South 32° West, 396 feet; thence South 28° 30' West, 396 feet; thence South 39° 15' West, 198 feet; thence South 46° 30' West, 442.2 feet; thence South 51° West, 264 feet; thence South 46° 30' West, 990 feet; thence South 49° 30' West, 369.8 feet; thence South 54° 30' West, 198 feet; thence South 58° 15' West, 198 feet; thence South 63° 30' West, 224.40 feet; thence South 35° 15' West, 178.2 feet; thence South 46° 30' West, 396 feet; thence South 75° 53' West, 144.3 feet; thence North 34° 26' West, 2566 feet to the place of beginning.

APN'S: 90-210-050 and portion of 090

PARCEL TWO:

Beginning at a point which is North 82° 41' East, 6383 feet from an established point known as U.S. Geological Survey Pier No. 4, thence from said point of beginning, South 34° 26' East, 2566 feet to a point on the boundary line between lands of Dozier and Pressley Company and land of R.W. Hansen; thence along the boundary line of lands of Dozier and Pressley Company, a corporation, to lands of R.W. Hansen as follows: South 28° 8' West, 165.8 feet; thence South 45° 30' West, 231 feet; South 51° 20' West, 640.2 feet; South 38° 30' East, 142.6 feet to a point on the North shore line of Sacramento River, as it existed in the year 1880; thence following the meanderings of the North shore line of Sacramento River as then existing as follows: South 26° 15' West, 244 feet; thence South 64° 34' West, 600.0 feet; thence South 86° West, 429 feet; thence North 70° 15' West, 805.2 feet; thence North 67° 45' West, 1069.2 feet; thence North 69° 45' West, 587.4 feet; thence North 59° West, 161.9 feet; thence North 47° 39' East, 3680 feet to the place of beginning.

APN'S: 90-210-080 and portion of 090

PARCEL THREE:

Commencing at a point which is North 82° 41' East, 6383 feet from an esta-
lished point known as H.C. Geological Pier No. 4, said point being on the
Southeasterly line of the Sacramento River; thence North 47° 39' East,
4820.4 feet along the Southeasterly boundary of said new channel of
Sacramento River to a point between the lands formerly of H. Glassell and
others, to land acquired by the U.S. of America; thence along the same,
South 67° 29' East, 1584.6 feet to the land of W.R. Hansen and point of
beginning of the following described parcel of land; thence from said point
of beginning South 0° 45' West, 204 feet; thence South 11° 15' West, 132
feet; thence South 17° 45' West, 396 feet; thence South 16° 0' West, 856
feet; thence South 26° 30' West, 178.2 feet; thence South 32° 0' West, 396
feet; thence South 28° 30' West, 396 feet; thence South 39° 15' West, 198
feet; thence South 46° 30' West, 442.2 feet; thence South 51° 0' West, 264
feet; thence South 46° 30' West, 990 feet; thence South 49° 30' West, 369.6
feet; thence South 54° 30' West, 198 feet; thence South 58° 15' West, 198
feet; thence South 63° 30' West, 224.4 feet; thence South 35° 15' West,
178.2 feet; thence South 46° 30' West, 396 feet; thence South 75° 33' West,
144.3 feet; thence South 28° 08' West, 165.8 feet; thence South 45° 30'
West, 231 feet; thence South 51° 20' West, 640.20 feet; thence South 39°
30' East, 142.60 feet; thence South 33° West, 22 feet; thence South 54° 14'
West, 196 feet; thence South 49° 29' West, 241.7 feet; thence South 47° 50'
West, 533.5 feet; thence South 48° 46' West, 297 feet; thence South 47° 20'
West, 297 feet; thence South 49° 04' West, 272.50 feet; thence South 58°
35' West, 242.30 feet; thence South 55° 0' West, 245.5 feet; thence South
48° 46' West, 228 feet; thence South 47° 43' West, 265 feet; thence South
46° 15' West, 210.3 feet; thence South 44° 55' West, 333.5 feet; thence
South 47° 51' West, 484 feet; thence South 49° 41' West, 324.5 feet; thence
South 42° 42' West, 306.5 feet; thence South 36° 16' West, 97.7 feet;
thence South 28° 03' West, 391.30 feet; thence South 35° 46' West, 256.8
feet; thence South 31° 41' West, 189.3 feet; thence South 24° 41' West, 187
feet; thence South 14° 07' West, 420 feet; North 75° 06' West, 190 feet;
thence North 09° 05' East, 205.50 feet; thence North 01° 40' West, 303
feet; thence North 09° 35' East, 447 feet; thence North 00° 28' West, 236
feet; thence North 67° 29' West to the point of beginning.

APN'S: 90-210-050 and portion of 090

EXCEPTING THEREFROM:

Any portion of Parcels One, Two and Three above lying within the natural
bed of the Sacramento River below the line of ordinary high water.

Reserving to the Grantor the following mineral rights:  oil,
gas, and other petroleum interests lying more than 500 feet
below the surface of the ground.



# Exhibit 13

| Recorded in Official Records, Solano County | | 8/25/2003 |
|---|---|---|
| **Skip Thomson**<br>Assessor/Recorder | | 8:00 AM<br>AR21<br>16 |
| 01  Chicago Title Co | | |
| Doc#: **200300141581** | Titles:   1 | Pages:   4 |
| | Fees<br>Taxes<br>Other<br>PAID | 16.00<br>0.00<br>0.00<br>$16.00 |

72384 LR

RECORDING REQUESTED BY

AND WHEN RECORDED MAIL TO

CHICAGO TITLE COMPANY
388 Market Street, Suite 1300
San Francisco, CA 94111
Attn: Foreclosure Department

LOAN:                        TSG ORDER:                        TS#723841LR

## NOTICE OF DEFAULT AND ELECTION TO SELL UNDER
## DEED OF TRUST
## IMPORTANT NOTICE:

IF YOUR PROPERTY IS IN FORECLOSURE BECAUSE YOU ARE BEHIND IN YOUR PAYMENTS, IT MAY BE SOLD WITHOUT ANY COURT ACTION, and you may have the legal right to bring your account in good standing by paying all of your past due payments plus permitted costs and expenses within the time permitted by law for reinstatement of your account, which is normally five business days prior to the date set for the sale of your property. No sale date may be set until three months from the date this notice of default may be recorded (which date of recordation appears on this notice).

This amount is **$10,049,079.00 as of August 8, 2003** and will increase until your account becomes current

While your property is in foreclosure, you still must pay other obligations (such as insurance and taxes) required by your note and deed of trust or mortgage. If you fail to make future payments on the loan, pay taxes on the property, provide insurance on the property, or pay other obligations as required in the note and deed of trust or mortgage, the beneficiary or mortgagee may insist that you do so in order to reinstate your account in good standing. In addition, the beneficiary or mortgagee may require as a condition to reinstatement that you provide reliable written evidence that you paid all senior liens, property taxes, and hazard insurance premiums.

Upon your written request, the beneficiary or mortgagee will give you a written itemization of the entire amount you must pay. You may not have to pay the entire unpaid portion of your account, even though full payment was demanded, but you must pay all amounts in default at the time payment is made. However, you and your beneficiary or mortgagee may mutually agree in writing prior to the time the notice of sale is posted (which may not be earlier than the end of the three-month period stated above) to, among other things, (1) provide additional time in which to cure the default by transfer of the property or otherwise; or (2) establish a schedule of payments in order to cure your default; or both (1) and (2).

9640086ND

### NOTICE OF DEFAULT AND ELECTION TO SELL UNDER DEED OF TRUST

LOAN:                    TSG ORDER:                    TS#723841LR

Following the expiration of the time period referred to in the first paragraph of this notice, unless the obligation being foreclosed upon or a separate written agreement between you and your creditor permits a longer period, you have only the legal right to stop the sale of your property by paying the entire amount demanded by your creditor.

TO FIND OUT THE AMOUNT YOU MUST PAY, OR TO ARRANGE FOR PAYMENT TO STOP THE FORECLOSURE, OR IF YOUR PROPERTY IS IN FORECLOSURE FOR ANY OTHER REASON, CONTACT:

**KIMU MOTOKAZU, AKIO HISHIDA, AKIO TOMITA, TOSHIYUKI HENMI, HIKIOCHI MORI**
**C/O JOHNSON & JOHNSON, ATTORNEYS AT LAW**
**430 RAILROAD AVENUE**                    **ATTN: PETER JOHNSON, ESQ.**
**PITTSBURG CA 94565**                    **925-432-7447**

If you have any questions, you should contact a lawyer or the governmental agency which may have insured your loan.

Notwithstanding the fact that your property is in foreclosure, you may offer your property for sale, provided the sale is concluded prior to the conclusion of the foreclosure.

### REMEMBER, YOU MAY LOSE LEGAL RIGHTS
### IF YOU DO NOT TAKE PROMPT ACTION.

NOTICE IS HEREBY GIVEN: That **CHICAGO TITLE COMPANY, a California Corporation** is duly appointed Trustee under the following described Deed of Trust with Assignment of Rents dated _____, executed by **MEGA SAND, INCORPORATED, a California corporation ("Mega Sand"),** as Trustor , to secure certain obligations in favor of **TAIKI CORPORATION USA, an Oregon corporation, ("Taiki"),** as Beneficiary, recorded **February 8, 1994** as Instrument No. **1994-00015039,** in Book N/A , at Page N/A of Official Records, in the office of the Recorder of **SOLANO** County, California, describing the land therein as more fully described in said Deed of Trust.

The Deed of Trust encumbers certain real property more particularly described therein. Additionally, certain personal property and fixtures also serving as collateral for the obligations are described in the Deed of Trust. The real property, personal property and fixtures are hereinafter collectively referred to as the "Trust Property".

The Beneficiary may elect to conduct a unified sale under Commercial Code Section 9501(4)(a)(ii) of some or all of the personal property which may serve as collateral for the obligations pursuant to the Deed of Trust and other security agreements or pledge agreements in connection with the sale of the land, collateral, and fixtures described.

The Deed of Trust secures the payment of and/or performance of certain obligations (the "Obligations"). The Obligations are evidenced by, among other things, the secured instruments (the "Secured Instruments") more particularly described in Exhibit "A" hereto. A default in the payment and/or performance of any one of the Obligations evidenced by any one of the Secured Instruments, shall, at the option of the holder thereof, be deemed a default under the Deed of Trust and/or the Secured Instruments.

9640086ND

A breach of, and default in the obligations for which said Deed of Trust is security has occurred in that payment has not been made of:

1. The  principal sum which became due October 31, 2002 together with interest due from October 31, 1998;
2. Attorney's fees incurred and which will continue to accrue;
3. Foreclosure fees and costs.

THAT by reason thereof the beneficiary under said Deed of Trust, has executed and delivered to said duly appointed Trustee, a written Declaration of Default and Demand for Sale, and has deposited with said duly appointed Trustee, such Deed of Trust and all documents evidencing obligations secured thereby, and has declared and does hereby declare all sums secured thereby immediately due and payable and has elected and does hereby elect to cause the trust property to be sold to satisfy the obligations secured thereby.

DATE:  August 20, 2003

CHICAGO TITLE COMPANY,
A California corporation,  AS TRUSTEE

Laurie Rosa, Vice President

9640086ND

TS#723841LR                          EXHIBIT "A"

1.  Promissory Note dated February 2, 1994 in the original principal amount of $50,000.00 executed by Mega Sand in favor of Taiki;

2.  Loan Modification and Extension Agreement dated April 30, 1998 by and between Taiki and Mega Sand;

3.  Loan Modification and Extension Agreement dated April 30, 1998 by and between Taiki and Mega Sand;

4.  Loan Modification and Extension Agreement Future Advances dated April 30, 1998 by and between Taiki and Mega Sand;

5.  Promissory Note dated June 1, 1998 in the original principal amount of $4,814,043.00 executed by Taiki in favor of Kimu Motokazu ("Motokazu") (Motokazu Note);

6.  Promissory Note dated June 1, 1998 in the original principal amount of $1,469,270.00 executed by Taiki in favor of Toshiyuki Henmi ("Henmi")  (Henmi Note);

7.  Promissory Note dated June 1, 1998 in the original principal amount of $975,010.00 executed by Taiki in favor of Hikiochi Mori ("Mori") (Mori Note);

8.  Promissory Note dated June 1, 1998 in the original principal amount of $655,510.00 executed by Taiki in favor of Akio Hishida ("Hishida") (Hishida Note);

9.  Promissory Note dated October 23, 1998 in the original principal amount of $356,112.00 executed by Taiki in favor of Akio Tomita ("Tomita") (Tomita Note);

10. Pledge Agreement entered into November 1, 2000 by and among Taiki and Motokazu, Henmi, Mori, Hishida and Tomita;

11. Security Agreement dated November 1, 2002 by and between Mega Sand and Tomita;

12. Action by Unanimous Written Consent of Taiki Corporation, USA, an Oregon Corporation  dated November 1, 2000;

13. Collateral Assignment of Deeds of Trust dated November 17, 2000, recorded November 27, 2000 as Instrument #2000-00099959 in the Records of County of Solano.



END OF DOCUMENT

Exhibit 14

Recorded in Off. Records, Solano County

5/26/2005
1:48 PM
AR28
3N

**Skip Thomson**
Assessor/Recorder

P TCS

Doc#: **200500077802**

| | | Titles: 1 | Pages: 4 |
|---|---|---|---|

| Fees | 16.00 |
|---|---|
| Taxes | 0.00 |
| Other | 0.00 |
| PAID | $16.00 |

Recording requested by
and when recorded mail to:
Alliance Title Company
33 New Montgomery Street, Suite 290
San Francisco, California 94105
TS No.: 43321

———————————————————————— SPACE ABOVE THIS LINE FOR RECORDER'S USE ————

## NOTICE OF TRUSTEE'S SALE
Notice

YOU ARE IN DEFAULT UNDER A DEED OF TRUST DATED February 2, 1994. UNLESS YOU TAKE ACTION TO PROTECT YOUR PROPERTY, IT MAY BE SOLD AT A PUBLIC SALE. IF YOU NEED AN EXPLANATION OF THE NATURE OF THE PROCEEDING AGAINST YOU, YOU SHOULD CONTACT A LAWYER. On June 21, 2005, at 10:30 am, at the Santa Clara Street entrance to the City Hall, 555 Santa Clara Street, Vallejo, California; Alliance Title Company, as duly appointed trustee, will sell, at public auction to the highest bidder, in lawful money of the United States, all payable at the time of sale, that certain property situated in Solano County, California, known as assessor's parcel number 90-210-090 and 90-210-050, Decker Island, and further described in Exhibit "A" hereto. The Trustee disclaims any liability for any incorrectness of the street address and other common designation, if any, shown herein. The name and address of the Beneficiary (or Beneficiary's counsel or agent) at whose request the sale is being conducted is Jeffrey W. Shopoff, as Trustee c/o Shopoff & Cavallo LLP Attn: Jeffrey W. Shopoff, 353 Sacramento Street, Suite 1040, San Francisco, CA 94111. Directions to the property may be obtained pursuant to a written request submitted to the Beneficiary within ten (10) days from the first publication of this notice (June 1, 2005). Said sale will be made without covenant or warranty, express or implied, regarding title, possession or encumbrances, to pay the remaining unpaid balance of the obligations secured by and pursuant to the power of sale contained in that certain Deed of Trust with Assignment of Rents (together with any modifications thereto), executed by Mega Sand, Incorporated, a California corporation, as trustor, and recorded February 8, 1994, as Instrument Number 1994-00015039 in the office of the Solano County Recorder. The total amount of the unpaid balance of the obligations secured by the property to be sold and reasonable estimated costs, expenses and advances at the time of the initial publication of this Notice of Trustee's Sale is estimated to be $10,074,158.50, provided, however, prepayment premiums, accrued interest and advances will increase this figure prior to sale. Beneficiary's bid at said sale may include all or part of said amount. In addition to cash, the Trustee will accept a cashier's check drawn on a state or national bank, a check drawn by a state or federal credit union or a check drawn by a state or federal savings and loan association, savings association or savings bank specified in Section 5102 of the California Financial Code and authorized to do business in California, or other such funds as may be acceptable to the trustee. In the event tender other than cash is accepted, the Trustee may withhold the issuance of the Trustee's Deed Upon Sale until funds become available to the payee or endorsee as a matter of right. Beneficiary has elected and hereby elects to conduct a unified foreclosure sale pursuant to the provisions of California Commercial Code Section 9604(a)(1)(B)(ii) and to include in the nonjudicial foreclosure of the estate described in this Notice of Trustee's Sale all of the personal property and fixtures described in the Deed of Trust and in any other instruments in favor of Beneficiary, which property is more particularly described in Exhibit "B" hereto. Beneficiary reserves the right to revoke its election as to some or all of said personal property and/or fixtures, or to add additional personal property and/or fixtures to the election herein expressed, at Beneficiary's sole election, from time to time and at any time until the consummation of the trustee's sale to be conducted pursuant to the Deed of Trust and this Notice of Trustee's Sale. The property offered for sale excludes all funds held on account by the property receiver, if applicable.

Date: May 24, 2005

Alliance Title Company, 33 New Montgomery St., #290, San Francisco, CA 94105 {415} 442-5120

By: _____, Authorized Signature

**Sale Information at 714-573-1965 or logon to www.priorityposting.com**
**Use TS Number 43321**

Exhibit "A"
TS Number 43321

THOSE CERTAIN LANDS SITUATE IN SECTIONS 13, 14, 22, 23 AND 24, TOWNSHIP 3 NORTH, RANGE 2 EAST, MOUNT DIABLO BASE AND MERIDIAN, DESCRIBED AS FOLLOWS:

PARCEL ONE:

COMMENCING AT A POINT, WHICH IS NORTH 82° 41' EAST, 6383 FEET FROM AN ESTABLISHED POINT KNOWN AS U.S. GEOLOGICAL PIER NO. 4, SAID POINT BEING ON THE SOUTHEASTERLY LINE OF SACRAMENTO RIVER; THENCE FROM SAID POINT OF BEGINNING NORTH 47° 39' EAST, 4820.4 FEET ALONG THE SOUTHEASTERLY BOUNDARY OF SAID NEW CHANNEL OF SACRAMENTO RIVER TO A POINT BETWEEN THE LANDS FORMERLY OF H. GLASSELL AND OTHERS TO LAND ACQUIRED BY THE U.S. OF AMERICA; THENCE ALONG THE SAME, SOUTH 67° 29' EAST, 1584.6 FEET TO LAND OF W.R. HANSEN; THENCE ALONG SAID LINE SOUTH 0° 45' WEST, 264 FEET; THENCE SOUTH 11° 15' WEST, 132 FEET; THENCE SOUTH 17° 45' WEST, 396 FEET; THENCE SOUTH 16° WEST, 858 FEET; THENCE SOUTH 26° 30' W, 178.2 FEET; THENCE SOUTH 32° WEST, 396 FEET; THENCE SOUTH 28° 30' WEST, 396 FEET; THENCE SOUTH 39° 15' WEST, 198 FEET; THENCE SOUTH 46° 30' WEST, 442.2 FEET; THENCE SOUTH 51° WEST, 264 FEET; THENCE SOUTH 46° 30' WEST, 990 FEET; THENCE SOUTH 49° 30' WEST, 369.6 FEET; THENCE SOUTH 54° 30' WEST, 198 FEET; THENCE SOUTH 58° 15' WEST, 198 FEET; THENCE SOUTH 63° 30' WEST, 224.40 FEET; THENCE SOUTH 35° 15' WEST, 178.2 FEET; THENCE SOUTH 46° 30' WEST, 396 FEET; THENCE SOUTH 75° 53' WEST, 144.3 FEET; THENCE NORTH 34° 26' WEST, 2566 FEET TO THE POINT OF BEGINNING.

APN:  90-210-090 AND PORTION OF 090

PARCEL TWO:

BEGINNING AT A POINT WHICH IS NORTH 82° 41' EAST, 6383 FEET FROM AN ESTABLISHED POINT KNOWN AS U.S. GEOLOGICAL SURVEY PIER NO. 4, THENCE FROM SAID POINT OF BEGINNING, SOUTH 34° 26' EAST, 2566 FEET TO A POINT ON THE BOUNDARY LINE BETWEEN LANDS OF DOZIER AND PRESSLEY COMPANY AND LAND OF R.W. HANSEN; THENCE ALONG THE BOUNDARY LINE OF LANDS OF DOZIER AND PRESSLEY COMPANY, A CORPORATION, TO LANDS OF R.W. HANSEN AS FOLLOWS:  SOUTH 28° 8' WEST, 165.8 FEET; THENCE SOUTH 45° 30' WEST, 231 FEET; SOUTH 51° 20' WEST 640.2 FEET; SOUTH 38° 30' EAST, 142.6 FEET TO A POINT ON THE NORTH SHORE LINE OF SACRAMENTO RIVER, AS IT EXISTED IN THE YEAR 1880; THENCE FOLLOWING THE MEANDERINGS OF THE NORTH SHORE LINE OF SACRAMENTO RIVER AS THEN EXISTING AS FOLLOWS:  SOUTH 26° 15' WEST, 244 FEET; THENCE SOUTH 64° 34' WEST, 600.0 FEET; THENCE SOUTH 86° WEST, 429 FEET; THENCE NORTH 70° 15' WEST, 805.2 FEET; THENCE NORTH 67° 45' WEST, 1069.2 FEET; THENCE NORTH 67° 45' WEST, 587.4 FEET; THENCE NORTH 59° WEST, 161.9 FEET; THENCE NORTH 47° 39' EAST, 3680 FEET TO THE POINT OF BEGINNING.

APN:  90-210-090 AND PORTION OF 090

PARCEL THREE:

COMMENCING AT A POINT WHICH IS NORTH 82° 41' EAST 6383 FEET FROM AN ESTABLISHED POINT KNOWN AS H.C. GEOLOGICAL PIER NO. 4, SAID POINT BEING ON THE SOUTHEASTERLY LINE OF THE SACRAMENTO RIVER; THENCE NORTH 47° 39' EAST, 4820.4 FEET ALONG THE

Exhibit "A"
TS Number 43321

SOUTHEASTERLY BOUNDARY OF SAID NEW CHANNEL OF SACRAMENTO RIVER TO A POINT BETWEEN
THE LANDS FORMERLY OF H. GLASSELL AND OTHERS, TO LAND ACQUIRED BY THE U.S. OF
AMERICA; THENCE ALONG THE SAME, SOUTH 67° 29' EAST, 1584.6 FEET TO THE LAND OF W.R.
HANSEN AND POINT OF BEGINNING OF THE FOLLOWING DESCRIBED PARCEL OF LAND; THENCE
FROM SAID POINT OF BEGINNING SOUTH 0° 45' WEST, 264 FEET; THENCE SOUTH 11° 15' WEST,
132 FEET; THENCE SOUTH 17° 45' WEST, 395 FEET; THENCE SOUTH 16° 0' WEST, 856 FEET;
THENCE SOUTH 26° 30' WEST, 178.2 FEET; THENCE SOUTH 32° 0' WEST, 369 FEET; THENCE
SOUTH 28° 30' WEST, 396 FEET; THENCE SOUTH 39° 15' WEST, 198 FEET; THENCE SOUTH 46°
30' WEST, 442.2 FEET; THENCE SOUTH 51° 0' WEST, 264 FEET; THENCE SOUTH 46° 30' WEST,
990 FEET; THENCE SOUTH 49° 30' WEST, 396.6 FEET; THENCE SOUTH 54° 30' WEST, 198
FEET; THENCE SOUTH 58° 15' WEST, 198 FEET; THENCE SOUTH 63° 30' WEST, 224.4 FEET;
THENCE SOUTH 35° 15' WEST, 178.2 FEET; THENCE SOUTH 46° 30' WEST, 396 FEET; THENCE
SOUTH 75° 33' WEST, 144.3 FEET, THENCE SOUTH 28° 08' WEST, 165.8 FEET; THENCE SOUTH
45° 30' WEST, 231 FEET; THENCE SOUTH 51° 20' WEST, 640.20 FEET; THENCE SOUTH 39° 30'
EAST, 142.60 FEET; THENCE SOUTH 33° WEST, 22 FEET; THENCE SOUTH 54° 14' WEST, 196
FEET; THENCE SOUTH 49° 29' WEST, 241.7 FEET; THENCE SOUTH 47° 50' WEST, 533.5 FEET;
THENCE SOUTH 48° 46' WEST, 297 FEET; THENCE SOUTH 47° 20' WEST, 297 FEET; THENCE
SOUTH 49° 04' WEST, 272.50 FEET; THENCE SOUTH 58° 35' WEST, 242.30 FEET; THENCE
SOUTH 55° 0' WEST, 245.5 FEET; THENCE SOUTH 48° 46' WEST, 228 FEET; THENCE SOUTH 47°
43' WEST, 265 FEET; THENCE SOUTH 46° 15' WEST, 210.3 FEET; THENCE SOUTH 44° 55'
WEST, 333.5 FEET; THENCE SOUTH 47° 51' WEST, 484 FEET; THENCE SOUTH 49° 41' WEST,
324.5 FEET; THENCE SOUTH 42° 42' WEST, 306.5 FEET; THENCE SOUTH 36° 16' WEST, 97.7
FEET; THENCE SOUTH 28° 03' WEST, 391.30 FEET; THENCE SOUTH 35° 46' WEST, 256.8 FEET;
THENCE SOUTH 31° 41' WEST, 189.3 FEET; THENCE SOUTH 24° 41' WEST, 187 FEET; THENCE
SOUTH 14° 07' WEST, 420 FEET; THENCE NORTH 75° 06' WEST, 190 FEET; THENCE NORTH 9°
05' EAST, 205.50 FEET; THENCE NORTH 01° 40' WEST, 303 FEET; THENCE NORTH 09° 35'
EAST, 447 FEET; THENCE NORTH 00° 26' WEST, 236 FEET; THENCE NORTH 67° 29' WEST, TO
THE POINT OF BEGINNING.

APN:  90-210-050 AND PORTION OF 090

EXCEPTING THEREFROM ANY PORTION OF PARCELS ONE, TWO AND THREE ABOVE LYING WITHIN
THE NATURAL BED OF THE SACRAMENTO RIVER BELOW THE LINE OF ORDINARY HIGH WATER.

ALSO EXCEPTING THEREFROM THE FOLLOWING MINERAL RIGHTS:  OIL, GAS, AND OTHER
PETROLEUM INTERESTS LYING MORE THAN 500 FEET BELOW THE SURFACE OF THE GROUND, AS
RESERVED IN THE DEED RECORDED JULY 9, 1993, SERIES NO. 1993-00062208, OFFICIAL
RECORDS.

ASSESSOR'S PARCEL NOS.:  0090-210-050 AND A PORTION OF 090

Exhibit "B"
TS Number 43321

All furnishings, equipment, inventory, accounts, and other personal property assets of every nature and kind, tangible and intangible, including but not limited to, Trustor's interests as Lessee uner lease pursuant to which Trustor leases the premises commonly known as 110 L Street, Suite 2, Antioch, CA.

END OF
DOCUMENT

This is certified to be an exact reproduction of the filed record if certification is imprinted in purple ink, bearing date of issuance and an original signature of the Assessor/Recorder or deputy.
MARC C. TONNESEN
Solano County Assessor/Recorder

By: _Deliah Ditt,_ Deputy

Issue Date: _7-1-10_

Copy No: _10-44982_



# Exhibit 15

Recording Requested by:
ALLIANCE TITLE COMPANY
------------------------------------------------
When Recorded Mail To:

Jeffrey W. Shopoff, as Trustee
c/o Shopoff & Cavallo LLP
Attn: Jeffrey W. Shopoff
353 Sacramento Street, Suite 1040
San Francisco, CA 94111
------------------------------------------------
Mail Tax Statements to:

Same as Above

| Recorded in Official Records, Solano County | | 6/28/2005 |
|---|---|---|
| **Skip Thomson** | | 1:21 PM |
| Assessor/Recorder | | AR59 |
| | | 22 |
| **P TCS** | | |
| Doc#: **200500096013** | Titles: 1 | Pages: 7 |
| | Fees | 25.00 |
| | Taxes | 0.00 |
| | Other | 0.00 |
| | PAID | $25.00 |

----------------------------SPACE ABOVE THIS LINE FOR RECORDER'S USE----------------------------

1. The Grantee herein was the Beneficiary.
2. The amount of the unpaid debt was $10,049,079.00.
3. The amount paid by the Grantee was $2,600,000.00.
4. The property is in Solano County, unincorporated area.
5. The Documentary Transfer Tax is $0.00.
6. The City Transfer Tax is $0.00.
7. The Monument Tax is $0.00.

ALLIANCE TITLE COMPANY


By: _____          1st DEED OF TRUST
   Authorized Signature

--------------------------------------------------------------------------------------------------

Trustee's Sale No: 43321
Title Order No: 1125425

# TRUSTEE'S DEED UPON SALE


Parcel No: 0090-210-090 and 0090-210-050

ALLIANCE TITLE COMPANY, a corporation (the "Trustee"), as duly appointed trustee under that certain Deed of Trust with Assignment of Rents (the "Deed of Trust") more particularly described below, does hereby grant, but without covenant or warranty, express or implied, to **Jeffrey W. Shopoff, Esq., as Trustee or successor trustee, as trustee for the benefit of Laurence Colangelo, International Development and Consultants, Inc., Junho Hyon, and Hyon International, Inc., under Agreement dated July 2-3, 2000 (the "Grantee"),** the property more particularly described in Exhibits 'A' and 'B' attached hereto (the "Trust Property"), which property is situated in the County of **Solano**, State of California.

The conveyance is made pursuant to the powers conferred upon Trustee by the Deed of Trust, which Deed of Trust was dated as of February 2, 1994 and was executed by Mega Sand, Incorporated, a California corporation, as trustor, to Chicago Title Company, a California corporation, as trustee, and which Deed of Trust was **recorded February 8, 1994, as Instrument Number 1994-00015039** of Official Records in the office of the Recorder of said County and State.

The beneficiary of the Deed of Trust delivered to the Trustee a written Declaration of Default and Demand for Sale, and caused a Notice of Default and Election to Sell Under

Deed of Trust to be recorded in the office of the County Recorder of said County and State. Said beneficiary made due and proper demand upon the Trustee to sell said Trust Property pursuant to the terms and conditions of the Deed of Trust.

The posting and first publication of the Notice of Trustee's Sale of the Trust Property occurred not less than three months from the recording of said Notice of Default and Election to Sell Under Deed of Trust. The Trustee executed its Notice of Trustee's Sale stating that it would sell, at public auction, for cash, in lawful money of the United States, the Trust Property, which Notice of Trustee's Sale duly fixed the time and place of said sale as therein stated.

All requirements of law regarding the mailing, personal delivery, posting and publication of copies of said Notice of Default and Election to Sell Under Deed of Trust and of said Notice of Trustee's Sale have been complied with. The Trustee, in compliance with said Notice of Trustee's Sale, and in exercise of its powers under the Deed of Trust, sold the Trust Property at public auction on **June 21, 2005**. The Grantee, being the last and highest bidder at said sale, became the purchaser of said Trust Property for the amount bid, being **$2,600,000.00** cash, in lawful money of the United States, or by the satisfaction, pro tanto, of all or a portion of the obligations then secured by the Deed of Trust.

Dated: June 21, 2005

ALLIANCE TITLE COMPANY, Trustee

By:_____

Jasmine R. De Lung, Authorized Signature

*- MAIL TAX STATEMENTS AS DIRECTED ABOVE -*

Exhibit "A"
TS Number 43321

THOSE CERTAIN LANDS SITUATE IN SECTIONS 13, 14, 22, 23 AND 24, TOWNSHIP 3 NORTH, RANGE 2 EAST, MOUNT DIABLO BASE AND MERIDIAN, DESCRIBED AS FOLLOWS:

PARCEL ONE:

COMMENCING AT A POINT, WHICH IS NORTH 82° 41' EAST, 6383 FEET FROM AN ESTABLISHED POINT KNOWN AS U.S. GEOLOGICAL PIER NO. 4, SAID POINT BEING ON THE SOUTHEASTERLY LINE OF SACRAMENTO RIVER; THENCE FROM SAID POINT OF BEGINNING NORTH 47° 39' EAST, 4820.4 FEET ALONG THE SOUTHEASTERLY BOUNDARY OF SAID NEW CHANNEL OF SACRAMENTO RIVER TO A POINT BETWEEN THE LANDS FORMERLY OF H. GLASSELL AND OTHERS TO LAND ACQUIRED BY THE U.S. OF AMERICA; THENCE ALONG THE SAME, SOUTH 67° 29' EAST, 1584.6 FEET TO LAND OF W.R. HANSEN; THENCE ALONG SAID LINE SOUTH 0° 45' WEST, 264 FEET; THENCE SOUTH 11° 15' WEST, 132 FEET; THENCE SOUTH 17° 45' WEST, 396 FEET; THENCE SOUTH 16° WEST, 858 FEET; THENCE SOUTH 26° 30' W, 178.2 FEET; THENCE SOUTH 32° WEST, 396 FEET; THENCE SOUTH 28° 30' WEST, 396 FEET; THENCE SOUTH 39° 15' WEST, 198 FEET; THENCE SOUTH 46° 30' WEST, 442.2 FEET; THENCE SOUTH 51° WEST, 264 FEET; THENCE SOUTH 46° 30' WEST, 990 FEET; THENCE SOUTH 49° 30' WEST, 369.6 FEET; THENCE SOUTH 54° 30' WEST, 198 FEET; THENCE SOUTH 58° 15' WEST, 198 FEET; THENCE SOUTH 63° 30' WEST, 224.40 FEET; THENCE SOUTH 35° 15' WEST, 178.2 FEET; THENCE SOUTH 46° 30' WEST, 396 FEET; THENCE SOUTH 75° 53' WEST, 144.3 FEET; THENCE NORTH 34° 26' WEST, 2566 FEET TO THE POINT OF BEGINNING.

APN:  90-210-090 AND PORTION OF 090

PARCEL TWO:

BEGINNING AT A POINT WHICH IS NORTH 82° 41' EAST, 6383 FEET FROM AN ESTABLISHED POINT KNOWN AS U.S. GEOLOGICAL SURVEY PIER NO. 4, THENCE FROM SAID POINT OF BEGINNING, SOUTH 34° 26' EAST, 2566 FEET TO A POINT ON THE BOUNDARY LINE BETWEEN LANDS OF DOZIER AND PRESSLEY COMPANY AND LAND OF R.W. HANSEN; THENCE ALONG THE BOUNDARY LINE OF LANDS OF DOZIER AND PRESSLEY COMPANY, A CORPORATION, TO LANDS OF R.W. HANSEN AS FOLLOWS:  SOUTH 28° 8' WEST, 165.8 FEET; THENCE SOUTH 45° 30' WEST, 231 FEET; SOUTH 51° 20' WEST 640.2 FEET; SOUTH 38° 30' EAST, 142.6 FEET TO A POINT ON THE NORTH SHORE LINE OF SACRAMENTO RIVER, AS IT EXISTED IN THE YEAR 1880; THENCE FOLLOWING THE MEANDERINGS OF THE NORTH SHORE LINE OF SACRAMENTO RIVER AS THEN EXISTING AS FOLLOWS:  SOUTH 26° 15' WEST, 244 FEET; THENCE SOUTH 64° 34' WEST, 600.0 FEET; THENCE SOUTH 86° WEST, 429 FEET; THENCE NORTH 70° 15' WEST, 805.2 FEET; THENCE NORTH 67° 45' WEST, 1069.2 FEET; THENCE NORTH 67° 45' WEST, 587.4 FEET; THENCE NORTH 59° WEST, 161.9 FEET; THENCE NORTH 47° 39' EAST, 3680 FEET TO THE POINT OF BEGINNING.

APN:  90-210-090 AND PORTION OF 090

PARCEL THREE:

COMMENCING AT A POINT WHICH IS NORTH 82° 41' EAST 6383 FEET FROM AN ESTABLISHED POINT KNOWN AS H.C. GEOLOGICAL PIER NO. 4, SAID POINT BEING ON THE SOUTHEASTERLY LINE OF THE SACRAMENTO RIVER; THENCE NORTH 47° 39' EAST, 4820.4 FEET ALONG THE

Exhibit "A"
TS Number 43321

SOUTHEASTERLY BOUNDARY OF SAID NEW CHANNEL OF SACRAMENTO RIVER TO A POINT BETWEEN
THE LANDS FORMERLY OF H. GLASSELL AND OTHERS, TO LAND ACQUIRED BY THE U.S. OF
AMERICA; THENCE ALONG THE SAME, SOUTH 67° 29' EAST, 1584.6 FEET TO THE LAND OF W.R.
HANSEN AND POINT OF BEGINNING OF THE FOLLOWING DESCRIBED PARCEL OF LAND; THENCE
FROM SAID POINT OF BEGINNING SOUTH 0° 45' WEST, 264 FEET; THENCE SOUTH 11° 15' WEST,
132 FEET; THENCE SOUTH 17° 45' WEST, 395 FEET; THENCE SOUTH 16° 0' WEST, 856 FEET;
THENCE SOUTH 26° 30' WEST, 178.2 FEET; THENCE SOUTH 32° 0' WEST, 369 FEET; THENCE
SOUTH 28° 30' WEST, 396 FEET; THENCE SOUTH 39° 15' WEST, 198 FEET; THENCE SOUTH 46°
30' WEST, 442.2 FEET; THENCE SOUTH 51° 0' WEST, 264 FEET; THENCE SOUTH 46° 30' WEST,
990 FEET; THENCE SOUTH 49° 30' WEST, 396.6 FEET; THENCE SOUTH 54° 30' WEST, 198
FEET; THENCE SOUTH 58° 15' WEST, 198 FEET; THENCE SOUTH 63° 30' WEST, 224.4 FEET;
THENCE SOUTH 35° 15' WEST, 178.2 FEET; THENCE SOUTH 46° 30' WEST, 396 FEET; THENCE
SOUTH 75° 33' WEST, 144.3 FEET, THENCE SOUTH 28° 08' WEST, 165.8 FEET; THENCE SOUTH
45° 30' WEST, 231 FEET; THENCE SOUTH 51° 20' WEST, 640.20 FEET; THENCE SOUTH 39° 30'
EAST, 142.60 FEET; THENCE SOUTH 33° WEST, 22 FEET; THENCE SOUTH 54° 14' WEST, 196
FEET; THENCE SOUTH 49° 29' WEST, 241.7 FEET; THENCE SOUTH 47° 50' WEST, 533.5 FEET;
THENCE SOUTH 48° 46' WEST, 297 FEET; THENCE SOUTH 47° 20' WEST, 297 FEET; THENCE
SOUTH 49° 04' WEST, 272.50 FEET; THENCE SOUTH 58° 35' WEST, 242.30 FEET; THENCE
SOUTH 55° 0' WEST, 245.5 FEET; THENCE SOUTH 48° 46' WEST, 228 FEET; THENCE SOUTH 47°
43' WEST, 265 FEET; THENCE SOUTH 46° 15' WEST, 210.3 FEET; THENCE SOUTH 44° 55'
WEST, 333.5 FEET; THENCE SOUTH 47° 51' WEST, 484 FEET; THENCE SOUTH 49° 41' WEST,
324.5 FEET; THENCE SOUTH 42° 42' WEST, 306.5 FEET; THENCE SOUTH 36° 16' WEST, 97.7
FEET; THENCE SOUTH 28° 03' WEST, 391.30 FEET; THENCE SOUTH 35° 46' WEST, 256.8 FEET;
THENCE SOUTH 31° 41' WEST, 189.3 FEET; THENCE SOUTH 24° 41' WEST, 187 FEET; THENCE
SOUTH 14° 07' WEST, 420 FEET; THENCE NORTH 75° 06' WEST, 190 FEET; THENCE NORTH 9°
05' EAST, 205.50 FEET; THENCE NORTH 01° 40' WEST, 303 FEET; THENCE NORTH 09° 35'
EAST, 447 FEET; THENCE NORTH 00° 26' WEST, 236 FEET; THENCE NORTH 67° 29' WEST, TO
THE POINT OF BEGINNING.

APN:  90-210-050 AND PORTION OF 090

EXCEPTING THEREFROM ANY PORTION OF PARCELS ONE, TWO AND THREE ABOVE LYING WITHIN
THE NATURAL BED OF THE SACRAMENTO RIVER BELOW THE LINE OF ORDINARY HIGH WATER.

ALSO EXCEPTING THEREFROM THE FOLLOWING MINERAL RIGHTS:  OIL, GAS, AND OTHER
PETROLEUM INTERESTS LYING MORE THAN 500 FEET BELOW THE SURFACE OF THE GROUND, AS
RESERVED IN THE DEED RECORDED JULY 9, 1993, SERIES NO. 1993-00062208, OFFICIAL
RECORDS.

ASSESSOR'S PARCEL NOS.:  0090-210-050 AND A PORTION OF 090

Exhibit "B"
TS Number 43321

All furnishings, equipment, inventory, accounts, and other personal property assets of every nature and kind, tangible and intangible, including but not limited to, Trustor's interests as Lessee uner lease pursuant to which Trustor leases the premises commonly known as 110 L Street, Suite 2, Antioch, CA.

END OF
DOCUMENT

6

STATE OF CALIFORNIA                          } ss.
COUNTY OF SAN FRANCISCO                       }

On June 27, 2005, before me, _Jasmine Rae De Lung_____ , personally
appeared Jasmine R. de Lung, personally known to me (or proved to me on
the basis of satisfactory evidence) to be the person(s) whose name(s)
is/are subscribed to the within instrument and acknowledged to me that
he/she/they executed the same in his/her/their authorized capacity(ies),
and that by his/her/their signature(s) on the instrument the person(s),
or the entity upon behalf of which the person(s) acted, executed the
instrument.


WITNESS my hand and official seal.

Signature _____

M. R. EINSUND
Commission # 1533957
Notary Public - California
Alameda County
My Comm. Expires Dec 12, 2008

# Government Code 27361.7

I certify under penalty of perjury that the notary seal on the document to which this statement is attached reads as follows:

Name of Notary  M.B. EINBUND

Commission Number  1533957

Commissioned in  ALAMEDA

Date Commission Expires  DEC 12, 2008

Date: 6/28/05    X _____
By:

TCS

Firm Name (if any)

END OF
DOCUMENT

# Exhibit 16

`JUNHO HYON
725 LIVINGSTON PLACE
RIO VISTA, CA 94571
707 374-5133

JUNHO HYON, IN PRO PER

ENDORSED FILED
SOLANO SUPERIOR COURT

13 APR 24  PM 1:49

BY_____ ·D̶      MCESSY
                DEPUTY CLERK

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SOLANO

Case No. FCS041402

JUNHO HYON,

        Plaintiff,

      vs.

HAROLD J. LIGHT; LAW OFFICES
OF HAROLD J. LIGHT;
ROBERT J. STUMPF, JR.;
SHEPPARD, MULLIN, RICHTER &
HAMPTON LLP

        Defendants,

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

*Scott L. Kays*

Assigned to Judge ~~Scott Daniels~~
Dept.16, for all purposes
   *16*

**PLAINTIFF'S FIRST AMENDED
COMPLAINT FOR**

**(1) BREACH OF FIDUCIARY DUTY**

**(2) CONSTRUCTIVE FRAUD**

**(3) FRAUD**

**(4) NEGLIGENCE**

**(5) BREACH OF COVENANT OF
    GOOD FAITH AND FAIR DEALING**

Plaintiff, Junho Hyon, In Pro Per, complains and for causes of action alleges as follows:

**PARTIES**

1. Defendant, Harold J. Light ("Light"), is, and at all times herein mentioned was, a

resident of the County of Los Angeles, State of California.

1

2. Defendant, Light, is, and at all times mentioned., was doing business as with principal place of business in the City of West Los Angeles, County of Los Angeles, State of California.

3. Defendant, Law Offices of Harold J. Light ("Law Offices of Light), is, and at all times mentioned., was doing business as with the principal place of business in the City of Los Angeles, County of Los Angeles, State of California.

4. Defendant, Robert J. Stumpf, Jr. ("Stumpf"), is, and at all times herein mentioned was, a resident of the County of San Francisco, State of California.

5. Defendant, Stumpf, is, and at all times mentioned., was doing business as with principal place of business in the City of San Francisco, County of San Francisco, State of California.

6. Defendant, Sheppard, Mullion, Richter & Hampton LLP ("Sheppard"), is, and at all times mentioned., was doing business as with the principal place of business in the City of San Francisco, County of San Francisco, State of California.

## GENERAL ALLEGATIONS

7. Plaintiff is filing this Complaint based on his discovery of Light's wrongful conduct and Stumpf's wrongful conduct last November. *Complaint Filed on 3 - 15 - 13*

8. Venue in this County is proper because Light was a defendant in the case "JUNHO HYON vs. SHOPOFF & CAVALLO et al" Case No. FCS039786 pending in the Court of Judge Scott L. Kays and he was dismissed from the Court recently.

2

9. Venue is this County is proper because Light and Stumpf had been closely involved each other in the appeal from Judge Curtis Karnow's decision on the interpleader lawsuit which Jeffrey W. Shopoff ("Shopoff").

10. **Plaintiff believes the gist of this Complaint is that Light and Stumpf have known Shopoff's interpleader lawsuit against plaintiff was illegal and void, but they have hidden it from plaintiff.**

11. In September 2004, plaintiff's lawyer Shopoff filed an interpleader lawsuit against plaintiff and others as trustee for plaintiff. Shopoff claimed in his interpleader lawsuit that plaintiff named him trustee. **Plaintiff never has named him trustee.**

12. Upon the interpleader lawsuit, the others joined Shopoff and conspired against plaintiff. Plaintiff believes Light and Stumpf have known their conspiracies.

13. Upon the lawsuit, Light started to represent plaintiff.

14. Judge Curtis A. Karnow ("Judge Karnow") had presided over the lawsuit. Plaintiff had demanded a jury trial, believing he must have a jury trial to win. But Judge Karnow denied his demands, citing an interpleader lawsuit does not require a jury trial. Then, he had sided with Shopoff and others. After his bench trial, Judge Karnow issued fabricated "Statement of Decision" in favor of Shopoff and others.

15. Plaintiff appealed, through Stumpf, from the judge's decision. Stumpf pleaded with the Appeal Court to grant plaintiff a jury trial. But the Court ruled against him, citing an interpleader lawsuit does not require a jury trial. Plaintiff petitioned to Supreme Court of California, but the Court denied his petition.

16. Last November, plaintiff discovered from a paralegal that it was wrongful conduct for Light to have let Judge Karnow assume that Shopoff was plaintiff's trustee.

3

Furthermore, the paralegal said that Light should have tried to stop Judge Karnow from his proceedings. **Plaintiff did not know of Light's wrongful conduct until the paralegal told it to him in November 2012.**

17. Plaintiff believes Light should have done all means to stop Judge Karnow's proceedings such as filing complaint with Commission on Judicial Performance and Peremptory Challenge to the judge.

18. Plaintiff believes Light should also have reported to the State Bar that Shopoff's interpleader lawsuit was illegal and requested the Bar to investigate Shopoff.

19. **Light had the evidence that Shopoff has never been plaintiff's trustee. He should have presented the evidence to Judge Karnow. Instead, he let Judge Karnow assume Shopoff was plaintiff's trustee.**

20. When plaintiff said to Light, "I cannot take anymore with Judge Karnow's misconduct. Do something to stop him." Light said to him, "I am trying in order to appeal. He gave plaintiff a false expectation that he win the appeal. Light refused to file appeal. This is constructive fraud. He also had said to plaintiff, "I will file complaint with Commission on Judicial Performance." Light had repeatedly given plaintiff false expectations that he may win. This is constructive fraud. Light had refused to file it with the Commission despite plaintiff's repeated requests. Plaintiff had filed it in vain.

21. **Plaintiff believes Light knew an interpleader lawsuit does not require a jury trial when Shopoff filed the lawsuit. Plaintiff believes Light had committed serious fraud.**

4

22. **Plaintiff believes Light had hidden his true intention to allow that Shopoff was trustee for plaintiff.**

23. Light's wrongful conduct caused Judge Karnow to side with Shopoff and other defendants. It caused them to file their fraudulent motions to appoint a receiver. It caused Judge Karnow to appoint the receiver.

24. Plaintiff believes that Light has known or should have known the receiver Donald Savage (Receiver Savage) has broken laws:

25. *Cal. Rules of Ct., Rule 3.1179 (a)*: The receiver is the agent of the court and not any party, and is neutral, and acts for the benefit of all who may have an interest in the receivership property, and hold assets for the court and not for the plaintiff or the defendants.

Receiver Savage has been the agent of Shopoff and other defendants, and has been not neutral, and has acted for the benefit of Shopoff and other defendant, and has never held assets (Decker Island) for the court and has held for them.

Light has never argued that Receiver Savage has broken the law with Judge Karnow. The law also says, "Being an officer or representative of court, the receiver is subject to the court's direction. Receiver Savage has been subject to Shopoff's direction and other defendants' directions. Light has never argued that Receiver Savage has been subject to their directions.

26. *Code Civ. Proc. 567: see 486.10* et seq.: A receiver takes an oath to perform his or her duties faithfully and gives a bond to the effect that he or she will faithfully discharge the duties of receiver in the action and **obey the orders of the court.** The

law also says, "A receiver stands in the position of a court-appointed fiduciary.

Receiver Savage has acted faithfully for Shopoff and other defendants.

Light has never argued with Judge Karnow that Receiver Savage has acted faithfully

for them, not for the court.

27. If Light had argued that Receiver Savage had broken laws, plaintiff believes he might

have won the trial.

Consequence of Light's wrongful conduct caused Shopoff to sell Decker Island for

$6.6 million over plaintiff's fierce objection. It caused Shopoff and others to receive

money from the sale and **plaintiff to receive no money**, although he owned about

66% of the island.

28. Light's wrongful conduct caused Judge Karnow to award over $1 million to Shopoff

and others for their attorneys' fees from the sale's proceeds.

29. Light's wrongful conduct caused Shopoff to file his fraudulent 2007 tax return on

plaintiff's behalf. Shopoff reported to IRS that plaintiff made a capital gain of

$630,000 from the sale of Decker Island, whereas I received no money from the sale.

Shopoff paid $144,000 to Franchise Tax Board from the sale's proceeds for the

plaintiff's capital gain. **Shopoff received $1,443,807.07 from the sale. In addition,**

**he embezzled over a half million dollars.**

30. In fact, there was no capital gain because plaintiff acquired Decker Island in exchange

for a $7.6 million judgment against the former owner of the island.

31. Plaintiff requested Light to file a motion to try Shopoff with Judge Karnow for

Shopoff's fraudulent tax return on behalf of plaintiff. But Light refused his request

6

because he owed him money. If Light had tried Shopoff, plaintiff might have won Judge Karnow's bench trial.

32. Plaintiff believes Light had unfairly overcharged him. The amount of his total billing was $1,916,027.60. Plaintiff had paid him $1,177,060.02. Thus, plaintiff still owes him $738,967.58. Light put a lien on Decker Island. Plaintiff's records show Light had billed him $1,176,060.02 from July 2004 when he retained him to April 2006 a month before Judge Karnow's decision in May 2006. Light knew plaintiff had to borrow money to pay him. Plaintiff believes this is breach of covenant of good faith and fair dealing.

33. Light charged $2,900 twice in the bill of January 2006. Plaintiff called him and asked. He said he made an honest mistake. Plaintiff doubts whether it was an honest mistake.

34. Light had unfairly billed plaintiff $49,240.27 for the trial he volunteered to try for free in June 2009 in Los Angeles. This is constructive fraud. Furthermore, he intentionally lost the trial.

35. Light volunteered to try for free because he wanted to get money which was attributable to plaintiff at the Superior Court in San Francisco. He asked plaintiff to write a declaration to support his motion to obtain the money against his lien on Decker Island if he would win the trial in Los Angeles. Plaintiff agreed with him. Light drafted the declaration, and plaintiff signed it. However, the court rejected his motion.

36. Light lost interest in winning the trial and had tried to lose it. Light was censured by the trial Judge John Wiley for his intentionally losing the trial. As a result, defendant

7

Eric Selten was granted $736,809.13 from the money held at the Superior Court in San Francisco.

37. Judge Wiley's censured ruling:

"Respectfully, of course, ten minutes of cross-examination on one of the most vulnerable time periods would have deflated the whole raft. One hole lets out all the air. So review all of these hours. Pick the juiciest target. Barbecue Mr. Selten and how he's padding, his method is invalidated. There goes the preponderance of evidence. It's a cross-examiner's dream. You pick where you shoot on raft. Anywhere you like. He's laid it all out. You just need one puncture hole to destroy the faith that the finder of fact should place in this method. Not even one minute of trial was devoted to that effort. In effect, there's been no serious challenge to the accuracy of the reconstruction, which I accept. I said as much on the record last night. Mr. Selten was on the stand again today. No such attack."

38. After the trial in Los Angeles, Light told plaintiff to file bankruptcy to wipe out money plaintiff owed him and others.

39. Plaintiff appealed to the Court of Appeal in Los Angeles, but could not find a contingency lawyer. The circumstance forced plaintiff to represent himself. Eventually he lost.

40. In October 2009, Plaintiff sued Light in San Francisco because he neglected to amend cross-complaint at the Judge Karnow's trial. The Opinion of the Court of Appeal in San Francisco says, "The trial court (Judge Karnow) recognized that Hyon "may be able to state damages," particularly associated with the $2.6 million debt he incurred in the GSA, and thus granted him the opportunity to file a "new amended cross-

8

complaint" to plead "other damages which are not speculative," but an amended pleading was never properly filed. Nor did Hyon demonstrate that an amendment would cure the defect in his cross-complaint."

41. Plaintiff had searched diligently a contingency lawyer in vain. Eventually the Superior Court dismissed his lawsuit against Light.

42. Shortly after Judge Wiley's bench trial, plaintiff went to Free Legal Counseling at Vallejo and talked with a lawyer about Light's wrong conduct at the trial. The lawyer told plaintiff that he had 4 years to sue Light. Thus, plaintiff filed Complaint against him along with others last May. The lawsuit is pending at Judge Kays' court.

43. Plaintiff learned that statute of limitations to sue Light is one year, not 4 years. Thus, he dismissed Light from the lawsuit last month and then filed Complaint against him with this Court.

44. Light's wrongful conduct caused plaintiff to lose his life of running a sand-mining business on Decker Island, which might last beyond a half century. It caused plaintiff and his wife to lose a home in Rio Vista. It caused plaintiff to send her to their daughter's place because he could not afford her living with him. It caused him to receive food from Rio Vista Community Services. It caused him also to receive financial assistances from RVCS for utilities.

45. Plaintiff had borrowed over $3 million from friends, relatives, and a family member to finance litigations. His daughter mortgaged her home to help him. He cannot die in peace until he pays them back.

46. Light's friend referred plaintiff to Stumpf of Sheppard in order to appeal from Judge Karnow's decision. Plaintiff retained Stumpf.

9

47. Last November, plaintiff discovered from the same paralegal mentioned above that it was wrongful conduct for Stumpf to file Opening Brief with Court of Appeal in San Francisco by pleading with the Court to grant plaintiff a jury trial. **Plaintiff believes Stumpf knew that an interpleader lawsuit does not require a jury trial.** Plaintiff did not know of his wrongful conduct until the paralegal told it to him in November 2012.

48. Plaintiff believes Stumpf has known Shopoff's interpleader lawsuit was illegal and void. He believes Stumpf had committed serious **fraud**.

49. Stumpf knew Shopoff had fabricated his interpleader lawsuit which states Shopoff was named by plaintiff as Trustee to take possession of the Recovery and to preserve it for the benefit of plaintiff. Stumpf knew that plaintiff has never named Shopoff as trustee.

50. Stumpf knew Shopoff fabricated his interpleader lawsuit which states that "this action is brought to resolve multiple, conflicting claims with respect to the interests of the parties hereto in the Recovery from successful litigation, and to seek protection, for the benefit of all claimants, from destruction or loss of value to the Recovery". Stumpf knew that there are no "multiple claims" and "destruction or loss of value to the Recovery".

51. Stumpf said in the opening brief, "Shopoff filed a complaint in interpleader for ostensible purpose of resolving "multiple, conflicting claims with respect to the interests" of the named defendants" In fact, Stumpf knew there was no "multiple, conflicting claims".

10

52. If Stumpf had argued in the opening brief that there was no "multiple, conflicting claims" and Shopoff was never plaintiff's trustee, plaintiff might have won the appeal.

53. **Instead, Stumpf pleaded with the Appeal Court to grant plaintiff a jury trial, knowing it was impossible to obtain it.**

54. Stumpf refused plaintiff's request to obtain the escrow instruction of the sale of Decker Island. He breached fiduciary duty.

55. Stumpf refused plaintiff's request of filing a motion to try Shopoff on his fraudulent tax return on plaintiff's behalf. He breached fiduciary duty.

56. Stumpf has known or should have known Receiver Savage had broken laws.

57. Stumpf has never argued in the opening brief that Receiver Savage has broken laws. If Stumpf had argued that Receiver Savage has broken them, plaintiff might have won the appeal.

58. Stumpf's wrongful conduct has ruined plaintiff financially.

59. A record shows that plaintiff had paid Stumpf $249,305.

60. **The key issue of this complaint is that Light and Stumpf accepted Shopoff's fraudulent claim of plaintiff's trustee. Consequently, plaintiff has been financially devastated.**

### FIRST CAUSE OF ACTON
#### (Breach of Fiduciary Duty)

61. Plaintiff incorporates herein by reference the allegations made in paragraph 7, 10, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 31, 35, 36, 37, 38, 40, 44 and 60 inclusive, as though fully set forth herein.

11

62. At all times relevant herein, Light had owed Plaintiff "Fiduciary Duty" to perform truthfully, faithfully and loyally for Plaintiff. But Light had breached the duty.

63. Plaintiff incorporates herein by reference the allegations made in paragraph 7, 10, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 31, 35, 36, 37, 38, 40, 44 and 60 inclusive, as though fully set forth herein.

64. At all times relevant herein, Law Offices of Light had owed Plaintiff "Fiduciary Duty" to perform truthfully, faithfully and loyally for Plaintiff. But Law Offices of Light had breached the duty.

65. Plaintiff incorporates herein by reference the allegations made in paragraph 7, 10, 15, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, 58 and 60 inclusive, as though fully set forth herein.

66. At all times relevant herein, Stumpf had owed Plaintiff "Fiduciary Duty" to perform truthfully, faithfully and loyally for Plaintiff. But Stumpf had breached the duty.

67. Plaintiff incorporates herein by reference the allegations made in paragraph 7, 10, 15, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, 58 and 60 inclusive, as though fully set forth herein.

68. At all times relevant herein, Sheppard had owed Plaintiff "Fiduciary Duty" to perform truthfully, faithfully and loyally for Plaintiff. But Sheppard had breached the duty.

## SECOND CAUSE OF ACTION
### (Constructive Fraud)

69. Plaintiff incorporates herein by reference the allegation made in paragraph 20 inclusive, as though fully set forth herein.

70. At all times relevant herein, Light had concealed his true intention to harm Plaintiff. Thus, Light has committed "Constructive Fraud".

71. Plaintiff incorporates herein by reference the allegation made in paragraph 20 inclusive, as though fully set forth herein.

72. At all times relevant herein, Law Office of Light had concealed its true intention to harm Plaintiff. Thus, it had committed "Constructive Fraud".

### THIRD CAUSE OF ACTION
### (Fraud)

73. Plaintiff incorporates herein by reference the allegation made in paragraph 21 inclusive, as though fully set forth herein.

74. At all times relevant herein, Light had concealed the fact that an interpleader lawsuit does not require a jury trial. Thus, he had committed fraud.

75. Plaintiff incorporates herein by reference the allegation made in paragraph 21 inclusive, as though fully set forth herein.

76. At all times relevant herein, Law Offices of Light had concealed the fact that an interpleader lawsuit does not require a jury trial. Thus, it had committed fraud.

77. Plaintiff incorporated herein by reference the allegation made in paragraph 47 and 48 inclusive, as though fully set forth herein.

78. At all times relevant herein, Stumpf had concealed the fact that an interpleader lawsuit does not require a jury trial. Thus, he had committed fraud.

79. Plaintiff incur[orated herein by reference the allegation made in paragraph 47 and 48 inclusive, as though fully set forth herein.

13

1 80. At all times relevant herein, Sheppard had concealed the fact that an interpleader

2   lawsuit does not require a jury trial. Thus, it had committed fraud.

**FOURTH CAUSE OF ACTION**
(Negligence)

81. Plaintiff incorporated herein by reference the allegations made in paragraph 7, 10, 16,

  17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 35, 36, 37, 38, 40, 44, 45 and 60

  inclusive, as though fully set forth herein.

82. At all times relevant herein, Light had owed Plaintiff a legal duty to care Plaintiff, but

  he had failed to care him. Thus, he had breached the legal duty. As a result, Plaintiff's

  life has been devastated.

83. Plaintiff incorporated herein by reference the allegations made in paragraph 7, 10, 16,

  17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 35, 36, 37, 38, 40, 44, 45 and 60

  inclusive, as though fully set forth herein.

84. At all times relevant herein, Law Offices of Light had owed Plaintiff a legal duty to

  care Plaintiff, but it had failed to care him. Thus, it had breached the legal duty. As a

  result, Plaintiff's life has been devastated.

85. Plaintiff incorporated herein by reference the allegations made in paragraph 7, 10, 15,

  47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 25, 26, 57, 58 and 60 inclusive, as though fully

  set forth herein.

86. At all times relevant herein, Stumpf had owed Plaintiff a legal duty to care Plaintiff,

  but he had failed to care him. Thus, he had breached the legal duty. As a result,

  Plaintiff's life has been devastated.

14

87. Plaintiff incorporated herein by reference the allegations made in paragraph 7, 10, 15, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57 and 58 inclusive, as though fully set forth herein.

88. At all times relevant herein, Sheppard had owed Plaintiff a legal duty to care Plaintiff, but it had failed to care him. Thus, it had breached the legal duty. As a result, Plaintiff has been financially devastated.

**FIFTH CAUSE OF ACTION**
**(Breach of Covenant of Good Faith and Fair Dealing)**

89. Plaintiff incorporated herein by reference the allegations made in paragraph 32, 33 and 34 inclusive, as though fully set forth herein.

90. At all times relevant herein, Light had owed Plaintiff "Good Faith and Fair Dealing", but he had breached the covenant of good faith and fair dealing.

91. Plaintiff incorporated herein by reference the allegations made in paragraph 32, 33 and 34 inclusive, as though fully set forth herein.

92. At all times relevant herein, Law Offices of Light had owed Plaintiff "Good Faith and Fair Dealing", but it had breached the covenant of good faith and fair dealing.

93. Plaintiff incorporated herein by reference the allegation made in paragraph 59 inclusive, as though fully set forth herein.

94. At all times relevant herein, Stumpf had owed Plaintiff "Good Faith and Fair Dealing", but he breached the covenant of good faith and fair dealing.

95. Plaintiff incorporated herein by reference the allegations made in paragraph 59 inclusive, as though fully set forth herein.

96. At all times relevant herein, Sheppard had owed Plaintiff "Good Faith and Fair Dealing", but it breached the covenant of good faith and fair dealing.

15

WHEREFORE, Plaintiff prays for relief as follows:

**<u>JURY TRIAL</u>**

97.  Plaintiff hereby demands a trial by jury in this matter.

**<u>PRAYER</u>**

1.  For compensatory damages;

2.  For exemplary and punitive damages;

3.  For declaratory relief as may be ordered by the Court.

Dated:    March 29, 2013

Junho Hyon, in Pro Per

16

<u>PROOF OF SERVICE</u>

<u>STATE OF CALIFORNIA, COUNTY OF SOLANO</u>

<u>HYON V LIGHT, ET AL.</u>

**Solano County Superior Court, Case No. FCS041402**

I am a retiree in the County of Solano; I am over the age of eighteen years and not a party to the within entitled action; my address is 400 Bay Oaks, Rio Vista, California 94571.

April 24, 2013, I served "PALINTIFF'S FIRST AMENDED COMPLAINT " to the following Defendant in this action by placing true copies thereof enclosed in sealed envelopes addressed as follows:

By First Class Mail:

Lewis, Brisbois, Bisgaard & Smith LLP
333 Bush Street, Suite 1100
San Francisco, CA 94104

I declare under penalty of perjury under the laws of the State of California that the forgoing is true and correct.

Date: April 24, 2013

Gene Way